LEWIS & LLEWELLYN LLP
   Paul T. Llewellyn (Bar No. 216887)
   Marc R. Lewis (Bar No. 233306)
   Ryan B. Erickson (Bar No. 268239)
505 Montgomery Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 800-0590
Facsimile: (415) 390-2127
Email: pllewellyn@lewisllewellyn.com
       mlewis@lewisllewellyn.com
       rerickson@lewisllewellyn.com

GIBSON, DUNN & CRUTCHER LLP
   Frederick Brown (Bar No. 65316)
555 Mission Street, Suite 3000
San Francisco, California 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
Email: fbrown@gibsondunn.com

Attorneys for Plaintiff
SPARTA CONSULTING, INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| SPARTA CONSULTING, INC., <br><br> Plaintiff, <br><br> v. <br><br> COPART, INC., <br><br> Defendant. | CASE NO. <br><br> **COMPLAINT FOR:** <br><br> **(1) BREACH OF CONTRACT** <br><br> **(2) PROMISSORY ESTOPPEL** <br><br> **(3) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br><br> **(4) ACCOUNT STATED** <br><br> **(5) QUANTUM MERUIT** <br><br> **(6) UNJUST ENRICHMENT** <br><br> **(7) DECLARATORY RELIEF** <br><br> **(DEMAND FOR JURY TRIAL)** |

Plaintiff Sparta Consulting, Inc., for its complaint against defendant, Copart, Inc., alleges as follows:

## THE PARTIES

1. Plaintiff Sparta Consulting, Inc. ("Sparta") is a California corporation with its principal place of business located in Folsom, California. Sparta is an IT consulting company that specializes in the design and implementation of SAP-based Enterprise Resource Planning ("ERP") software solutions for its customers.

2. Defendant Copart, Inc., ("Copart") is a Delaware corporation with its principal place of business located in Dallas, Texas. Upon information and belief, Copart is a worldwide provider of online vehicle auctions and vehicle remarketing services. The company provides a full range of services for vehicle sellers to sell their vehicles primarily over the internet using online auctions. According to Copart's website, the company sells more than one million vehicles each year using its internet sales technology.

## JURISDICTION AND VENUE

3. This is an action between citizens of different states in which the amount in controversy exceeds $75,000, exclusive of interest and costs. Accordingly, this Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District. Among other things, the contract at issue in this dispute was negotiated, entered into, and performed in California. Additionally, pursuant to the contract at issue, Sparta and Copart agreed as follows: "Any action or proceeding arising from or relating to this Agreement may be brought in a court with jurisdiction of actions arising in the County of Solano, California and each Party irrevocably submits to the personal jurisdiction and venue of any such court in any such action or proceeding." *See* Ex. A, ¶ 19.14. Accordingly, this Court is the proper venue for this dispute, and the Court may exercise personal jurisdiction over Copart.

5. Pursuant to Local Rule 120(d) of the Eastern District of California, this matter is properly before the Sacramento Division, because a substantial part of the events or omissions

giving rise to the claims occurred in Solano County, California.

## FACTUAL ALLEGATIONS

**A.     General Background**

6.    For years, Copart has used an ERP system, known as the Copart Auction System ("CAS"), which Copart had developed internally. Upon information and belief, Copart and its vehicle-seller clients used the CAS system to coordinate the collection, storage, retrieval and sale of the sellers' vehicles.

7.    By 2010, it had become apparent to Copart that its CAS system and the company's other information technology management platforms were outdated, and needed to be upgraded and/or replaced with a new ERP system.

8.    As part of its plan to implement a new ERP system, Copart ultimately hired Sparta to design and implement the new system, known as "AIMOS," using an SAP-based software platform.

**B.     In October 2011, Copart Hires Sparta To Design And Build A Replacement ERP System In Two Phases: Design And Realization.**

9.    On October 6, 2011, Sparta and Copart executed an Implementation Services Agreement ("ISA"), the contract pursuant to which Sparta would design and implement a new ERP system for Copart. *See* Exhibit A. The ISA provides that it is governed by California law. *Id.* at ¶ 19.14.

10.   The parties agreed that the design and implementation of the new ERP system would proceed in two phases: (1) The "design" phase, whereby Sparta would design the new system; and (2) the "realization" phase, whereby Sparta would build and implement the design in accordance with the specifications documented in phase 1.

11.   At the same time Sparta and Copart entered into the ISA, they also agreed upon a Design Statement of Work ("Design SOW"), which further defined the services to be provided by Sparta under the design phase, and Copart's payment obligations for that phase. Thereafter, Sparta began to work on the design phase between approximately October 2011 and March 2012. Sparta completed the design phase in March 2012 to Copart's satisfaction, and in return,

Copart paid Sparta the agreed-upon amount of $3.7 million. Additionally, in March 2012, Copart paid Sparta a "bridge" payment of $1.4 million to cover the transition from the design phase to the realization phase, for a total payment of $5.1 million.

12. Before Sparta embarked on the realization phase of the AIMOS project (phase 2), and at Copart's request, Sparta conducted a thorough analysis of the amount of work that would be required to complete the realization phase, concluding that it would take approximately 193,000 hours of work. Thereafter, Copart engaged KPMG LLP ("KPMG"), one of the world's leading audit firms, to audit and validate that figure.

13. Copart concluded that Sparta's time estimate and proposed budget for phase 2 was an accurate and reasonable estimate for a project of this magnitude, based in part, upon information and belief, from input from KPMG.

14. Accordingly, on March 28, 2012, Sparta and Copart executed a Realization Statement of Work ("Realization SOW") for phase 2, which encompassed (i) the actual software coding and customization as designed and documented, and signed off by Copart in phase 1; and (ii) its deployment and integration across Copart's three major geographic areas: Canada, the United Kingdom and the United States.

15. Pursuant to the Realization SOW, Copart agreed to pay Sparta a total of $18.8 million for the build-out of the AIMOS system, and its deployment and integration across Canada, the United Kingdom and the United States. At Copart's insistence, Sparta agreed to receive payment of the $18.8 million in fees in ten installment payments, or "milestones," with the payments scheduled to occur between April 27, 2012 and May 1, 2013.

16. In addition to the payments set forth above, following the execution of the Realization SOW, the parties agreed to certain "change" orders, for a total of $750,000 in additional payments. This brought the total contract price for phase 2 of the AIMOS project, *i.e.* the amount Copart agreed to pay Sparta, to $19,630,000.

17. Pursuant to the Realization SOW, Copart further agreed to reimburse Sparta for travel expenses incurred up to 15% of the fixed fees due under the SOW, *i.e.* the equivalent of just under $3 million in reimbursable expenses.

4

**C.     Because Of Delays Attributable To Copart, Sparta Is Unable To Meet The Deadlines For The Scheduled Deployment The AIMOS System.**

18.     The first three milestones of the Realization SOW concerned the actual coding and customization of the AIMOS system documented in the design phase.  All subsequent milestones concerned the actual deployment and integration of this software across Copart's operations in Canada, the United Kingdom and the United States.  While the AIMOS system was to be deployed across these three geographic areas, Sparta developed and documented a system which provided a consistent, global and scalable platform, so that the vast majority of the work performed by Sparta for one geographic area could be applied across all three areas.

19.     Sparta completed the first three milestones of phase 2—the Realization SOW— to Copart's satisfaction.  For this work, Copart paid Sparta the agreed upon total of $5,440,000, consisting of two payments of $1,800,000 and one payment of $1,680,000.  (The third milestone payment was reduced by $200,000, since some of that work was transferred to the next milestone.)

20.     The remaining milestones under phase 2—the Realization SOW—concerned the actual implementation and deployment of the system in Copart's three key geographic markets.  For this to occur, the software would first be subject to User Acceptance and Integration Testing ("UAT Testing"), a process by which the software's performance was tested.

21.     The next "milestone" under the Realization SOW was the "UAT Canada" milestone, after which the system would "go live" in Canada.  This would then be followed by testing and deployment in the United Kingdom and then the United States.

22.     However, delays and other factors attributable to Copart contributed to the delay of the UAT-Canada milestone, as well as the remaining milestones.  Among the factors contributing to delay were the following:

  a.     *Copart's delay in developing a necessary portion of the integrated system*.  The implementation of AIMOS was dependent upon Copart's other operational systems for which Copart was solely responsible, one of which was known as ATOM.  However, the development and implementation of ATOM was repeatedly delayed by Copart.  And because

5

AIMOS and ATOM were intended to exist as a single, integrated system, Copart's delay in completing the ATOM system substantially delayed and impaired Sparta's ability to complete the remaining phases of the Realization SOW.

    b. ***Copart's demands for out-of-scope work***.  In the Realization SOW, the parties specifically agreed that "[t]his SOW describes the realization of the AIMOS design *as documented* in the collective output of the AIMOS design project."  Even though the parties had already agreed upon the scope of phase 2 of the AIMOS project, Copart sought to expand the scope of the engagement following each test cycle.  In doing so, Copart demanded that Sparta include numerous additional software functionalities and enhancements that were beyond the agreed upon design for the AIMOS system.  Sparta made numerous requests to freeze the project scope and requirements, but Copart refused to do so.  By changing the scope and requirements of the project, Sparta was required to complete a substantial amount of additional, out-of-scope work, and await Copart's testing and approval of these new functionalities.

    c. ***Copart's responsibility for the vast majority of bugs found during testing***.  During the UAT-Canada test cycles, Copart frequently claimed there were "bugs" in the software that needed to be fixed.  Sparta would fix them and then Copart would claim there were new bugs.  The result was that Copart was creating a moving target and was unreasonably withholding its approval.  More importantly, however, the vast majority of the bugs claimed by Copart were outside of Sparta's control.  Sparta devoted substantial resources to investigate these bugs, only to discover that they were mostly attributable to user error by Copart, inadequate-training of Copart personnel, defects in Copart's proprietary systems, and/or new testing scenarios outside the SOW.

    d. ***Inadequate resources devoted to testing.***  The delay was made worse by the unavailability of Copart business resources during the testing phases, and the fact that the relevant Copart personnel did not receive enough training to execute the testing.  Additionally, in 2013, Copart moved its IT headquarters from California to Texas, which caused many of Copart's best IT personnel to leave the company.  This loss of institutional and technical knowledge further delayed the completion of user acceptance testing and the completion of the

remaining work under the Realization SOW.

23. Whereas the Realization SOW anticipated that it would take 8 weeks to complete the entire UAT-Canada phase, as a result of the delays caused by Copart, Sparta was required to spend a total of 29 weeks on the UAT-Canada phase. Even then, Copart took the position that the UAT-Canada phase had not been completed to its satisfaction. Nevertheless, throughout this process, Sparta remained committed to the project. Sparta devoted substantial additional resources to the project, including tens of thousands of additional hours that were beyond the SOW. Indeed, at its peak, Sparta had approximately 80 professionals working long hours to complete the project. .

**D. In August 2013 Sparta And Copart Agree To Revise The Schedule For Various Phase 2 Milestones, But Copart Terminates The Contract "For Convenience" One Month Later.**

24. In light of the delays associated with the UAT-Canada milestone, on or around August 16, 2013, the parties entered into an Amendment to the ISA ("ISA Amendment"). Among other things, the ISA Amendment provided a mechanism to address the outstanding issues with respect to UAT-Canada milestone, and imposed new dates for the completion of the remaining work under the Realization SOW.

25. However, on September 17, 2013, just one month after it had agreed to a revised schedule for the completion of phase 2, and without any prior warning, Copart sent a notice to Sparta that it was terminating the ISA for "convenience." *See* Ex. B. The relevant provision of the ISA provides as follows:

> **15.2 Termination for Convenience.** Copart may terminate this Agreement for convenience by giving Service Provider [Sparta] written notice of the termination, which termination shall be effective on the date specified in such notice. In the event that Copart terminates this Agreement pursuant to this Section 15.2, then Copart shall pay [Sparta] only for the portion of the Services that have been performed and completed as of the termination date, as such portion agreed by Copart and calculated and documented by [Sparta's] project management software system.

Ex. A, ¶ 15.2.

7

### E. Rather Than Pay The Amounts Due To Sparta For Services Rendered, Copart Files A Sham Lawsuit In Texas.

26. Recognizing its obligation to pay Sparta for that portion of services performed and completed as of the September 17, 2013 termination date, in its termination notice, Copart invited Sparta to contact Copart regarding the amount it was owed pursuant to section 15.2 of the ISA. *See* Ex. B.

27. On October 18, 2013, Sparta responded to Copart's request, with a good faith, detailed analysis of the amount it believed it was entitled to under the ISA. In that analysis, Sparta pointed out, among other things, (a) Sparta had not been paid anything by Copart since August 2012, *i.e.* for more than a year; (b) at the time of termination, Sparta had expended nearly a quarter of a million professional hours on Copart's behalf (over 20% more than the original hours estimate); (c) the vast majority of the work for all remaining milestones, across all three geographic areas, had been completed—for example, at the time of termination, Canada go-live readiness was approximately 90% complete, and approximately 80% of the development and configuration work for the United Kingdom and United States rollout was complete; (d) the vast majority of the technical objects identified in the Realization SOW across all three geographic areas had been completed; and (e) up to 90% of the testing across all three geographic areas had been passed by Copart or was in progress at the time of termination. In light of these and other facts, Sparta was entitled to be paid over $12 million under section 15.2 of the ISA. This amount included unreimbursed expenses of just under $140,000 that were still outstanding at the time of termination. Sparta requested a response to its request by November 1, 2013.

28. Rather than address Sparta's proposal, or make its own proposal for a resolution pursuant to section 15.2 of the ISA, Copart responded on November 1, 2013, by hastily filing a lawsuit against Sparta in Texas State Court. Not only that, and contrary to its earlier representation that Copart was terminating the agreement for "convenience," the lawsuit suggested for the first time, through vague allegations, that Sparta had engaged in fraud, negligent misrepresentation and unfair business practices. Of course, Copart had never made any such suggestions during its entire course of dealing with Sparta. If Copart had genuinely

8

believed such wrongdoing had occurred, then it had the option to terminate the ISA "for cause." *See* Ex. A, ¶ 15.4.

29. Where, as here, a party waits until the last day a settlement offer is due to expire before rushing to the courthouse in an attempt to gain a tactical advantage, the courts have uniformly disapproved of such gamesmanship. *See*, *e.g.*, *In Southmark Corp. v. PSI, Inc.*, 727 F. Supp. 1060, 1063 (S.D. Miss. 1989) ("While Southmark apparently made a good faith effort to enter into settlement negotiations, PSI took advantage of those negotiations through deceptive maneuvers to get a head start in a 'race for the courthouse.' This Court will join other federal courts in disapproving such misuse of the Declaratory Judgment Act.").

30. Upon information and belief, Copart's *modus operandi* is to preemptively file suit against the company's contractors with baseless litigation and suggestions of improper practices to avoid paying for services rendered. *See, e.g., Copart, Inc. v. Lightmaker USA, Inc.*, No. 2:12-cv-02943 (E.D. Cal.) (filed Jan. 28, 2013) (alleging, among other things, that a website design company Copart contracted with "did not have the appropriate expertise," "lacked experience with the Copart environment" which caused "severe project delays and failures" and "made false representations to obtain more money.").

31. On January 2, 2014, Sparta removed the Texas lawsuit to the United States District Court for the Northern District of Texas.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

32. Sparta realleges and incorporates by reference the allegations contained in paragraphs 1 through 31 as though fully set forth herein.

33. Copart breached its contract with Sparta by, among other things, (i) failing to pay the amounts due to Sparta under section 15.2 of the ISA, (ii) failing to pay anything at all to Sparta under section 15.2 of the ISA; and (iii) failing to reimburse Sparta for expenses incurred and owing under the ISA.

34. Sparta has fully performed its obligations under the contract.

9

35. All conditions required for Copart's performance have occurred.

36. As a direct and proximate result of Copart's breach, Sparta has been damaged in an amount in excess of $12 million and which will be proved at trial.

## SECOND CLAIM FOR RELIEF
### (Promissory Estoppel)

37. Sparta realleges and incorporates by reference the allegations contained in Paragraphs 1 through 36 as though fully set forth herein.

38. Copart promised to pay Sparta for the consulting services performed and expenses incurred at Copart's request.  These services and expenses include, but are not limited to, services and expenses set forth within the ISA and Realization SOW executed between Sparta and Copart, as well as services which were beyond the Realization SOW.  Copart should have and did reasonably expect these promises to induce action and forbearance by Sparta, which in fact did occur as has been set forth above, all of which Copart knew.  Injustice can only be avoided by providing Sparta relief in the form of damages in accordance with Copart's promises.

39. Copart made these promises to pay with the intention of inducing Sparta to perform these consulting services and pay the expenses incurred.

40. Sparta has asked that Copart pay these sums.  However, Copart has refused, and continues to refuse, to pay Sparta for these services rendered and expenses incurred at Copart's request.

41. As a direct and proximate result of Copart's failure to pay Sparta the reasonable value of the consulting services rendered and costs incurred, Sparta has suffered damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

42. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 41 as though fully set forth herein.

43. Like all contracts, the contract between Sparta and Copart contained an implied covenant of good faith and fair dealing which bound each party, such that neither party would do

10

anything that would injure the rights of the other party to receive the benefits of the agreement, and that imposed on each party the duty to exercise its discretion in such a way as to protect the reasonable expectations of the other party to the contract.

44. By engaging in the conduct described above, Copart's acts and omissions—and in particular its refusal to pay for the services performed by Sparta and its refusal to negotiate in good faith the reasonable value of services rendered at the time of termination—injured the rights of and breached Copart's duty to protect the reasonable expectations of Plaintiff.

45. As a direct and proximate result of Copart's breach, Sparta has been damaged in an amount in excess of $12 million and which will be proved at trial.

46. Upon information and belief, Copart's *modus operandi* is to preemptively file suit against the company's contractors with baseless litigation and suggestions of improper practices to avoid paying for services rendered. *See*, *e.g.*, *Copart Inc. v. Lightmaker USA, Inc.*, No. 2:12-cv-02943 (E.D. Cal.) (filed Jan. 28, 2013)

47. Copart' acts and omissions in breaching the implied covenant of good faith and fair dealing in the agreement constituted action taken in bad faith, which was willful, oppressive and malicious, and which justifies an award of punitive damages.

**FOURTH CLAIM FOR RELIEF**
**(Account Stated)**

48. Sparta realleges and incorporates by reference the allegations contained in Paragraphs 1 through 47 as though fully set forth herein.

49. During the course of its performance under the ISA, Sparta submitted regular billing statements to Copart detailing the amounts due to it, including expenses incurred.

50. Sparta has requested that Copart pay these sums. However, Copart has refused, and continues to refuse, to pay Sparta for these services rendered and expenses incurred.

51. As a direct and proximate result of Copart's failure to pay Sparta for the services rendered and expenses incurred, Sparta has suffered damages in an amount to be proven trial.

**FIFTH CLAIM FOR RELIEF**
**(Quantum Meruit)**

52. Sparta realleges and incorporates by reference the allegations contained in Paragraphs 1 through 51 as though fully set forth herein.

53. Sparta has performed consulting services and incurred expenses for Copart at Copart's request.

54. Copart promised to pay Sparta the reasonable value of these consulting services to be performed and expenses to be incurred at Copart's request.

55. Sparta requested payment from Copart for the reasonable value of the services Sparta performed and the expenses it has incurred. However, Copart has refused, and continues to refuse, to pay Sparta for the services rendered and expenses incurred.

56. As a direct and proximate result of Copart's failure to pay Sparta for the consulting services rendered and expenses incurred, Sparta has suffered damages in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

57. Sparta realleges and incorporates by reference the allegations contained in Paragraphs 1 through 56 as though fully set forth herein.

58. By its wrongful acts and omissions, Copart was unjustly enriched at the expense of and to the detriment of Sparta or while Sparta was unjustly deprived.

59. Sparta seeks restitution from Copart and seeks an order of this Court disgorging all commissions, profits, benefits and other compensation obtained by Copart from its wrongful conduct.

**SEVENTH CLAIM FOR RELIEF**
**(Declaratory Relief)**

60. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 59 as though fully set forth herein.

61. An actual controversy has arisen and now exists between Sparta and Copart

COMPLAINT AND DEMAND FOR JURY TRIAL

concerning the extent of Copart's liability to Sparta for the services it rendered and the expenses it has incurred.

62. In light of Copart's refusal to comply with the termination provisions of the ISA, a declaration as to the parties' rights and duties under the ISA is necessary and proper at this time.

63. Sparta seeks a judicial declaration that: (i) Copart owes Sparta an amount to be proven at trial for services rendered under the ISA and its related agreements; (ii) Copart owes Sparta an amount to be proven at trial for work and services that were beyond the scope of the ISA and its related agreements; (iii) Copart's refusal to comply with the termination provisions of the ISA and its preemptive lawsuit against Sparta breached the implied covenant of good faith and fair dealing; and (iv) Copart's refusal to negotiate in good faith the reasonable value of the services Sparta rendered at the time of termination (and its decision to instead file suit) was an act done in bad faith.

**PRAYER**

WHEREFORE, Sparta prays for judgment against Copart as follows:

1. For compensatory damages according to proof;
2. For a declaration described above;
3. For prejudgment interest at the maximum rate allowed by law;
4. For costs of suit herein, including reasonable attorneys' fees and experts' fees;
5. For exemplary damages; and
6. For such other and further relief as the Court may deem just and proper.

COMPLAINT AND DEMAND FOR JURY TRIAL

| | |
|---|---|
| Dated: January 8, 2014 | LEWIS & LLEWELLYN LLP<br>Paul T. Llewellyn<br>Marc R. Lewis<br>Ryan B. Erickson |
| | By: _____/s/_____<br>      Paul T. Llewellyn |
| Dated: January 8, 2014 | GIBSON, DUNN & CRUTCHER LLP<br>Frederick Brown |
| | By: _____/s/_____<br>      Frederick Brown |
| | Attorneys for Plaintiff<br>Sparta Consulting, Inc. |

## **DEMAND FOR JURY TRIAL**

Sparta demands trial by jury on each of its claims for relief which are triable before a jury.

| | |
|---|---|
| Dated: January 8, 2014 | LEWIS & LLEWELLYN LLP<br>Paul T. Llewellyn<br>Marc R. Lewis<br>Ryan B. Erickson |
| | By: _____/s/_____<br>      Paul T. Llewellyn |
| Dated: January 8, 2014 | GIBSON, DUNN & CRUTCHER LLP<br>Frederick Brown |
| | By: _____/s/_____<br>      Frederick Brown |
| | Attorneys for Plaintiff<br>Sparta Consulting, Inc. |

COMPLAINT AND DEMAND FOR JURY TRIAL