1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11   COPART, INC.,                              No.  2:14-CV-00046-KJM-CKD

12              Plaintiff-
             Counterdefendant,
13                                              ORDER

14        v.

15   SPARTA CONSULTING, INC.,

16              Defendant-
             Counterplaintiff.
17

18              This matter is before the court on the parties' separate motions to dismiss.

19   Defendant and Counterplaintiff Sparta Consulting, Inc. (Sparta) filed a motion to dismiss the tort-

20   based claims pled in Copart's second amended complaint based on Federal Rules of Civil

21   Procedure 12(b)(6) and 9(b).  Def.-Counterpl. Mot. to Dismiss ("Sparta Motion"), ECF No. 45.

22   Plaintiff and counterdefendant Copart, Inc. (Copart) filed a motion to dismiss several claims from

23   Sparta's counterclaim under Federal Rule of Civil Procedure 12(b)(6).  Pl.-Counterdef. Mot to

24   Dismiss ("Copart Motion"), ECF No. 47.  The court held a hearing on January 16, 2015.  Mark

25   Ressler and Jason Takenouchi appeared for plaintiff-counterdefendant Copart and Paul Llewellyn

26   and Ryan Erickson appeared for defendant-counterplaintiff Sparta.  For the following reasons, the

27   court GRANTS in part and DENIES in part Copart's motion and DENIES Sparta's motion.

28   ////

1    I.       PROCEDURAL BACKGROUND AND ALLEGED FACTS

2            A.       Procedural Background

3                     On November 1, 2013, Copart sued Sparta in state court in Dallas, Texas.  Sparta

4    Counterclaim ("Countercl.") ¶ 28, ECF No. 46.  The Texas complaint alleged fraud, negligent

5    misrepresentation, and unfair business practices.  *Id*.  On January 2, 2014, Sparta removed the

6    action to federal court in the Northern District of Texas.  *Id*. ¶ 30.

7                     On January 8, 2014, Sparta filed a separate suit in this district against Copart with

8    claims for (1) breach of contract; (2) promissory estoppel; (3) breach of the implied covenant of

9    good faith and fair dealing; (4) account stated; (5) quantum meruit; (6) unjust enrichment; and

10   (7) declaratory relief.  Compl., ECF No. 1.

11                    On August 8, 2014, the Northern District of Texas granted Sparta's motion to

12   transfer Copart's action to this district.  *Id*. ¶ 30; Sparta Motion at 5.  This court consolidated the

13   actions under the current caption and realigned the parties, with Copart serving as plaintiff-

14   counterdefendant and Sparta as defendant-counterplainitff.  ECF No. 33.  Copart filed its second

15   amended complaint on October 30, 2014, alleging (1) fraudulent inducement; (2) fraud;

16   (3) negligent misrepresentation; (4) breach of contract; (5) breach of the implied covenant of

17   good faith and fair dealing; (6) request for declaratory relief; (7) unfair competition; and

18   (8) unjust enrichment.  Second Amended Complaint (SAC), ECF No. 38.  On November 20,

19   2014, Sparta filed its counterclaim, setting forth the same causes of action as its initial suit and

20   adding a claim for unjust enrichment.  ECF No. 46.

21                    Sparta filed the instant motion to dismiss all of the tort-based claims of Copart's

22   second amended complaint, claims 1, 2, 3, 5, 7 and 8, on November 20, 2014.  ECF No. 45.

23   Copart filed its motion to dismiss claims 2, 3, 4, 5, 6 and 7 of Sparta's counterclaim on December

24   4, 2014.  ECF No. 47.  Both parties have filed oppositions,  Sparta Opp'n, ECF No. 50; Copart

25   Opp'n, ECF No. 51, and replies, Sparta Reply, ECF No. 52; Copart Reply, ECF No. 53.

26           B.       Alleged Facts in Copart's Second Amended Complaint

27                    Copart is a Texas corporation that sells vehicles on the internet in a virtual auction

28   to a range of commercial buyers.  SAC ¶¶ 12, 14.  Copart built the auction system (Copart

2

1    Auction Systems, "CAS") to support its operations.  *Id*. ¶ 16.  In 2010, Copart began the process

2    of replacing CAS with "AIMOS," an enterprise resource planning (ERP) software (SAP).  SAC at

3    2-3, 18-19.  The replacement was expected to have 100 percent of the same functionality as CAS

4    to ensure Copart's business model could continue.  *Id*. ¶ 17.

5           In August 2011, Copart solicited bids from several software consulting firms.  *Id*.

6    ¶ 19.  Based on Sparta's represented skills, experience and expertise, Copart selected Sparta to

7    design and implement the AIMOS project.  *Id*. ¶ 20.  From August through September 2011,

8    Copart and Sparta met at least ten times to discuss the potential engagement, Copart's business

9    requirements, Copart's other computer systems, and the required features and functions of CAS

10   so that AIMOS would be compatible.  *Id*.  Sparta represented in its August 5, 2011 presentation to

11   Copart that AIMOS would include "100% CAS functionality."  *Id*. ¶ 21.  Sparta also represented

12   "it had the ability to design and implement AIMOS with 100% of the features and functions of

13   CAS," "it had solutions to the specific CAS features and functions," it had relevant experience

14   and would "staff the project with seasoned employees who had been long-term employees of

15   Sparta" and SAP experts.  *Id*. ¶ 22.  Sparta said it had "the skill and ability to manage a SAP

16   project of Copart's size and nature," "was more nimble and more creative" than the other firms,

17   and was "the firm called upon to fix projects . . . when the big consulting firms had failed." *Id*. ¶

18   22.  Sparta's pre-contract representations included claims of its abilities, experience, staffing and

19   capabilities.  *Id*. ¶¶ 22-28.  Relying on those representations, Copart hired Sparta in September

20   2011.  *Id*. ¶ 29.

21          On October 6, 2011, Copart and Sparta signed an Implementation Services

22   Agreement (ISA).  *Id*. ¶ 30.  The agreement included covenants representing that Sparta had

23   conducted due diligence to ensure CAS functionality and would use employees with "suitable

24   training, education, experience and skill . . . ."  *Id*. ¶¶ 31-32; ISA, Ex. A SAC, ECF No. 38-1.

25   Copart and Sparta also entered into Statements of Work (SOW) detailing the work, timetables for

26   completion, and fixed fee payments conditioned on Copart's acceptance of Sparta's work.  SAC

27   ¶ 34.  The work was to be completed over a series of "phases" and "milestones."  *Id*. ¶¶ 35-68.

28

1    Each milestone "had a specific set of requirements . . . completion schedule, and a fixed fee to be

2    paid only after Sparta's completion and Copart's acceptance of the work." *Id.* ¶ 51.

3           During the initial "design phase," Copart began to notice a lack of detail in the

4    AIMOS design documentation and questioned Sparta about it.  Senior Sparta executive Prafaulla

5    Kharkar responded through Vincent Phillips and Gayle Mooney, among others, that Sparta was

6    the "SAP expert" and that "this was how SAP designs are done." *Id.* ¶ 38.  Copart continued to

7    share concerns and Sparta continued to reiterate its expertise. *Id.* ¶ 39.  Sparta did not meet the

8    design phase deadline, but represented it would correct the missing functionalities in the second

9    phase. *Id.* ¶ 42.  It represented this delay did "not jeopardize the overall project." *Id.*

10          The second phase was the "build phase." *Id.* ¶ 45.  In the build phase SOW,

11   Copart and Sparta agreed to "configure, develop, and deploy the AIMOS design," "document the

12   configuration and extensions," and "prepare and follow comprehensive and detailed plans

13   approved by Copart . . . ." *Id.* ¶ 50; SOW Ex. C SAC.  During the build phase, problems arose

14   with milestones 5 (source code) and 6 (code drop), and Sparta produced work that was not

15   functional. *Id.* ¶¶ 52-55.  Each problem "reflected the inability of AIMOS to perform CAS

16   functions and interface with Copart's existing systems." *Id.* ¶ 55.  Sparta represented it would

17   remedy the problems. *Id.*

18          In August 2012, Sparta demonstrated AIMOS to Copart to show its progress.

19   Copart alleges Sparta employees "manipulated the demonstration to give the appearance that

20   AIMOS was working, even though it was not." *Id.* ¶ 58.  Sparta, through Kharkar, represented

21   the project "was on target" and "denied any problems." *Id.*  Copart brought the issues to Sparta's

22   senior management, who "promised to do better," "add more resources," and "increase project

23   management support." *Id.*  Sparta "failed to complete the requirements of [m]ilestone 7" and

24   milestone 8.  Sparta replaced Kharkar with a new project manager, Shyam Chodapunedi. *Id.*

25   ¶ 61.  In a "re-group meeting" with Sparta and Copart, Chodapunedi represented he would "fix

26   the problems with the source code," "address the missing components," "and get the AIMOS

27   project back on track." *Id.* ¶ 64.  He also represented the AIMOS project would be complete in

28   eight more weeks. *Id.*  Over the course of the next few weeks, Sparta made continued assurances

1    and repeated its previous representations.  *Id*. ¶ 65.  However, the source code continued to fail.

2    *Id*. ¶¶ 68, 71.  Copart refused to pay until Sparta delivered the requirements of milestone 8.

3    Sparta continued to work on the source code over the next eight months.  *Id*. ¶ 71.  On June 18,

4    2013, Sparta management executives represented the source code would be complete within four

5    weeks.  *Id*. ¶ 72.  Copart and Sparta established a plan to try to salvage the AIMOS project.  *Id*.

6    ¶ 73.

7             On August 16, 2013, the parties amended the ISA.  *Id*. ¶ 74; Ex. D, SAC.  The

8    amendment "restated the requirements of [m]ilestone 8, extended the deadlines for completion,

9    required a plan for remediation of the listed functional gaps, and provided a fee discount if the

10   functional gaps were not completed."  *Id*. ¶ 75.  Sparta management represented that "Sparta

11   would provide massive additional resources to make a final push to get [m]ilestone 8 completed

12   and presented to Copart."  *Id*. ¶ 76.  Soon after the amendment, Sparta representatives "missed

13   internal deadlines and failed to deliver working code," "began to refuse to answer Copart's

14   questions or otherwise engage in information sharing with Copart," "refused to participate in

15   overall project planning or work on addressing the deficiencies in the system they designed and

16   refused to allow Copart access to the source code."  *Id*. ¶ 77.  Sparta did not produce working

17   source code, and on September 17, 2013, Copart notified Sparta it was terminating the

18   relationship for "convenience" under Section 15.2 of the ISA.  Termination Letter, Ex. E, SAC.

19   Under the terms of the ISA, there is no cure period, and Sparta is not entitled to any payment

20   unless it has completed the contractual services with documentation and Copart's agreement.

21   SAC ¶ 78.

22            As a result of Sparta's failure to perform, Copart says it incurred "significant

23   expenses . . . for costs associated with the failed implementation" and "business injury related to

24   the years-long delay."  *Id*.  Copart seeks monetary damages, restitution, punitive damages,

25   declaratory relief, pre- and post- judgment interest, and costs of suit.  *Id*. at 25.

26            C.     Alleged Facts in Sparta's Counterclaim

27            Sparta does not object to or dispute the accuracy of exhibits submitted with

28   Copart's second amended complaint.  Sparta's allegations differ in the following respects:

1       •     Sparta says it completed the design phase in March 2012 to Copart's satisfaction,

2 and was paid the agreed-upon $3.7 million for its services.  Additionally, in March 2012, Copart

3 paid Sparta a "bridge" amount of $1.4 million to cover the transition to this build phase.

4 Countercl. ¶ 11.

5       •     The Realization/Build SOW had Copart agreeing to pay Sparta $18.8 million for

6 the AIMOS system and its "deployment and integration" in Canada, the United Kingdom and the

7 United States.  *Id.* ¶ 15. The payments were to be made in ten installments corresponding to

8 completion of "milestones."  *Id.*

9       •     Copart's delays caused the corresponding delay of the fourth and subsequent

10 milestones.  *Id.* ¶¶ 19, 22.  Copart's loss of personnel and moving of its headquarters from

11 California to Texas also caused delays.  *Id.* ¶ 22(d).  Copart further delayed the development of

12 another system, ATOM, upon which AIMOS relied.  *Id* ¶ 22(a).  These delays caused Sparta to

13 spend 29 weeks on a phase it anticipated and had represented would be done in 8 weeks.  *Id.* ¶ 23.

14       •     Copart sought to expand the scope of engagement, and demanded Sparta include

15 numerous additional software functionalities and enhancements beyond the agreed upon AIMOS

16 system design, and that it also complete a substantial amount of out-of-scope work while awaiting

17 Copart's testing and approval.  *Id.*

18       •     The alleged system "bugs" were "mostly attributable to user error by Copart,

19 inadequate training of Copart personnel, defects in Copart's proprietary systems, and/or new

20 testing scenarios outside the SOW."  *Id.* ¶ 22(c)

21       •     The terms of the ISA provide that Copart shall pay Sparta for the portion of

22 services "performed and completed" by the termination date, as "agreed by Copart" and

23 "calculated and documented by [Sparta's] project management software system."  *Id.* ¶ 25.

24 Under that obligation, Copart in its termination notice invited Sparta to discuss the services

25 completed.  *Id.* ¶ 26.  On October 18, 2013, Sparta submitted a "good faith, detailed analysis of

26 the amount it believed it was entitled to," more than $12 million, and stated: (1) it had not been

27 paid for more than a year, (2) at the time of termination, Sparta had expended nearly a quarter of a

28 million professional hours on Copart's behalf, 20 percent more than initially estimated; (3) the

1  vast majority of the work for the remaining milestones had been completed; and (4) 90 percent of

2  the testing across all three geographic areas was complete or in progress at time of termination.

3  *Id.* ¶ 27.  Sparta requested a response by November 1, 2013.  *Id.*  Sparta seeks compensatory

4  damages, restitution, declaratory relief, pre- and post-judgment interest, and costs of suit.  *Id.* at

5  14.

6  II.      LEGAL STANDARD FOR MOTION TO DISMISS

7            Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a

8  complaint for "failure to state a claim upon which relief can be granted."  A court may dismiss

9  "based on the lack of cognizable legal theory or the absence of sufficient facts alleged under a

10  cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

11  Although a complaint need contain only "a short and plain statement of the claim showing that

12  the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), to survive a motion to dismiss this short

13  and plain statement "must contain sufficient factual matter . . . to 'state a claim to relief that is

14  plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v.*

15  *Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must include something more than "an

16  unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and conclusions' or 'a

17  formulaic recitation of the elements of a cause of action . . . .'"  *Id.* (quoting *Twombly*, 550 U.S. at

18  555).  Determining whether a complaint will survive a motion to dismiss for failure to state a

19  claim is a "context-specific task that requires the reviewing court to draw on its judicial

20  experience and common sense."  *Id.* at 679.  Ultimately, the inquiry focuses on the interplay

21  between the factual allegations of the complaint and the dispositive issues of law in the action.

22  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

23            In making this context-specific evaluation, this court "must presume all factual

24  allegations of the complaint to be true and draw all reasonable inferences in favor of the

25  nonmoving party."  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  This rule

26  does not apply to "a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555

27  (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), nor to "allegations that contradict matters

28  properly subject to judicial notice," or to material attached to or incorporated by reference into the

1    complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A court's

2    consideration of documents either attached to a complaint or incorporated by reference, or of

3    matters of judicial notice, will not convert a motion to dismiss into a motion for summary

4    judgment. *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).

5    III.    DISCUSSION

6         A.    Copart's Motion to Dismiss

7            1.    Equitable Claims: Promissory Estoppel (Claim 2), Quantum Meruit
                 (Claim 5), Unjust Enrichment (Claim 6)

8

9            As noted, Sparta seeks equitable relief on the basis of promissory estoppel,

10   quantum meruit, or unjust enrichment.  Sparta alleges Copart promised to pay Sparta for services

11   performed and expenses incurred at Copart's request and under the ISA and SOW.  Countercl. at

12   9, 11, 12.  As of the time of its termination, Sparta contends it expended nearly a quarter of a

13   million hours over the course of more than a year, and performed services beyond the scope of

14   the ISA and related agreements.  *Id*. at 12.  Sparta claims Copart should have expected Sparta to

15   reasonably rely on its promises to pay, and justice requires awarding damages to Sparta in an

16   amount to be proven at trial.  *Id*. at 9, 11, 12.  Copart argues these equitable claims are not

17   actionable because an express contract exists governing the terms of the termination of the

18   contract.

19           "[F]ederal courts sitting in diversity jurisdiction apply state substantive law and

20   federal procedural law." *Zamani v. Carnes*, 491 F.3d 990, 995 (9th Cir. 2007) (internal quotation

21   marks omitted).  In California, the state whose law applies here, a plaintiff may not assert quasi-

22   contract claims where it does not dispute the validity of the express agreements governing the

23   parties. *Lance Camper Manufacturing Corp. v. Republic Indemnity Co*., 44 Cal. App. 4th 194,

24   203 (1996) ("It is well settled that an action based on an implied-in-fact or quasi-contract cannot

25   lie where there exists between the parties a valid express contract covering the same subject

26   matter . . . plaintiff must allege that the express contract is void or was rescinded in order to

27   proceed with its quasi-contract claim."); *see also Hedging Concepts, Inc. v. First Alliance*

28   *Mortgage Co*., 41 Cal. App. 4th 1410, 1420 (1996), *as modified on denial of reh'g* (Feb. 22,

1   1996) ("When parties have an actual contract covering a subject, a court cannot - not even under

2   the guise of equity jurisprudence - substitute the court's own concepts of fairness regarding that

3   subject in place of the parties' own contract."); *Total Coverage, Inc. v. Cendant Settlement Servs.*

4   *Grp., Inc*., 252 F. App'x 123, 125–26 (9th Cir. 2007) (party cannot state claims for quantum

5   meruit, unjust enrichment, or promissory estoppel because the parties' respective rights were set

6   out in undisputed written agreement).

7   Under an exception to this principle, Sparta may assert quasi-contract principles

8   only if the work giving rise to the equitable claims is different from the work covered by the

9   written agreement. *Shum v. Intel Corp*., 630 F. Supp. 2d 1063, 1077 (N.D. Cal. 2009), *aff'd*,

10   633 F.3d 1067 (Fed. Cir. 2010) (unjust enrichment claim not precluded by parties' written

11   agreement where court ruled agreement covered conduct different from that underlying unjust

12   enrichment claim).

13   Sparta argues it performed services outside the scope of the express agreements.

14   Sparta Opp'n at 4. If the agreements do not govern the full scope of the relationship between

15   Copart and Sparta, the court is empowered to find the quasi-contract claims viable in this context.

16   In *In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.,* 601 F. Supp. 2d 1201,

17   1220–21 (S.D. Cal. 2009), the district court rejected defendants' arguments for dismissal of an

18   unjust enrichment claim in a suit brought by mortgage borrowers against lenders, claiming,

19   among other things, a conspiracy to commit RICO violations. The court found that "[a]lthough

20   there are contracts at issue in this case, none appears to provide for the specific recovery sought

21   by Plaintiffs' unjust enrichment claim." *Id*. at 1220–21; *see also Benson Elec. Co. v. Hale Bros.*

22   *Associates*, 246 Cal. App. 2d 686, 697 (1966) (finding the general rule inapplicable where

23   damages sought for value of "extras for which there was no underlying express contract"). Sparta

24   argues the court should not yet make a determination as to whether the express agreement covers

25   the extra work allegedly performed by Sparta and provides the basis of its equitable claims.

26   /////

27   /////

28

9

1    The facts pled by Sparta do not specify with any detail the work performed outside

2    the scope of the contemplated agreement.  The counterclaim states only:

> Copart sought to expand the scope of the engagement following each test cycle.  In doing so, Copart demanded that Sparta include numerous additional software functionalities and enhancements that were beyond the agreed upon design for the AIMOS system.  Sparta made numerous requests to freeze the project scope and requirements, but Copart refused to do so.  By changing the scope and requirements of the project, Sparta was required to complete a substantial amount of additional, out-of-scope work, and await Copart's testing and approval of these new functionalities.

Countercl. ¶ 22.  Its pleading does not give adequate notice to Copart as to what alleged work is covered by the agreement and what is not.  Even assuming more enhancements and functionalities were requested by Copart, that the work was more intense or laborious does not render it unrelated to the design and development of the AIMOS system.  In fact, the SOW specifies a process for changes in the scope of the project, which are to be identified by a "Change Request."  SOW at 18.  A Change Request "should be documented, prepared by the Service Provider [Sparta] and approved by Copart."  *Id*.  Sparta has not pled it made any such requests.  It does not say either party requested any change in nature, extent, or services governed by the agreement except in the August 2013 amendment.  That amendment "provided a mechanism to address the outstanding issues . . . and imposed new dates for the completion of the remaining work," but did not change the subject of the agreement or its terms.  Countercl. ¶ 24.

Sparta's claims are premised on a breach of the contract for the development of the AIMOS system; any equitable claims for a failure to compensate or a bad faith breach are governed by the terms of the parties' agreement to design and develop the AIMOS system.  Copart's motion to dismiss these claims is granted with leave to amend.

2.    Account Stated (Claim 4)

Sparta contends it is entitled to damages as a result of Copart's failure to pay Sparta for services rendered and expenses incurred in regular billing statements submitted to Copart during the course of their business relationship.  Countercl. at 11.  Copart argues a claim for account stated cannot be sustained because (1) there was no specific agreed amount due; (2) there was no promise to pay the specific amount; and (3) any amount would be governed by

1   the express agreement.  Copart Motion at 7.  Sparta responds the account can be implied if the

2   amount is not objected to by the opposing party within a reasonable time once the bill is

3   submitted, and the amount is specified in the counterclaim.  Sparta Opp'n at 13.

4            An account stated is "an agreement, based on prior transactions between the

5   parties, that all items of the account are true and that the balance struck is due and owing from

6   one party to the other."  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1091 (9th Cir. 1989); *Trafton*

7   *v. Youngblood*, 69 Cal. 2d 17, 25 (1968).  The elements of an account stated are: "(1) previous

8   transactions between the parties establishing the relationship of debtor and creditor; (2) an

9   agreement between the parties, express or implied, on the amount due from the debtor to the

10   creditor; (3) a promise by the debtor, express or implied, to pay the amount due."  *Zinn v. Fred R.*

11   *Bright Co.*, 271 Cal. App. 2d 597, 600 (1969); *see Maggio, Inc. v. Neal*, 196 Cal. App. 3d 745,

12   752–53 (1987).  Both parties must assent to the new amount owed to create an account stated.

13   *See Hansen v. Fresno Jersey Farm Dairy Co.*, 220 Cal. 402, 408 (1934); *Maggio*, 196 Cal. App.

14   3d at 752.  "An account stated constitutes a new contract which supersedes and extinguishes the

15   original obligation."  *Zinn*, 271 Cal. App. 2d at 600; *see Jones v. Wilton*, 10 Cal. 2d 493, 498

16   (1938).  Thus, a debt that is not predicated on a new contract, but is instead based on a preexisting

17   express contract, "cannot be the basis of an account stated."  *National Ins. Co. v. Expert Auto.*

18   *Reconditioning, Inc.,* 2013 WL 6190591, *3 (C.D. Cal. Nov. 24, 2013) (citing *Moore v.*

19   *Bartholomae Corp.,* 69 Cal. App. 2d 474, 477 (1945)).

20            Accepting the facts pled as true, Copart failed to pay Sparta for services rendered

21   for over a year, despite (1) Sparta's regularly billing Copart; (2) a binding agreement detailing a

22   payment schedule; and (3) Sparta's continuing to perform its obligation.  Sparta is not alleging a

23   new and separate agreement, which is required for an account stated claim.  Without a new and

24   separate agreement regarding the new amount owed, there is not an account stated.  *Martini E*

25   *Ricci Iamino S.P.A.--Consortile Societa Agricola v. W. Fresh Mktg. Servs., Inc.*, 2014 WL

26   4661149, at *10 (E.D. Cal. Sept. 18, 2014); *see also National Ins.*, 2013 WL 6190591 at *3; *Zinn*,

27   271 Cal. App. 2d at 600.

28

An allegation that the bills Sparta sent to Copart themselves constitute new and separate agreements would not save the claim.  An "action upon an account stated is not upon the original dealings and transactions of the parties," rather it is "upon the new contract by and under which the parties have adjusted their differences and reached an agreement."  *Gardner v. Watson*, 170 Cal. 570, 574 (1915); *see S.O.S.*, 886 F.2d at 1091; *Gleason v. Klamer*, 103 Cal. App. 3d 782, 786–87 (1980).  The bills here, as pled, are merely expressions of the terms and obligations of the ISA, not a new and separate agreement extinguishing the original agreement.  This claim is dismissed with leave to amend.

3.      Breach of Implied Covenant of Good Faith and Fair Dealing (Claim 3)

Sparta alleges Copart breached the implied covenant of good faith and fair dealing when it (1) failed to follow the termination procedures of the ISA; (2) refused to pay for the services performed by Sparta; (3) refused to negotiate in good faith the reasonable value of services rendered at the time of termination; (4) repeatedly unreasonably delayed the development of the ATOM system, which impaired Sparta's ability to perform its obligations; (5) repeatedly and unreasonably demanded additional software functionalities, enhancements, and substantial out of scope work; and (6) withheld its approval of Sparta's work product repeatedly and unreasonably.  Countercl. at 10.  Copart argues these allegations do not satisfy the elements required for breach of the implied covenant because there is no conscious or deliberate act pled, and even as currently pled, Sparta failed to perform its duties under the contract and therefore cannot state a claim against Copart for breach of a contract covenant.  Copart Motion at 7–10.

The elements of a claim for breach of the covenant of good faith and fair dealing are: (1) the plaintiff and the defendant entered into a contract; (2) the plaintiff did all or substantially all of the things that the contract required it to do or that it was excused from having to do; (3) all conditions required for the defendant's performance had occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the defendant's conduct harmed the plaintiff.  *Woods v. Google, Inc.*, 889 F. Supp. 2d 1182, 1194 (N.D. Cal. 2012) (citing Judicial Council of California Civil Jury Instructions § 325 (2011)).  "The covenant of good faith finds particular application in situations where one party is invested

12

1   with a discretionary power affecting the rights of another.  Such power must be exercised in good

2   faith."  *Carma Developers, Inc. v. Marathon Development California, Inc*., 2 Cal. 4th 342, 372

3   (1992); *see Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 923 (1985).  "The exercise of

4   discretionary powers is evaluated under the implied covenant to assure that the promises of the

5   contract are effective and in accordance with the parties' legitimate expectations."  *McNeary–*

6   *Calloway*, 863 F. Supp. 2d at 956–57; *see Carma*, 2 Cal. 4th at 373–74; *Gabana Gulf Distrib.,*

7   *Ltd. v. GAP Int'l Sales, Inc*., 2008 WL 111223, at *8 (N.D. Cal. Jan. 9, 2008).

8   Here, the terms of the ISA and SOW specify a payment schedule upon the

9   completion of various milestones.  *See* SOW at 23, ISA ¶ 3.1.  Upon termination, Copart

10  requested a billing from Sparta to pay for the portion of services performed and completed as of

11  the termination date.  Countercl. ¶ 21; Ex. E, Countercl.  Sparta alleges, however, that Copart has

12  not rendered any payment for the completion of milestones since termination in September 2013,

13  or any payment at all after August 2012, over a year before termination; Sparta also says Copart,

14  in bad faith, withheld approval of Sparta's work product in order to avoid payment.  Countercl. ¶

15  21.  Sparta "vigorously disputes" the argument it did not complete the conditions precedent to

16  Copart's duty to pay.  Sparta Opp'n at 10.

17  At this stage, the court must consider the facts pled as true.  Although the ISA

18  gives Copart discretion to determine whether Sparta meets the condition precedent, it is not the

19  court's job to determine whether that discretion was exercised in good faith.  *Gifford v. J & A*

20  *Holdings*, 54 Cal. App. 4th 996, 1006 ("Good faith and commercial reasonableness primarily

21  involve questions of fact, based on all the circumstances . . .").  Given Copart's discretionary

22  authority conferred by the agreement, Sparta's allegation it performed or attempted to perform in

23  good faith all of its contractual duties, and Copart's alleged continued unwillingness to

24  compensate Sparta for its services since August 2012, the court finds Sparta states a claim for

25  breach of the implied covenant.  The motion to dismiss this claim is denied.

26  4.      Unfair Competition (Claim 7)

27  Sparta alleges Copart violated the  California Business and Professions Code

28  section 17200, *et seq*., when it (1) failed to follow the termination procedures of the ISA;

1  (2) refused to pay for the services performed by Sparta; (3) refused to negotiate in good faith the

2  reasonable value of services rendered at the time of termination; (4) repeatedly unreasonably

3  delayed the development of ATOM, which impaired Sparta's ability to perform its obligations;

4  (5) repeatedly and unreasonably demanded additional software functionalities, enhancements, and

5  substantial out-of-scope work; and (6) withheld its approval of Sparta's work product repeatedly

6  and unreasonably.  Countercl. at 12-13.  Copart argues the claim is not sustainable because Sparta

7  does not allege the breach was independently unfair, unlawful, or fraudulent.  Copart Motion at

8  10.  Sparta responds by pointing to the nearly full page in its counterclaim setting forth the unfair

9  nature of the breach and conduct extraneous to the breach.  Countercl. at 5.

10       The unfair competition statute prohibits practices that are either "unfair,"

11  "unlawful," or "fraudulent."  *Pastoria v. Nationwide Ins*., 112 Cal. App. 4th 1490, 1501 (2003);

12  *see also Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

13  "[A] breach of contract may form the predicate for a section 17200 claim, provided it also

14  constitutes conduct that is unlawful, or unfair, or fraudulent."  *Nat'l Rural Telecomm. Co-op*.,

15  319 F. Supp. 2d at 1074 (internal quotation and citation omitted).  Because section 17200 is

16  written in the disjunctive, it establishes three separate types of unfair competition.  *Id*.

17       Sparta alleges Copart's behavior satisfies the "unfair" prong of the code.  Sparta

18  Opp'n at 12.  California courts typically apply the unfairness prong in the following

19  circumstances, the first two of which involve harm to a consumer, which Sparta does not qualify

20  as here.  First, "[a]n act or practice is unfair if the consumer injury is substantial, is not

21  outweighed by any countervailing benefits to consumers or to competition, and is not an injury

22  the consumers themselves could reasonably have avoided."  *Daugherty v. Am. Honda Motor Co.,*

23  *Inc.*, 144 Cal. App. 4th 824, 839 (2006).  Second, "'unfair' business practice occurs when that

24  practice offends an established public policy or when the practice is immoral, unethical,

25  oppressive, unscrupulous or substantially injurious to consumers."  *Smith v. State Farm Mut.*

26  *Auto. Ins. Co*., 93 Cal. App. 4th 700, 719 (2001) (internal citation and quotation marks omitted).

27  Third, an unfair business practice means "the public policy which is a predicate to the action must

28  be 'tethered' to specific constitutional, statutory or regulatory provisions."  *Scripps Clinic v.*

1   *Superior Court*, 108 Cal. App. 4th 917, 940 (2003).  A fourth test applies to competitors asserting

2   UCL claims under the "unfair" prong against each other, and is limited to anti-competitive

3   practices and not actions by consumers.  *Cel–Tech*, 20 Cal. 4th at 187 n.12.  It is inapplicable in

4   this context because Sparta and Copart are not competitors.

5          The court finds Sparta has not pled facts satisfying any of the applicable tests for

6   "unfair" practices.  The *Smith* standard, which Sparta relies on in its opposition, is intended to

7   protect consumers from unfair business practices, as is the *Daugherty* standard.  Sparta is not a

8   consumer of Copart's services.  For that reason, *Smith* and *Daugherty* are inapplicable.  The third

9   standard in *Scripps*, which does not specify the consumer protection context, requires the act be

10  "tethered to specific constitutional, statutory, or regulatory provisions."  *Scripps*, 108 Cal. App.

11  4th at 940.  Sparta does not link its claim to any statutory or regulatory scheme, but simply

12  repeats as a basis its claim that Copart breached the covenant of good faith and fair dealing.  It is

13  not a competitor as required by *Cel-Tech*.  Sparta does not cite a single case where the UCL has

14  been applied that does not rely either on consumer or competitive harm.  The "unfairness" prong

15  of the UCL "does not give the courts a general license to review the fairness of contracts."

16  *Altman v. PNC Mortgage*, 850 F. Supp. 2d 1057, 1077 (E.D. Cal. 2012).  The UCL "is not an all-

17  purpose substitute for a tort or contract action."  *Cortez v. Purolator Air Filtration Products Co*.,

18  23 Cal. 4th 163, 173 (2000).  A claim for unfair competition must have an independent basis for

19  its unfairness, not merely that the breach itself is unfair.  *See Sybersound Records, Inc. v. UAV

20  Corp*., 517 F.3d 1137, 1152 (9th Cir. 2008) (affirming dismissal of UCL claim where plaintiff

21  "has not pled that the breaches of contract are independently unlawful, unfair, or fraudulent,

22  merely that the [defendants are] in breach of their contracts . . .").

23          Sparta also cites another case in which this court dismissed a case against a

24  defendant mortgage lender for overcharging mortgage payments and foreclosing on the property

25  of plaintiff's deceased husband.  *See Vincent v. PNC Mortgage, Inc.*, 2014 WL 2766116, at *1

26  (E.D. Cal. June 18, 2014).  Consumer protection is clearly implicated in the mortgage context,

27  and the plaintiff in *Vincent* was an individual consumer.

28

1      Sparta's claim for unfair competition is misplaced and is merely a restatement of

2  its breach of contract claim.  Given the state of the law, the court finds amendment would be

3  futile.  This claim is dismissed without leave to amend.

4      B.      Sparta's Motion

5              1.      Fraud Claims:  Particularity Requirement of Rule 9(b)

6      As a preliminary matter, Sparta argues each of Copart's fraud-based claims, claims

7  1, 2, 3, 7 and 8, fail to meet the particularity requirements of the federal civil rules and should

8  therefore be dismissed.  Copart disagrees, outlining several specific instances of statements and

9  representations Sparta made in pre-contractual meetings and during the contractual relationship.

10  Copart Opp'n at 8–9.  These incidents, as discussed below, are described with reference to

11  approximate dates and details, and identify specific individuals.

12      Under Federal Rule of Civil Procedure 9(b), a plaintiff who alleges fraud "must

13  state with particularity the circumstances constituting the fraud," but may "aver[] generally" the

14  state of mind animating the fraud.  The pleading must "be specific enough to give defendants

15  notice of the particular misconduct . . . so that they can defend against the charge and not just

16  deny that they have done anything wrong."  *Sanford v. Memberworks, Inc*., 625 F.3d 550, 558

17  (9th Cir. 2010) (quoting *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1124 (9th Cir. 2009)).  To

18  avoid dismissal, the complaint must describe the time, place, and specific content of the false

19  representations and identify the parties to the misrepresentations.  *Id*.  Rule 9(b) requires a

20  plaintiff to allege particular details of the alleged fraud.  *Kearns*, 567 F.3d at 1126 (affirming the

21  dismissal of plaintiff's complaint alleging fraudulent misrepresentations because plaintiff "failed

22  to articulate the who, what, when, where, and how of the misconduct alleged").

23      In its second amended complaint, Copart makes several specific allegations of

24  material, false representations made by Sparta in the bidding process and during the period of its

25  contractual obligations.  *See, e.g.*, SAC ¶ 21 (August 5, 2011 presentation where Sparta

26  recognized Copart's functionality needs); *id*. ¶ 22 (in its bid, Sparta represented it had the ability

27  to design and implement AIMOS with 100 percent AIMOS functionality, had solutions other

28  consultants did not, would have experts and teams of programmers suitable for the project); *id*.

1    ¶ 23 (Sparta employees Vaibhav Nadgauda, Ashu Bhalla, Paul Freudenberg and Prafulla Kharkar

2    continued to represent it had solutions in fall 2011 meetings); *id*. ¶ 36 (representations of design

3    and functionalities made in the Design SOW); *id*. ¶ 38 (Kharkar, Phillips and Gayle Mooney

4    stating they were the "SAP expert" in response to lack of details in design documentation); *id*.

5    ¶ 39 (Sparta employees promising details would come later about the business requirements

6    documents (BRDs)); *id*. ¶ 42 (Kharkar, Phillips and others assuring delay would not jeopardize

7    the project); *id*. ¶ 53 (representing source code was not supposed to be functional, but would be

8    later); *id*. ¶ 58 (in a September 2012 presentation, Kharkar manipulated the demonstration to

9    Copart to give the appearance AIMOS was working, and claimed AIMOS project was "on target

10   and denied any problems"); *id*. ¶ 60 (false claim source code had been fixed); *id*. ¶ 64 (in

11   "regroup meeting, Sparta Vice President Shyam Chodapunedi represented he would fix the source

12   code, address missing component, and needed eight more weeks to complete the project").

13   Copart alleges these material representations, and others, were false.  *See* Copart Opp'n at 8–9.

14            The court finds these allegations satisfy the pleading requirements of Rule 9(b).

15   The Ninth Circuit has found the particularity requirements met in similar circumstances, where a

16   defendant allegedly misrepresents "the state of operations and its overall prospects."  *Cooper v.*

17   *Pickett*, 137 F.3d 616, 626 (9th Cir. 1997).  The facts are pled with sufficient particularity to

18   withstand a motion to dismiss because they put defendant on notice of the alleged

19   misrepresentations.  *See Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.,* 965 F. Supp. 2d

20   1141, 1151 (E.D. Cal. 2013) ("To state a viable fraud claim, the complaint must specify such

21   facts as the times, dates, places, benefits received, and other details of the alleged fraudulent

22   activity."); *Allstate Ins. Co. v. Ball*e, 2012 WL 907466, at *3 (D. Nev. Mar. 16, 2012) (facts are

23   sufficiently particular when they put defendant on notice of the basis for the claims made by

24   plaintiff); *Eidson v. Medtronic, Inc*., 2014 WL 1996024, at *22 (N.D. Cal. May 13, 2014)

25   (allegations of misrepresentations in "specific studies and presentations" were adequate to satisfy

26   Rule 9(b)).  The motion to dismiss the fraud-based claims for failure to satisfy Rule 9 is denied.

27   /////

28   /////

17

1

    2.      Fraudulent Inducement, Fraud, and Negligent Misrepresentation
            (Claims 1, 2, 3)

2

3      As discussed above, Copart's allegations of fraud and negligent misrepresentation

4  meet the heightened pleading requirements, but the court must also decide whether the allegations

5  in claims 1, 2 and 3 state a claim under Rule 12(b)(6).  Sparta claims these fraud and negligent

6  misrepresentation claims merely restate contractual obligations and are barred by the established

7  principle that damages for breaches of contract are not recoverable in tort.  Sparta Motion at 12–

8  15.  Sparta further argues the negligent misrepresentation claim is barred by the economic loss

9  rule, which bars tort recovery for breaches of contract.  Sparta Motion at 15–16.  Copart responds

10  the economic loss rule does not apply to fraud claims.  Copart Opp'n at 14.

11      Generally, "[a] person may not ordinarily recover in tort for the breach of duties

12  that merely restate contractual obligations."  *Aas v. Superior Court of San Diego County*, 24 Cal.

13  4th 627, 643 (2000), *superseded by statute on other grounds*, *Rosen v. State Farm Gen'l Ins. Co*.,

14  30 Cal. 4th 1070 (2003).  "'[C]ourts will generally enforce the breach of a contractual promise

15  through contract law, except when the actions that constitute the breach violate a social policy

16  that merits the imposition of tort remedies.'"  *Erlich v. Menezes*, 21 Cal. 4th 543, 552 (1999)

17  (quotation omitted).

18      Put another way, purely economic losses are not recoverable in tort.  *S.M. Wilson*

19  *& Co. v. Smith Int'l, In*c., 587 F.2d 1363, 1376 (9th Cir. 1978); *Seely v. White Motor Co*., 63 Cal.

20  2d 9, 16–17 (1965).  "[T]he economic loss rule 'prevent[s] the law of contract and the law of tort

21  from dissolving one into the other.'"  *Robinson Helicopter Co. v. Dana Corp*., 34 Cal. 4th 979

22  (2004) (quotation omitted).  However, there are three exceptions to this rule; the relevant

23  exception here is when a defendant breaches a legal duty independent of the contract, irrespective

24  of whether damages are economic, the economic loss rule does not apply.  *Robinson*, 34 Cal. 4th

25  at 989.  In *Robinson,* in reversing the appeals court for barring the plaintiff's fraud and intentional

26  misrepresentation claims based upon the economic loss rule, the California Supreme Court held

27  plaintiff's claims were independent of the defendant's breach of contract.  *Robinson*, 34 Cal. 4th

28  at 991.  But for the defendant's misrepresentations, the plaintiff "would not have accepted

18

1  delivery and used the nonconforming clutches . . . nor would it have incurred the cost of

2  investigating the cause of the faulty clutches . . . [a]ccordingly, [defendant's] tortious conduct was

3  separate from the breach itself, which involved [defendant's] provision of the nonconforming

4  clutches." *Id*. at 990–91 (alteration in original). *See also BNSF Ry. Co. v. San Joaquin Valley R.*

5  *C*o., 2011 WL 3328398, at *6 (E.D. Cal. Aug. 2, 2011) (California courts have only permitted tort

6  damages in contract cases in which the tort liability is "either completely independent of the

7  contract . . . or when the plaintiff was fraudulently induced to enter the contract.").

8          Here, Copart relied on Sparta's representations and assertions of expertise in its

9  decision to enter into the contract and accept Sparta's bid.  Sparta's representations, Copart

10  alleges, were made with knowing falsity and caused economic damage.  They were also made

11  prior to and separately from the alleged breach.  The fraud-based allegations identify statements,

12  representations, and promises of Sparta's capabilities prior to the contract; these statements do not

13  support the allegations of breach based on Sparta's failure to perform its contractual obligations.

14  Copart's allegations that Sparta fraudulently induced the contract and misrepresented material

15  information satisfies an established exception to the general bar of tort recovery for claims also

16  related to breaches of contract.  The motion to dismiss these claims is denied.

17          3.          Unfair Competition (Claim 7)

18          Copart's claim is based "on the entirety of Sparta's wrongdoing" including its

19  alleged fraud, fraudulent inducement, and other unlawful conduct.  Sparta Opp'n at 18.  As

20  discussed above, *see* pages 13–16 *supra,* under California Business and Professions Code section

21  17200, unfair competition prohibits any "unlawful, unfair or fraudulent business act or practice."

22  Cal. Bus. & Prof. Code § 17200.  The statute's language has been construed as prohibiting three

23  distinct types of practices: (1) unlawful acts or practices; (2) unfair acts or practices; and

24  (3) fraudulent acts or practices.  *Cel-Tech*, 20 Cal. 4th at 180.

25          At hearing, Copart's counsel clarified Copart relies on both the "fraudulent" and

26  "unfair" prongs of the UCL, as pled in the second amended complaint, which alleges "false

27  representations" and "fraudulent activities."  SAC at 24.  Copart, because it retained Sparta for its

28  services, may be considered a "consumer" of Sparta's.  A plaintiff that utilizes a defendant's

services may be a consumer for purposes of the UCL, as in cases brought against mortgage servicers or communication services providers. *See, e.g., Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 924 (N.D. Cal. 2013) (mortgage); *Moore v. Apple, Inc.*, No. 14-CV-02269, 2014 WL 5830374, at *8 (N.D. Cal. Nov. 10, 2014) (wireless service provider).  Copart pleads fraudulent business practices because Sparta allegedly fraudulently induced the contract and misrepresented its capabilities and the functionality of the AIMOS system.  Sparta argues Copart's claim should be dismissed because the underlying fraud claims are deficiently pleaded. Sparta Motion at 24.  As discussed above, the fraud-based claims are pleaded with sufficient particularity under 9(b).  Because the court sustains the fraud-based claims, Copart's accompanying UCL claim based on those actions also survives.  The motion to dismiss claim 7 is denied.

> **4.      Covenant of Good Faith and Fair Dealing (Claim 5)**

Copart contends Sparta breached the covenant of good faith and fair dealing in its various misrepresentations and by "acting in bad faith with respect to the AIMOS agreements." SAC at 23.  Sparta argues this claim must be dismissed because it is "superfluous to the contract claim."  Sparta Mot. at 17.

The covenant of good faith and fair dealing is "implied by law in every contract." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000).  To state a claim for breach of the implied covenant of good faith and fair dealing, plaintiffs must show "the existence of a contractual relationship" in the first place.  *Smith v. City & Cnty. of S.F.*, 225 Cal. App. 3d 38, 49 (1990). The covenant obligates the parties to a contract not to engage in conduct "which injures the right of the other to receive the benefits of the agreement."  *Wagner v. Benson*, 101 Cal. App. 3d 27, 33 (1980).

To the extent Copart relies on allegations of fraud or misrepresentations made by Sparta in the pre-contract negotiations, that behavior is not subject to the implied covenant. *Newsom v. Countrywide Home Loans, Inc.*, 714 F. Supp. 2d 1000, 1007 (N.D. Cal. 2010) ("Pre-contract conduct, however, cannot support a claim for breach of the implied covenant of good faith and fair dealing."); *see McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 799

(2008) (alleged misconduct during contract negotiations failed to state a claim for breach of the implied covenant of good faith and fair dealing).

Sparta contends Copart's allegation is superfluous because it is based on the same behavior as its breach of contract claim.  Copart argues Sparta's conduct "far exceeds the failure to meet its contractual obligations," pointing to the August 2012 "sham demonstration" and the "false claim it had solutions to programming problems."  Copart Opp'n at 18.  Whether a breach of the implied covenant of good faith and fair dealing can co-exist with a breach of contract claim is a question several courts have considered.  Instructively, in *Daly v. United Healthcare Ins. Co*., a sister district court found that *Guz* precludes implied covenant claims "based on the same breach" as the contract claim, but "it is quite possible for a breach of the implied covenant to be based on a different breach than the contract claim."  *Daly v. United Healthcare Ins. Co*., 2010 WL 4510911, at *4 (N.D. Cal. Nov. 1, 2010).  The *Daly* court found a case from the Central District*, Celador Intern. Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846 (C.D. Cal. 2004), persuasive on this question.  There, as here, the court considered a motion to dismiss a claim for breach of the implied covenant of good faith and fair dealing where defendant similarly argued that because the plaintiffs' claim for breach of the implied covenant was based on the same facts as the breach of contract claim, it was superfluous.  The court held "the fact finder could conclude," without finding a breach of the agreement, "that the actions of [d]efendants frustrated a benefit of the contract."  *Id*.

Relying on this standard, the *Daly* court concluded the breach of the covenant was "a different, albeit somewhat inconsistent, breach than the breach of contract claim . . . even if [p]laintiff fails to prove that the Agreement did not justify [d]efendant in terminating [p]laintiff 'for cause,' [p]laintiff could still recover on his breach of the implied covenant of good faith claim."  *Daly*, 2010 WL 4510911 at *6.

Here, Copart alleges Sparta materially misrepresented its expertise, capabilities, and handling of the problems with the AIMOS program during the course of their relationship.  Such misrepresentations are separate from Sparta's failure to meet the obligations of the contract; they are actions giving rise to actionable claims of fraud, not just a failure to perform the terms of

1   the ISA.  Ultimately, a factfinder could conclude Sparta breached its contract with Copart absent

2   a finding it made various fraudulent misrepresentations.  *McNeary-Calloway v. JP Morgan Chase*

3   *Bank, N.A.*, 863 F. Supp. 2d 928, 956 (N.D. Cal. 2012) ("[A] defendant who does not breach a

4   contract may still be liable for breach of the covenant of good faith and fair dealing if they fail

5   [sic] to perform the contract in good faith.").  The claims for breach of contract and breach of the

6   implied covenant of good faith and fair dealing are distinguishable, and this claim is not

7   superfluous to the breach of contract claim.  The motion to dismiss this claim is denied.

8                  5.      Unjust Enrichment (Claim 8)

9          Sparta argues this claim must be dismissed because 1) the claim is grounded in

10  fraud and fails to meet the heightened pleading standards of Rule 9(b), and 2) there is a failure to

11  allege the invalidity of the contact.  Sparta Mot. at 18.  Copart responds a claim for unjust

12  enrichment is properly brought with a breach of contract where the contract was allegedly

13  procured in fraud.  Copart Opp'n at 18.  As this court has already found the fraud-based claims

14  are pled with sufficient particularity as required by Rule 9(b), the court considers whether the

15  unjust enrichment claim is properly asserted where an express agreement, the ISA, exists.

16         To state a claim for unjust enrichment,[1] a plaintiff "must plead 'receipt of a benefit

17  and the unjust retention of the benefit at the expense of another.'"  *Walters v. Fidelity Mortgage*

18  *of Cal.*, 2010 WL 1493131, at *12 (E.D. Cal., Apr. 14, 2010) (quoting *Lectrodryer v. SeoulBank*,

19  77 Cal. App. 4th 723, 726 (2000)).  "Even when a person has received a benefit from another, he

20  is required to make restitution 'only if the circumstances of its receipt or retention are such that,

21  as between the two persons, it is unjust for him to retain it.'"  *Ghirardo v. Antonioli*, 14 Cal. 4th

22

23         [1] California courts generally construe claims for unjust enrichment as claims for
    restitution.  *See McBride v. Boughton*, 123 Cal. App. 4th 379 (2004) (terming the cause of action
24  a request for restitution because "unjust enrichment is not a cause of action or even a remedy, but
    rather a general principle underlying various legal doctrines and remedies"); *Lauriedale Assocs.,*
25  *Ltd. v. Wilson*, 7 Cal. App. 4th 1439, 1448 (1992) ("the phrase '[u]njust [e]nrichment' does not
    describe a theory of recovery, but an effect: the failure to make restitution under circumstances
26  where it is equitable to do so"); *Enreach Tech, Inc. v. Embedded Internet Solutions*,
    403 F. Supp. 2d 968, 976 (N.D. Cal. 2005)  ("unjust enrichment is not a valid cause of action in
27  California.").  With this understanding, the court will use the parties' language of "unjust
    enrichment" but cites to cases considering claims for restitution.
28

1   39, 51 (1996) (quoting Restatement of Restitution, § 1, cmt. c).  In *McBride v. Boughton*, the

2   court explained that "restitution may be awarded in lieu of breach of contract damages when the

3   parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for

4   some reason."  123 Cal. App. 4th 379, 388 (2004).  To prevail on a claim for restitution, a

5   plaintiff need not establish bad faith on the part of the defendant, so long as the recipient of the

6   funds was not entitled to the funds.  *See Lectrodryer*, 77 Cal. App. 4th at 726.

7           Because Copart alleges Sparta engaged in fraudulent misrepresentation to induce

8   Copart's assent to a contractual agreement, it pleads a potentially unenforceable contract.

9   Furthermore, that the unjust enrichment claim may be unsustainable if an enforceable agreement

10   is found does not doom the claim at the motion to dismiss stage.  *Nordberg v. Trilegiant Corp.*,

11   445 F. Supp. 2d 1082, 1101 (N.D. Cal. 2006) ("[A]lthough plaintiffs' restitution claim under their

12   eighth cause of action may ultimately be superfluous to their restitution claim under section

13   17200, it is inappropriate at the motion to dismiss stage to make that determination, as plaintiffs

14   may prevail in one cause of action and not in the other."); *see also McNeary*, 863 F. Supp. at 964

15   (denying motion to dismiss unjust enrichment claim where an express agreement existed, but

16   plaintiffs' claims were fraud-based).  Copart relies on its fraud claims to justify its request for

17   restitution; the cases Sparta relies on in its motion do not address the *McBride* fraud exception,

18   and are therefore not determinative.  The motion to dismiss the restitution claim is denied.

19   III.     CONCLUSION

20           For the foregoing reasons, the court orders as follows:

21           1.     Copart's motion to dismiss Sparta's counterclaim is:

22                a) GRANTED with leave to amend as to Sparta's equitable claims, claims

23   2, 5 and 6, and account stated claim, claim 4;

24                b) GRANTED without leave to amend as to Sparta's unfair competition

25   claim, claim 7; and

26                c) DENIED in all other respects.

27           2.     Sparta's motion to dismiss is DENIED.

28

3.      Sparta shall have 21 days from the date of this order to file an amended counterclaim.

IT IS SO ORDERED.

DATED: June 9, 2015.

_____
UNITED STATES DISTRICT JUDGE