MARK P. RESSLER (*admitted pro hac vice*)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:     (212) 506-1700
Facsimile:     (212) 506-1800
mressler@kasowitz.com

JASON S. TAKENOUCHI (SBN 234835)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 California Street, Suite 2300
San Francisco, California 94111
Telephone:     (415) 421-6140
Facsimile:     (415) 398-5030
jtakenouchi@kasowitz.com

Attorneys for Plaintiff/Counterdefendant
COPART, INC.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COPART, INC., | Case No: 2:14-CV-00046-KJM-CKD |
| Plaintiff | **THIRD AMENDED COMPLAINT** |
| v. | |
| SPARTA CONSULTING, INC., KPIT INFOSYSTEMS, INC., and KPIT TECHNOLOGIES LTD. | **JURY TRIAL DEMANDED** |
| Defendants | |
| SPARTA CONSULTING, INC. | |
| Counterplaintiff, | |
| v. | |
| COPART, INC., | |
| Counterdefendant | |

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    Plaintiff Copart, Inc. ("Copart"), for its complaint against defendants Sparta Consulting,

2  Inc. ("Sparta"), KPIT Infosystems, Inc., and KPIT Technologies Ltd. (the KPIT entities are

3  collectively referred to as "KPIT"), alleges as follows:

4    **PRELIMINARY STATEMENT**

5    1.    This action arises from the fraud, theft, and other misconduct of defendants Sparta,

6  a U.S.-based software consulting firm, and its parent companies – one based in the U.S. and the

7  other in India – related to a failed project to design and implement an enterprise-wide software

8  system for Copart, a leading provider of on-line vehicle auctions.

9    2.    Sparta and KPIT's failure was, by their own accounts, spectacular.  Documents that

10  Sparta and KPIT produced in this litigation reveal that they admitted internally that their work

11  product was "extremely poor quality," "pathetic" and "a mess."  They admitted internally that the

12  software system they designed was "unstable" and "does not have stable design/solution"; that

13  they had written software without applying basic quality controls that are accepted practice in the

14  industry; and that their testing environment was improperly structured, which destabilized the

15  system at a "critical juncture" in the project.  Their internal documents further reveal that under

16  the guise of working as the systems integrator on Copart's software project, Sparta and KPIT

17  devised and executed an unlawful scheme to steal Copart's trade secrets to enhance one of Sparta

18  and KPIT's own software products.

19    3.    Sparta and KPIT did not disclose any of these performance failures to Copart

20  during the project.  To the contrary, in reports to Copart about project status, they concealed these

21  and other problems to induce Copart to sign off for additional work.  Nor did they disclose to

22  Copart that they had stolen Copart's trade secrets, or that – as their internal documents reveal –

23  they were aware of a scheme to rig the bidding on the project and deprive Copart of a potential

24  alternative vendor.

25    4.    Even well into the project, as Sparta and KPIT's teams were in a self-described

26  "panic" over their continuing failure to understand Copart's business and patch together a stable

27  design – after nearly 18 months of development work and millions of dollars in billings – Sparta

28  and KPIT hid their failings from Copart.  The result was, predictably, a disaster.  The project

1  failed, inflicting more than $50 million in damages on Copart, including profits that Copart lost

2  because of delays in the expansion of its business.

## SUMMARY OF FACTS

4      5.    In 2010, Copart decided to pursue a company-wide strategic initiative to replace its

5  legacy computer system with enterprise resource planning ("ERP") software known as SAP (the

6  "Project").  Given the extraordinary operational risks in replacing its core information technology

7  system – and because Copart did not have the knowledge or expertise to implement an SAP

8  system on its own – Copart knew it had to rely on a software consulting firm to provide the

9  necessary resources, skills and experience to design and implement a software solution that could

10  meet Copart's business needs and support its continued growth and expansion.

11      6.    To that end, in August 2011, Copart solicited bids from several software consulting

12  firms to design and implement a global rollout of an SAP software solution.

13      7.    Fully aware that a timely and successful ERP implementation was critical to

14  Copart's strategic business plan, Sparta won the bid by falsely representing that it had the requisite

15  technical experience and expertise to implement a complex SAP business solution for Copart that

16  would deliver 100% of the functionality of Copart's legacy system.  After inducing Copart to enter

17  into a contract based on repeated and specific representations concerning its experience, ability

18  and expertise, Sparta in fact delivered only ruin, assigning consultants who lacked the skill and

19  experience to successfully design and implement an SAP solution at Copart.

20      8.    Even though Sparta was supposed to design the new SAP system to replicate the

21  functionality of the old system, Sparta farmed out that design work to incompetent offshore KPIT

22  consultants who had never even seen the old system, much less spoken with Copart employees

23  who used that system.  Flying blind trying to replicate a system with which they were wholly

24  unfamiliar, the offshore KPIT consultants delivered an incomplete and defective design.  In their

25  internal emails, KPIT and Sparta admitted that the KPIT consultants' unfamiliarity with the

26  system doomed the Project.

27      9.    Despite knowing that the system was going to fail, Sparta nevertheless assured

28  Copart in early 2012 that the design was sound and complete, and demanded payment.  When

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Copart questioned the seeming lack of detail in Sparta's design documents, Sparta represented that it would fill in the design gaps as it built the system, falsely insisting that it was standard practice to do so.  Unaware that Sparta had offloaded key design work to incompetent offshore KPIT personnel, and that Sparta and KPIT had internally acknowledged that their design was defective, Copart relied on Sparta's representations and omissions, paid Sparta for a useless design, and ultimately engaged Sparta to build the new SAP system.

10.     Sparta and KPIT were never able to deliver a working SAP system.  Despite pocketing over $11 million in fees, their work on the Project was beset by egregious performance failures, including complete disarray in project management, a fundamental design flaw relating to how they integrated certain SAP modules, configuration and coding defects, deficient testing and a failure to appropriately identify, manage and mitigate project risk.  Throughout the Project, in dozens of internal emails, Sparta and KPIT managers delivered withering attacks on their clueless consultants, lamenting their "pathetic" work, that their deliverables were a "mess," that they worked "slower than a dead man walking," and that they had wasted countless hours on duplicative and useless work.

11.     Of course, Sparta and KPIT never shared with Copart their scathing running commentary on their own consultants' performance failures.  Rather, in their nearly three years of work on the Project, Sparta and KPIT engaged in a pattern of concealment to ensure that Copart would not learn the truth about Sparta and KPIT's misconduct, and would continue to rely on Sparta and pay it fees.  As part of this scheme, Sparta sanitized risk reports it shared with Copart to mislead Copart into believing the Project was on track, even as Sparta and KPIT internally admitted that, as a result of their own performance failures, the Project was going to fail.  Through such concealment, Sparta was able to extract additional payments from Copart for work that was deficient or not performed at all.

12.     But Sparta and KPIT's scheme against Copart was not limited to taking fees for botched work.  Sparta and KPIT also stole Copart's trade secrets.  In a brazen act of theft, Sparta and KPIT stole unique and proprietary software materials and business methods owned by Copart to enhance one of their products, known as AutoEdge, an ERP platform for the automobile

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

industry.  Indeed, Sparta and KPIT prepared a special protocol, entitled "Project Charter – AutoEdge Development under Copart Project," to govern their theft of Copart's trade secrets to improve their own AutoEdge product.  Documents that Sparta produced in this litigation in late 2015 included internal emails in which Sparta and KPIT instructed their consultants on the Project to copy and steal Copart's trade secrets for use in AutoEdge.  Sparta never disclosed this to Copart, and until 2015 Copart was not aware of this misconduct.  Nor did Sparta disclose that during the build phase of the Project, Sparta and KPIT diverted their consultants from the Project to AutoEdge development work, sometimes over those consultants' objections.  In this way, Copart effectively paid Sparta to steal Copart's trade secrets.

13.     Copart did not begin to discover the truth about Sparta's performance failures until mid-2013, when Sparta's lack of progress, bug-ridden code and flawed design became intolerable. At that time, Copart terminated Sparta.

14.     In 2014, Copart determined that proceeding with the Project was not viable, and on May 28, 2014 announced that it had taken a $29.1 million impairment expense associated with the failed SAP implementation.  In addition to the impairment charge, and millions of dollars in wasted fees and expenses related to the failed Project, Sparta's failure to timely complete the global rollout of SAP also forced Copart to delay planned initiatives for international expansion and caused Copart to defer or abandon other domestic business objectives, all resulting in substantial lost business opportunities.

15.     By this action, Copart seeks to recover the millions of dollars in damages that Sparta inflicted on Copart, in an amount no less than $50 million, as well as punitive damages. Copart also seeks an injunction against Sparta and KPIT's continued marketing and use of Copart's trade secrets in their proprietary AutoEdge product, damages and restitution for Sparta and KPIT's use of that property, and attorneys' fees.  Copart further seeks restitution from Sparta and KPIT.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because this is a dispute between citizens of different states and the amount in controversy exceeds $75,000.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this dispute

2    involves the application of federal law.

3         17.    Venue is proper in this district under 28 U.S.C. §1331(b)(2) as a substantial part of

4    the events and omissions giving rise to Copart's claims occurred in this district.

5         18.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each

6    Defendant: (a) purposefully directed its activities to Copart at a time when Copart resided in the

7    forum; (b) provided professional services intended for delivery, and in fact delivered, to Copart at

8    a time when Copart resided in the forum; and (c) participated in the theft of Copart property, and

9    other misconduct against Copart, at a time when Copart resided in the forum.  Sparta also acted as

10   the agent for and an alter ego of the other Defendants with respect to services provided to, and

11   misconduct against, Copart at a time when Copart resided in the forum.  Further jurisdictional

12   contacts are alleged below.

13                                    **THE PARTIES**

14        19.    Copart is a corporation formed under the laws of the state of Delaware.  Copart has

15   its headquarters in Dallas County, Texas.  Prior to its move to Dallas in 2011, Copart maintained

16   its headquarters in Fairfield, California.

17        20.    Upon information and belief, Sparta Consulting, Inc., is a corporation formed under

18   the laws of the State of California and is a wholly owned subsidiary of KPIT Infosystems Inc.

19   Sparta has accepted service and appeared in this action.

20        21.    KPIT Technologies Ltd. is a corporation based in India that provides technology

21   consulting services.  It is the direct parent company of KPIT Infosystems, Inc., and the indirect

22   parent company of Sparta Consulting.  KPIT Technologies purposefully directed its services to

23   California through its employees and agents who worked on the Project.

24        22.    Upon information and belief, KPIT Infosystems, Inc. is a corporation formed under

25   the laws of the State of New Jersey.  KPIT Infosystems is the parent company of Sparta

26   Consulting, and it purposefully directed its services to California through its employees and agents

27   who worked on the Project.  Upon information and belief, KPIT Infosystems acts as the general

28   manager of KPIT Technologies in the United States, and, in conjunction with its subsidiary Sparta,

1    acts as the public face of KPIT Technologies in the United States.  Upon information and belief,

2    KPIT Infosystems also acts as the general agent of KPIT Technologies in the United States.

3        23.    At all relevant times, each of the defendants was the agent of each of the other

4    defendants with respect to the misconduct alleged herein.

5        24.    At all relevant times, Sparta, KPIT Technologies and KPIT Infosystems were each

6    an alter ego of the other insofar as there was a unity of interest between them – *i.e.*, they

7    commingled resources, work product and employees freely, and failed to maintain arm's length

8    relationships among the entities, such that they all constituted a single business enterprise for

9    purposes of the Project.  The commingling of resources included unsecured loans between and

10   among the entities, the use of each other's employees on the Project for free or reduced rates, the

11   free transfer of company property, and the manipulation of payments between entities to take

12   advantage of tax laws.  The fiction of separate corporate identities creates the potential for

13   injustice insofar as it would allow KPIT Technologies and KPIT Infosystems to escape liability

14   for their own misconduct and for their role in directing and contributing to Sparta's misconduct.

15                              **FACTUAL BACKGROUND**

16       25.    Founded in 1982, Copart sells vehicles for a variety of consignors (including

17   insurance companies, finance companies, banks and rental car companies) to a variety of buyers

18   (including dealers, dismantlers, rebuilders and exporters).  Copart sells these vehicles on the

19   internet using its patented virtual auction and bidding technology.

20       26.    Copart's success in the industry depends on the operation of a complex set of

21   business methods and processes developed by Copart over decades of experience.  These

22   proprietary methods and processes are both complex and varied by jurisdiction, with different

23   regulations, procedures, and policies effecting the business methods and processes from state-to-

24   state and county-to-county.  The operation of these business methods and processes enable Copart

25   to be the leader in its line of business.

26       27.    Copart uses a legacy system called Copart Auction Systems ("CAS") to support its

27   operations.  CAS was built by and for Copart to perform all the features and functions that Copart

28   needs for its unique business model.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

28.     While CAS performs all the features and functions required to operate Copart's business, Copart needed a modern replacement for CAS to allow scaling and interfacing with other modern platforms and Copart's international operations.  Accordingly, Copart decided in 2010 to begin the process of replacing CAS.  But one thing was key to Copart's decision: the replacement system would have to include 100% of the functionalities of CAS.  The importance of this requirement cannot be overstated.  Copart needs 100% of the CAS functionalities to make its unique business model work.  Copart cannot be successful without 100% of CAS functionality.  So, while Copart wanted a modern version of CAS, Copart did not, and could not, take a step back in terms of the required features and functions, i.e., 100% of CAS functionality.

29.     The CAS replacement was called "AIMOS."  AIMOS was to be an ERP system, built on an SAP platform, with interfaces to Copart's e-commerce solution and virtual bidding engine.

30.     In August 2011, Copart issued a Request for Proposal for the design and implementation of AIMOS.  Sparta was one of several companies that submitted a proposal.

31.     As described more fully below, based on Sparta's representations concerning its consultants' purported skills, experience and expertise, Copart selected Sparta to design and thereafter implement an SAP software solution capable of meeting Copart's business needs.  From August to September 2011, Copart met with Sparta at least ten times to discuss the potential engagement of designing and implementing AIMOS (the "AIMOS Project").  During this period, Sparta met with Copart's various operations groups to learn about Copart's business requirements.  Sparta also met with Copart's technical group to learn about CAS and Copart's other computer systems.  The purpose of these meetings was for Sparta to learn about the features and functions of CAS, so Sparta could determine if it had the ability to design AIMOS with 100% of CAS functionality.

32.     Throughout this process Sparta recognized and acknowledged the importance of Copart's requirement that AIMOS include 100% CAS functionality.  Indeed, Sparta's August 5, 2011 presentation materials delivered to Copart made that clear: "Sparta developed this proposal

7

in response to an understanding that ***Copart needs 100% of CAS functionality*** without building too many customization objects."  (Emphasis added.)

33.     After completing its due diligence, Sparta delivered a bid to Copart and made numerous material misrepresentations concerning the AIMOS Project.  For example, Sparta represented that it had the ability to design and implement AIMOS with 100% of the features and functions of CAS.  Sparta also assured Copart that it had the ability to make CAS functions work in SAP; that it had solutions to the specific CAS features and functions that had stumped another consulting firm previously hired by Copart that was unable to deliver a solution with business critical functionality; that it had large teams of programmers with experience in the OEM/Automobile industry available to work on the AIMOS Project; that it would staff the project with seasoned employees who had been long-term employees of Sparta; and that Sparta's SAP experts would work on the AIMOS Project.  Sparta also represented that it had the skill and ability to manage an SAP project of Copart's size and nature; that because of Sparta's smaller size, it was more nimble and more creative than the big consulting firms; that Sparta had the unique expertise and experience to design and implement an SAP solution for Copart; and that Sparta was the firm called upon to fix projects, even complex projects like the AIMOS Project, when the big consulting firms had failed.

34.     When pressed about the particular challenges of CAS functionality, Sparta stated that it had a solution for each and every one of these challenges.  Among others, Sparta representatives Executive Vice President Vaibhav Nadgauda, Senior Vice President Ashu Bhalla, founder and President Paul Freudenberg, and senior executive Prafulla Kharkar made these and other similar representations in the fall of 2011 at various meetings with Copart personnel, including meetings involving Vincent Phillips, Betsy Hollander, Simon Rote, Gayle Mooney and David Burke, among others.

35.     In addition, Sparta said it would "leverage SAP Best Practice processes and industry standards" to design the AIMOS Project.  It also claimed it would "[c]onfirm Interfaces between SAP and Legacy Systems for enabling common processes" and "[i]dentify existing Interfaces that will be removed/charged."  In connection with its review and bid process, Sparta

1    represented that it had "identified key elements of SAP solution that may be the best fit for

2    [Copart's] processes."

3         36.    Sparta also made representations about the resources it had available for the

4    AIMOS Project including that: "Sparta is proposing a team of **highly experienced senior level**

5    **SAP consultants**."  Sparta further represented that "Sparta is also proposing having **2 key SAP**

6    **resources** as part of our team to help in solution architecture…. The proposal resources are

7    available to be deployed on the Copart project as per the current schedule (September [2011])."

8    Sparta further assured Copart that because of its "partnership" with SAP, Sparta had access to

9    "**[t]he A-team of Expert Resources**."

10        37.     With regard to management of the AIMOS Project, Sparta made specific

11   representations about its senior management's involvement, including that "Sparta Executive

12   Management is very committed to the success of the engagement."

13        38.    But Sparta's precontract representations were false. When Sparta made the

14   representations to Copart, Sparta either knew they were false or made the representations

15   recklessly as positive assertions without knowledge of whether the representations were true or

16   false.  Sparta made the representations to Copart with the intent to induce Copart to hire Sparta

17   and enter into a contract with Sparta for the AIMOS Project.  Sparta induced Copart to enter into a

18   contract that Sparta had no intention of performing, and was unable to perform, as represented.

19        39.    In addition to its misrepresentations, Sparta also omitted material information.

20   Sparta failed to disclose that it did not have the ability and skill required to design AIMOS with

21   100% of CAS functionality, and that it did not have the solutions needed to re-create the features

22   and functions of CAS in AIMOS.  Sparta knowingly omitted this information with the intent to

23   induce Copart to hire Sparta and enter into a contract with Sparta.

24        40.    In September 2011, in good faith reliance on the numerous representations

25   identified above, including Sparta's representations that it had the SAP expertise and solutions to

26   bridge the CAS functionality gaps that a prior consulting firm had been unable to achieve, Copart

27   agreed to hire Sparta.  At the time it made its decision to select Sparta, Copart did not know that

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Sparta had withheld and failed to disclose material information about its inability to perform the services required.  Had Copart known the truth, Copart would not have hired Sparta.

41.    **The Implementation Services Agreement**.  On October 6, 2011, Copart and Sparta signed the Implementation Services Agreement (the "ISA").  A copy of the ISA is attached hereto as Exhibit A.

42.    In the ISA, Sparta confirmed that it had conducted sufficient due diligence to understand the task at hand:

> **9.4    Diligence**.  Service Provider acknowledges and agrees that Copart has delivered or made available to Service Provider all information and documents Service Provider has deemed necessary for Service Provider to determine the requirements to achieve the replacements of 100% of CAS Functionalities (as defined in the initial Statement of Work) and to otherwise commit to its obligations, including the fixed Fees, under this Agreement. Service Provider shall not be relieved of any of its obligations under this Agreement, or attempt to alter, increase or add any fees of charges related to this Agreement, as a result of its failure to review the foregoing information and documents or any documents referred to therein or its failure to request any information or documents from Copart or otherwise perform and diligence activities before the Effective Date.

ISA § 9.4, at 9.

43.    The ISA also contained an explicit covenant by Sparta concerning the skills and experience of its consultants and a warranted standard of performance:

> **14.2    By Service Provider**.  (a) [Sparta] shall provide the Services with promptness, diligence and in a professional manner, in accordance with the practices and professional standards used in well-managed operations performing services similar to the Services, and [Sparta] shall use adequate numbers of qualified individuals with suitable training, education, experience and skills to perform the Services.

ISA § 14.2, at 14.

44.    The ISA gave Copart all rights to the intellectual property that Sparta developed as part of the project:

> **11.4    Ownership of Deliverables.**  Other than Service Provider Background Intellectual Property, Copart will be the sole and exclusive owner of all Deliverables, and without further consideration or action, [Sparta] hereby assigns to Copart all of [Sparta]'s right, title and interest in and to such Deliverables, including all Intellectual property rights therein.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   ISA § 11.4, at 11.[1]

2        45.     The ISA also gave Copart all rights to any "derivatives, modifications,

3   enhancements or improvements" to Copart's existing intellectual property that were developed

4   during the project:

5        11.3    **Ownership of Copart-Owned Intellectual Property.**  [] Copart will be the sole
         and exclusive owner of the Intellectual Property (i) owned by or licensed to Copart…  Any
6        derivatives, modifications, enhancements or improvements to the Copart-Owned
7        Intellectual Property, including any Copart Software, developed by [Sparta] or Copart in
         connection with this Agreement will be deemed Copart-Owned Intellectual Property and
8        owned exclusively by Copart.

9   ISA § 11.3, at 11.

10       46.     As demonstrated below, Sparta breached its contractual obligations and warranties,

11  by among other things, (i) failing to assign to the project consultants with the requisite knowledge

12  and skills to successfully perform the project, and, as a result, (ii) failing to deliver an SAP system

13  capable of meeting 100% CAS functionality and Copart's business requirements, and (iii) stealing

14  Copart's intellectual property and trade secrets.

15       47.     In addition to the ISA, Copart and Sparta entered into Statements of Work (the

16  "SOWs") which detailed the work to be performed, the timetable for completing the work, and the

17  fixed fee payments associated with Sparta's completion of the work, conditioned on Copart's

18  acceptance of the work.

19       48.     The initial phase for Sparta's work on the AIMOS Project was the design phase

20  (the "Design Phase").  The SOW for the Design Phase (the "Design SOW") is attached as Exhibit

21  B.

22       49.     **The Design Phase**.  In the Design SOW, Copart and Sparta agreed on the

23  requirements of the Design Phase:

24       •   "Design the replacement of 100% of CAS Functionalities, including the
             replacement of 100% of Copart's JD Edwards functionality, and the complete
25

26  _____

27  [1] The ISA defined "Deliverables" as "all deliverables and other materials to be delivered to Copart by
    Service Provider in connection with the Services."  ISA § 1.12, at 2.

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

integration of the CAS Functionalities with ATOM[2] (collectively, the 'New Solution')."  Design SOW, at 2.

- "Design in as many SAP best practices and out-of-the box standard SAP functionality as possible without requiring changes to Copart's business processes and workflows to the extent that SAP best practices and out-of-the box standard SAP functionality fulfill Copart's requirements."  Design SOW, at 2.
- "Avoid designs that would require modifications to the source code of the SAP Software where possible and minimize the use of WRICEF's."[3]  Design SOW, at 2.
- "Prepare a comprehensive and detailed plan for the implementation, testing, training, and deployment of the New Solution."  Design SOW, at 2.

50.     These requirements were to be delivered over a schedule of "milestones" commencing with Milestone 1 and concluding with Milestone 3.  Each milestone had a specific set of requirements, a specific completion schedule, and a specific fixed fee to be paid only after Sparta's completion *and* Copart's acceptance of the work associated with that particular milestone.

51.     Sparta's misrepresentations continued during the Design Phase.  During Milestone 2, Copart noticed the lack of details in the AIMOS design documentation and questioned Sparta about it.  As one example, Sparta was contractually obligated to deliver business requirements documents (referred to by the parties as "BRDs") detailing all of the functional business requirements for the AIMOS Project.  In December 2011, Copart questioned Sparta about the lack of requirements recorded in the BRDs.  Sparta, through its senior executive Prafulla Kharkar and others, responded by representing to Copart, through Vincent Phillips and Gayle Mooney, among others, that Sparta was the "SAP expert" and that "this was how SAP designs are done."  The next month, Sparta assured Copart managers that:  the functional design documents did not need to address all the details of Copart's business; these documents could be modified or enhanced even after Copart signed off on them; these functional specification documents did not need to include field level details; and that such details would be added during the build phase.

---

[2] ""ATOM" refers to the Copart database that supports, among other things, Copart's virtual bidding engine known as "VB2" and Copart's e-commerce solution known as "C2," which was subsequently upgraded as "AURORA/C3/G1."  Per the Design SOW, AIMOS was to be designed by Sparta to fully integrate with ATOM."

[3] WRICEF is an acronym used in SAP implementations to refer to "Workflows, Reports, Interfaces, Conversions, Enhancements and Forms."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

52.   Similar exchanges took place as Sparta created other sparse designs.  Each time, upon questioning by Copart, Sparta reiterated that it was the "SAP expert" and that it knew "how SAP designs were done."  In particular, Vincent Phillips and others on Copart's behalf requested screen shots to ensure conformity to existing systems and to measure functionality.  But Sparta senior executive Prafulla Kharkar and others on behalf of Sparta responded that that was not the SAP design approach and that SAP allowed movement freely so a screen shot or static view was not important.  When pressed, Sparta insisted that the sparse detail in the BRDs was sufficient for an SAP design and promised that the details would come later.

53.   When Sparta made these representations to Copart, Sparta either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false.  Sparta made the representations to Copart with the intent to conceal from Copart that Sparta did not have the ability and skill required to design AIMOS with 100% of CAS functionality and to induce Copart to continue to pay money to Sparta, and not terminate the ISA.

54.   During the Design Phase, Sparta also repeatedly misrepresented the capabilities and performance of its consultants on the Project, and failed to disclose to Copart critical information that, once disclosed, would have led Copart to terminate Sparta immediately.  Thus, even as Sparta was assuring Copart that Sparta had staffed the Design Phase with appropriate resources, and that the Project was proceeding on track, Sparta was internally acknowledging major performance lapses and mistakes, none of which it disclosed to Copart:

   a.   A Sparta consultant, Ken Murray, warned his managers in November 2011 that Sparta had a "poor performing team" on the Project, and that turnover was already a problem.  Days later, when another Sparta consultant on the MM module, Ed Suttle, went "missing," Sparta decided that instead of telling Copart the truth – that the consultant had abandoned the project – Sparta told Copart that he had "food poisoning."  Weeks later Sparta was still scrambling for a replacement, but did not warn Copart that problems with the MM module might delay the project.

13

b.  In January 2012, a KPIT manager, Mandar Deshpande, told his KPIT and Sparta colleagues that "[t]he process we followed from beginning has led to confusion," and that "detail level process[es] have not been documented." He also explained that KPIT's offshore team, which was performing critical design work, was hampered because it had no client contact and sparse documentation from the on-site team.  Deshpande acknowledged that this confusion and failed management had resulted in wasted and duplicative work.

c.  In late February 2012, Namit Swaroop from Sparta instructed KPIT's offshore team to draft and update scores of functional specifications and other design documents, even though this team never had direct contact with the Copart employees who understood the business functions these design documents were supposed to describe.

d.  In March 2012, Sparta submitted functional specifications to Copart that included, in some instances, material that was cut-and-pasted from a prior vendor's design documents.

e.  Sparta hired a sub-contractor to design the replication of data between CRM and ECC, which was a critical component of Sparta's chosen design. Sparta delayed paying that consultant for months, resulting in delays and acrimony.  Sparta eventually stopped working with the sub-contractor.

55.    Sparta did not complete the requirements of the Design SOW by the contractual deadline.  At the time the deadline was reached, there were several CAS functions that were not yet designed.  Sparta recommended "double tracking", *i.e.*, working on the completion of the missing designs at the same time that Sparta began the second phase to build AIMOS.

56.    Sparta assured Copart that the missing functionalities were achievable and would be designed in the second phase of the implementation.  Sparta again represented its expertise in SAP and ability to handle the double-tracking of design and build.  Indeed, Sparta, through its senior executive Prafulla Kharkar and others, represented to Copart, through Vincent Phillips and

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

others, that it was "standard SAP protocol to double-track in this manner."  Sparta also represented that deferring the completion of these designs would enhance the flexibility of the build and, importantly, would not jeopardize the overall project.

57.     When Sparta made these representations to Copart, Sparta either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false.  Sparta made the representations to Copart with the intent to conceal from Copart that Sparta did not have the ability and skill required to design AIMOS with 100% of CAS functionality and to induce Copart to continue to pay money to Sparta, and not terminate the ISA.

58.     In addition to its numerous misrepresentations, both before and after the ISA was signed, Sparta also omitted material information.  Sparta failed to disclose that it did not have the ability, experience and skill required to design AIMOS with 100% of CAS functionality, and that it did not have the solutions needed to re-create the features and functions of CAS in AIMOS.  Sparta knowingly omitted this information with the intent to conceal from Copart that Sparta did not have the ability and skill required to design AIMOS with 100% of CAS functionality.  Sparta also omitted this information to induce Copart to continue to pay money to Sparta, and not terminate the ISA.

59.     Sparta also failed to disclose to Copart that Sparta was relying on KPIT and Sparta offshore personnel to perform critical design work.  Throughout the design process, Copart was told and believed that the Sparta consultants in charge of designing the new system were the same on-site consultants who had analyzed Copart's business requirements and had access to the CAS system whose functionality Sparta was supposed to replicate in the new system.  But this was not true.  In fact, offshore consultants performed much, if not most, of the design work for the new system.  Sparta also failed to disclose that its offshore consultants – a mix of Sparta and KPIT employees – lacked the requisite skills and experience and had not created sufficiently detailed design documents for a functioning SAP system.  Sparta concealed this information with the intent to induce Copart to continue pay Sparta fees for design, and to engage Sparta to work on the build phase.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

a. The KPIT Technologies employees who worked on the AIMOS project included at least the following: Amit Adhikari; Amit Choudhary; Aditya Sikaria; Vikas Jaiswal; Mandar Deshpande; Nitin Wanjara; Sujit Sahajan Mahanty; Swapnil Malpathak; Tejaswini Shenoy; Utkarsh Kanade; and Venkata Pradeep.  Collectively these employees worked tens of thousands of hours on the Project, according to Sparta records.

b. The KPIT Infosystems employees who worked on the project included Chandrasekhar Bade and Prabudh Kakkarl.  Collectively these employees worked thousands of hours on the Project, according to Sparta records.

60.     Copart relied on Sparta's misrepresentations and omissions when it decided to pay Sparta for its design work, not terminate the ISA, and engage Sparta to work on the build phase.

61.     **The Build Phase**.  The second phase of the implementation was called the realization or build phase (the "Build Phase").

62.     Sparta delivered a bid to Copart in connection with the Build Phase and made numerous representations to Copart concerning the Build Phase.  Specifically, Sparta represented that it had the ability and expertise to implement AIMOS with 100% of the features and functions of CAS.  Sparta also reassured and made repeated representations to Copart that it had the ability to make CAS functions work in SAP; that it had solutions to the specific CAS features and functions; that it had big teams available comprised of programmers with experience in the OEM/Automobile industry as well as seasoned employees who had been long-term employees of Sparta; and that Sparta's SAP experts would work on the AIMOS Project.  Sparta also represented that it had the skill and ability to manage an SAP project of this size and nature; that because of Sparta's smaller size, it was more nimble and more creative than the big consulting firms; that Sparta had the unique expertise and experience to design and implement AIMOS; and that Sparta was the firm called upon to fix projects, even complex projects like the AIMOS Project, when the big consulting firms had failed.  When pressed about the particular challenges of CAS functionality, Sparta represented that it had a solution for each of these challenges.  Further, Sparta represented that its work with Copart to learn the CAS functionalities – and representation that it

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  had received all necessary access to understand the project – gave Sparta an advantage over other

2  vendors.

3        63.     But Sparta's representations were false.  When Sparta made the representations to

4  Copart, Sparta either knew they were false or made the representations recklessly as positive

5  assertions without knowledge of whether the representations were true or false.   Sparta made the

6  representations to Copart with the intent to induce Copart to hire Sparta for the Build Phase by

7  entering into the Build Phase SOW and continuing the ISA for the AIMOS Project.

8        64.     In addition to its misrepresentations, Sparta also omitted material information.

9  Sparta failed to disclose that it did not have the ability, experience and skills required to design

10  and build AIMOS with 100% of CAS functionality, and that it did not have the solutions needed

11  to re-create the features and functions of CAS in AIMOS.  Sparta also failed to disclose to Copart

12  that Sparta had assigned offshore KPIT and Sparta consultants to do most of the system design

13  work, and that these offshore consultants created design documents that lacked sufficient detail to

14  design a working SAP system.  Sparta knowingly omitted this information with the intent to

15  induce Copart into hiring Sparta, continuing the ISA, and entering into a SOW with Sparta to

16  cover the Build Phase.

17        65.     Sparta also omitted other critical information from Copart in the weeks leading up

18  to Copart's decision on whether to select Sparta for the Build Phase:

19               a.   In late February, Sparta submitted a report to Copart on Sparta's plan for

20                  the Build Phase.  But that report omitted several project risks that Sparta's

21                  own project manager, Kharkar, had identified in an internal Sparta

22                  assessment.  Those risks included, among other things, the "Humongous

23                  Documentation" required for the project, the need to tailor the solution so

24                  that it could be used by the less-skilled workers at Copart's vehicle yards,

25                  and Sparta's reliance on offshore consultants and engineers.  Kharkar

26                  proposed internally that Sparta could mitigate these risks in various ways –

27                  for example, he thought the "Humungous Documentation" risk could be

28                  addressed by simply not fully documenting Sparta's design and

implementation.  But Sparta never presented this risk information, or Sparta's proposed (and ineffective and inadequate) mitigation measures, to Copart.  Instead, Sparta presented Copart with a sanitized version of the report that excluded any discussion of these risks.

b.  In March, a Sparta competitor, PwC, began work on a bid for the Build Phase.  On March 27, 2012, an SAP representative, Jerry Brooner, called Sparta executive Ashu Bhalla and told him that "PWC is still putting the proposal together for Copart and he [Brooner] and shane [another SAP representative] *will make sure that their numbers are higher than ours*." (Emphasis added.) Sparta never disclosed to Copart that Sparta was aware of SAP's bid-rigging conduct aimed at ensuring that Sparta won the bid for the Build Phase.

66.     While Copart did consider other bids, Copart selected Sparta for the Build Phase based on the numerous representations identified above as well as Sparta's assurances that it had the expertise and solutions to solve the CAS functionality issues in SAP.  Copart also selected Sparta because Copart did not know that Sparta withheld and failed to disclose the material information about the risks to the Project – all of which Sparta had identified internally – related to Sparta's inability to perform the services required, Sparta's defective design work, and Sparta's inadequate mitigation efforts.  Had Copart known the truth, Copart would not have hired Sparta for the Build Phase.

67.     In March 2012, Copart and Sparta agreed to the terms of the SOW for the Build Phase (the "Build SOW"). [4]  The Build SOW is attached as Exhibit C.  In the Build SOW, Copart and Sparta agreed that the requirements of the Build Phase were to:

- "Configure, develop, and deploy the AIMOS Design."  Build SOW, at 2.
- "Document the configuration and extensions . . . used to build the AIMOS Design."  Build SOW, at 2.

---

[4] Although the word "build" is not in the title of the SOW, Copart uses the phrase "Build SOW" to be consistent with the terminology used to reference the two phases of the AIMOS Project.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

- "Prepare and follow comprehensive and detailed plans approved by Copart for the implementation, testing, training, cut-over, and deployment of the AIMOS Design."  Build SOW, at 2.

68. As with the Design SOW, the requirements in the Build SOW were also to be delivered over a schedule of "milestones" commencing with Milestone 5 and concluding with Milestone 15.  Each milestone had specific set of requirements, a specific completion schedule, and a fixed fee to be paid only after Sparta's completion *and* Copart's acceptance of the work associated with that particular milestone.  For example, Milestone 9 set the first "go live" date for all yards in Canada to be October 1, 2012.  Build SOW, at 9-10, 30.

69. Problems during the Build Phase, however, began as soon as Sparta reached Milestone 5, the first delivery of source code.

70. Sparta's source code did not run. When questioned, Sparta, through its senior executive Prafulla Kharkar and others, responded to Copart, through Gayle Mooney among others, that the source code was not supposed to be functional at this stage.  Sparta further represented that the source code would be functional later.

71. Milestone 6 ("Code Drop #2") was doomed with similar issues: Sparta's source code was still not functional.  Sparta continued to represent to Copart that the source code was not supposed to be functional at that point.

72. Copart also identified shortfalls involving process integration, on-site networks, and yard hardware.  Copart raised these problems with Sparta.  Each of these problems reflected the inability of AIMOS to perform CAS functions and interface with Copart's existing systems.  Sparta first claimed that the issues related to yard hardware and onsite networks were "new" issues unrelated to the AIMOS Project.  But, eventually, Sparta conceded they were CAS functionalities, and told Copart it would remedy the problems.

73. With respect to the process integration issue, Sparta responded by claiming that the SAP portion of the solution was nearly complete.  But Copart took exception because, without process integration, AIMOS could not interface with other Copart systems or third-party systems, such as banks.  Despite its claims that it was an "SAP expert" and had SAP expertise, Sparta had failed to employ standard SAP project management processes.  Similarly, despite noting the

19

1   importance of interfaces, Sparta did not at that time have anyone staffed to the AIMOS Project

2   who could design and build interfaces with financial institutions, including critical security and

3   data confirmation necessary to complete such interfaces.

4          74.     In August 2012, Sparta planned a demonstration of AIMOS to show Sparta's

5   progress.  The demonstration went poorly.

6          75.     In a room full of employees from both Sparta and Copart, Sparta senior executive

7   Prafulla Kharkar led the meeting.  As he navigated the system from point-to-point, Sparta

8   employees manipulated the demonstration to give the appearance that AIMOS was working, even

9   though it was not.  After the demonstration, Copart met with Sparta to discuss the status of the

10   AIMOS Project.  Sparta, through Prafulla Kharkar, claimed the AIMOS Project was on target and

11   denied any problems.  Copart then escalated its concerns to Sparta's senior management.  Sparta,

12   through its Executive Vice President Vaibhav Nadgauda and others, promised to do better.   Sparta

13   committed to add more resources to the process integration work and to increase the project

14   management support.

15          76.     Sparta continued work on the AIMOS project, but by Milestone 7 it was stuck.  By

16   this point, there was a growing list of "gaps" in the functionality of AIMOS (i.e., shortfalls from

17   100% CAS functionality).  Sparta failed to complete the requirements of Milestone 7 and

18   transferred the uncompleted tasks to Milestone 8.

19          77.     In September 2012, Sparta began Milestone 8, called User Acceptance &

20   Integration Test Completion - Canada ("UAT").  The UAT phase was a failure from the start.

21   None of the Sparta-programmed source code passed testing.  Copart returned the source code to

22   Sparta so it could be fixed.  Sparta purported to repair and retest the source code, only to have it

23   fail again upon delivery to Copart.  This became a vicious cycle.

24          78.     Sparta's response to these repeated failures was to replace its project manager,

25   Prafulla Kharkar, with Sparta Vice President Shyam Chodapunedi.

26          79.     Pursuant to the Build SOW, AIMOS was scheduled to go live in October 2012 in

27   Canada, the smallest division of Copart's international operations.  But AIMOS was neither

28   finished nor anywhere near ready to go live at that time.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

80.     After Sparta's new project manager arrived, Copart and Sparta met to assess the status of the AIMOS Project in a "re-group meeting" involving both Sparta and Copart employees.

81.     At the "re-group" meeting the new Sparta project manager, Sparta Vice President Shyam Chodapunedi, made several representations to Copart.  Specifically, he promised to fix the problems with the source code, to address the missing components, and get the AIMOS Project back on track.  At the meeting, Sparta represented that it needed eight more weeks to complete the AIMOS Project. Gayle Mooney, Matt Raabe, Vincent Phillips, and others from Copart who attended that meeting heard and relied on Sparta's promises.

82.     During the meeting, and in the weeks that followed, Sparta reiterated its previous representations that it had the ability to implement AIMOS with 100% of the features and functions of CAS.  Sparta also again represented that it had the ability to make CAS functions work in SAP; that it had solutions to the specific CAS features and functions; that it had large teams of programmers with experience in the OEM/Automobile industry, as well as seasoned employees who had been long-term employees of Sparta, available to work on the project; and that Sparta was assigning its SAP experts to work on the AIMOS Project.  Sparta further assured Copart and repeated its representations that it had the skill and ability to manage an SAP project of this size and nature; that Sparta was smaller, and therefore more nimble and more creative than the big consulting firms; that Sparta had the unique expertise and experience to design and implement AIMOS; and that Sparta was the firm called upon to fix projects, even complex projects like the AIMOS Project, when the big consulting firms had failed.  When pressed about the particular challenges of CAS functionality, Sparta represented that it had a solution for each of these challenges.  Based on Sparta's representations, Copart continued under the ISA and did not terminate Sparta.

83.     But Sparta's representations were false.  When Sparta made the representations to Copart, Sparta either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false. Sparta made the representations to Copart with the intent to induce Copart to continue the ISA, and not terminate Sparta.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

21

84.     In addition to its misrepresentations, Sparta also omitted material information. Sparta failed to disclose that it did not have the ability, expertise and skill required to design and build AIMOS with 100% of CAS functionality, and that it did not have the solutions needed to re-create the features and functions of CAS in AIMOS.  Sparta knowingly omitted this information with the intent to induce Copart to continue the ISA, and not terminate Sparta.

85.     During the Build Phase, Sparta also repeatedly misrepresented the capabilities and performance of its consultants on the Project, and failed to disclose to Copart critical information that, once disclosed, would have led Copart to terminate Sparta immediately.  Thus, even as Sparta was assuring Copart that Sparta had staffed the Build Phase with appropriate resources, and that the Project was proceeding on track, Sparta was internally ridiculing its own consultants and acknowledging that the Project was a disaster.  In internal Sparta emails produced in this litigation, senior Sparta managers delivered scathing reports about their own team's incompetence, none of which Sparta shared with Copart:

      a.   Sparta project manager Prafulla Kharkar admitted in an internal July 21, 2012 email that Sparta's Project deliverables were "a mess," and that Sparta's attempt to correct these poor deliverables had been "[p]athetic."

      b.   A senior Sparta technical manager, Namit Swaroop, admitted in an internal March 13, 2013 email that Sparta's work was "extremely poor quality."

      c.   A senior KPIT manager, Mandar Deshpande, agreed in an internal March 13, 2013 email that Sparta and KPIT's work had been "poor quality" and that their system "does not have stable design/solution."

      d.   Sparta's project manager, Kharkar, admitted in an internal September 29 2012 email that Sparta continued to staff the Project with consultants it knew were incompetent:  "We all know that we have team members who are slower than a dead man.  Sushil, Raja, Tapan cannot even test[] interfaces by themselves…We have 50 plus resources onsite and we even now deal through only [a] selected few for everything."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

e.  Sparta's technical manager, Swaroop, admitted in an internal January 27, 2013 email that the Sparta/KPIT offshore team was inept:  "In offshore most folks are operating as body or headcount…There is no incentive to become better CRM consultant or auction expert."

f.  Sparta's technical manager, Swaroop, admitted in an internal August 3, 2012 email that the Sparta consultants who were handling the development of the system in the Title area were incompetent: "All formal Title team is clown."  Swaroop also blamed other Sparta personnel for creating a development bottleneck.

g.  Sparta project manager Kharkar admitted in an internal May 17, 2012 email that Sparta did not have data migration experience, and instructed others at Sparta to delete that fact from a report to Copart.  When data migration errors later occurred, senior Sparta manager Parag Gandhi blamed Copart, even though he admitted in an internal November 29, 2012 email that Sparta's team would have caught those problems at an early stage had it simply conducted "basic checks."

h.  Sparta technical manager Swaroop admitted in internal May 30, 2012 report that Sparta had a "serious problem" in its testing environment that would lead to project delays.  Sparta scrubbed this information from a report it provided to Copart.  Several months later, when problems in the testing environment destabilized the system at a critical juncture, Swaroop admitted in a March 13, 2013 internal email that Sparta could have caught that error had Sparta properly designed the testing environment.

i.  Sparta's offshore team manager, Ajay Tiwari, admitted in an internal July 20, 2012 email that Sparta's onsite team was so indifferent and incompetent that they did not even try to understand Copart's functional needs, complaining that "[m]ost of the issues which are originating [are] because of the unorganized structure at onsite and unstable product design."

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

j.   A Sparta consultant, Pramod Nair, complained in an internal April 23, 2012 email that BI/BW functionality – a crucial component of the SAP system that would have enabled Copart to run reports, store data and maximize its business efficiency – was destined to fail because of Sparta's incompetence. Noting that Sparta had failed to even prepare basic BI/BW design documents, Nair expressed concern that "[t]here seems to be some disconnect with the Sparta leadership here [about] what BI needs and how it is done."  Notably, Nair wrote that Sparta had botched a previous attempt to perform BI development for two other clients, Maines Paper & Food Service, Inc. and LES and urged Sparta consultants to review those failed efforts "to avoid doing the same mistakes."  Sparta later removed Nair from the Project after complaints by Kharkar, who wrote in an April 10, 2012 email: "I do not think Pramod is adding any value."

k.   Sparta offshore manager Chidanand Chauhan, in an internal email dated December 12, 2012, complained about the "[u]navailability of the resources with adequate skill set and experience."

86.   During the Build Phase, Sparta also continued to mislead Copart about the authorship and sufficiency of the functional and technical specifications that Sparta falsely claimed it had completed, and that Copart paid Sparta millions of dollars to develop.  Sparta's internal admissions about these failings included the following, none of which Sparta shared with Copart:

a.   In an internal report dated May 4, 2012, Sparta admitted that the Sparta/KPIT offshore team wrote most of the functional and technical specifications, even though that team had no access to CAS and no contact with Copart's business personnel.  The report admitted that, as a result, the design documents lacked the necessary details to begin development.

b.   A senior Sparta manager, Ajay Tiwari, complained in an email dated April 24, 2012 that Sparta's functional and technical specifications were

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  inadequate and incomplete, which prevented the Sparta/KPIT offshore team

2  from building the system.  He noted:  "the only challenge here is the lack of

3  adequate and complete FS [functional specification] & TS [technical

4  specification] Documents."

5     c.  A senior Sparta manager, Soundara Sathappan, complained in a December

6  11, 2012 email about Sparta's failure to prepare detailed documentation.

7  Sparta's project manager, Kharkar, admitted that "there is a lack of

8  documentation but that was the case back in Feb[ruary]."

9     d.  Sparta admitted in an internal report dated December 12, 2012 that Sparta's

10  onsite team still did not understand Copart's core business processes, which

11  caused Project delays.

12     e.  A KPIT offshore consultant, Sujit Mahanty, in an email dated December 14,

13  2012, responded to concerns about his team's poor performance by

14  requesting "documents or manuals" that described some of Copart's basic

15  processes.  Sparta technical manager Swaroop responded by admitting that

16  "[t]his is disappointing…we are running testing for last 3 weeks without

17  understanding."

18     f.  A senior Sparta consultant, Mark Stanish, admitted in an internal report on

19  January 24, 2013 that Sparta had to perform substantial "rework" because

20  the design work that it and KPIT had performed was inadequate.

21     87.  The UAT phase continued under Sparta's new project manager, Chodapunedi, but

22  the same pattern of failure continued.  Source code was tested, but failed.  The more it was tested,

23  the more it failed; the faster it was tested, the faster it failed.  Nevertheless, Sparta pretended and

24  represented that the source code had been fixed and scheduled a "formal" UAT testing anyway.

25  But the source code was not fixed, and it failed yet again.  Not surprisingly, this pattern of failure

26  led Copart to voice concerns over Sparta's capabilities and competence – concerns that Sparta

27  brushed aside, insisting that Copart was too demanding.  Yet in internal emails, KPIT and Sparta

28  acknowledged that they were unable to deliver functioning code, and that the KPIT offshore

1    managers were providing coding objects to the onsite team without doing any internal review to

2    determine if the code even worked.

3        88.    Knowing that the UAT testing would necessarily fail, Sparta still pushed Copart to

4    authorize it, and to set a new date for an initial go-live in Copart's Canada business.  Sparta

5    believed that having Copart insist on a deadline that Sparta knew could not be met would give

6    Sparta leverage in its attempts to get Copart to release further payments.

7        89.    Meanwhile, despite its continued failures, Sparta, through its senior executives

8    Vaibhav Nadgauda, Ashu Bhalla, Shyam Chodapunedi, and others began requesting payment

9    from Copart for Sparta's failed efforts.  For example, Sparta executive Vaibhav Nadgauda met

10   with Copart executive Vincent Phillips in Dallas, Texas to ask for payment, or at least partial

11   payment, for Milestone 8.

12       90.    Consistent with the terms of the ISA, Copart refused to pay until Sparta delivered

13   the requirements of Milestone 8 and Copart accepted that delivery.

14       91.    For the next eight months, Sparta purportedly worked on the source code, trying to

15   get it to work.  But it continued to fail and did not pass required testing.

16       92.    In the face of Sparta's repeated performance failures, Copart withheld payment of

17   fees on the ground that Sparta had not met delivery milestones required by the contract.  As

18   reflected in internal documents, without these payments, Sparta faced a cash crunch in early 2013.

19   In March 2013, Sparta made several desperate requests to its India-based parent company, KPIT

20   Technologies, for a $2 million loan Sparta needed to pay Sparta Infotech, a separate KPIT

21   Technologies subsidiary that had been providing contract work for Sparta.  KPIT Technologies

22   made the loan.

23       93.    **Sparta And KPIT's Theft Of Copart's Trade Secrets.**  At the same time that

24   Sparta and KPIT were botching the SAP implementation for Copart, they were also using that

25   Project to steal certain of Copart's valuable and proprietary trade secrets that were embodied in

26   unique software codes, software configurations and software-related data tables.  These software

27   materials were contained within the legacy CAS system and the AIMOS system that was under

28   development on the Project.  These software materials were not only unique Copart trade secrets,

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   but they in turn contained, referenced, described and enabled certain of Copart's unique

2   proprietary business processes.  In other words, Sparta and KPIT stole the unique software

3   materials that enabled Copart's computer systems to execute and run Copart's unique business

4   processes.

5          94.     Sparta and KPIT's theft of Copart's trade secrets arose out of Sparta and KPIT's

6   pursuit of a key internal Sparta and KPIT business initiative to upgrade their standalone,

7   proprietary SAP product, known as AutoEdge, focused on the automobile business.  As advertised

8   by Sparta, AutoEdge is:

> "a qualified SAP Business All-in-One partner solution designed
> specifically to meet the needs and improve the performance of mid-
> size automotive manufacturers and distributers. AutoEDGE
> streamlines processes for automotive OEM's suppliers, sales and
> service organizations through a truly holistic landscape. Through the
> combination of Sparta's built in industry best practices and
> methodologies with the robustness and flexibility of the SAP
> application, AutoEDGE is able to transform businesses and optimize
> processes across financials, operations, production, sales and
> service. Fully deployable in as little as 11-weeks, either on-premises
> or in the cloud, AutoEDGE provides customers with a pre-packaged,
> scalable and easy-to-manage enterprise software solution to improve
> business processes."

17         95.     The specific software materials and business methods that Sparta and KPIT stole

18  from Copart for use in AutoEdge included, at a minimum, the unique and proprietary software and

19  methods that Copart uses for generating, processing, storing and linking images of vehicles and

20  vehicle documentation, including methods that allow batch processing and automatic metadata

21  generation of such images.  The stolen materials – including the configuration specification for

22  ZCL_IMAGING and its dependent tables, and a "class" of software needed for the imaging

23  function – relate to the method by which Copart's computer systems: (i) process, store, and create

24  links to images (photos) of vehicles, title documents, or other documents necessary for Copart's

25  operations; (ii) associate those images with specific vehicles and business processes; and (iii)

26  automatically populate metadata for specific vehicles in Copart's inventory and auction system.

27  The stolen methods and software also allow Copart to process images for hundreds of different

28  vehicles in a single batch, which enables Copart to achieve substantial savings and maintain a

competitive advantage over competitors.  This imaging functionality ultimately enables Copart's customers and potential customers who log onto Copart's virtual auction website to view different images related to each of Copart's vehicles up for auction – *e.g.*, photos of front and rear passenger sides and driver sides, odometers, dashboards, title papers, and numerous other features of each vehicle Copart offers for sale.

96.     The software and methods that Sparta and KPIT stole were developed by Copart over time and at significant expense, are non-public and proprietary to Copart, provide Copart with a competitive advantage over its existing and would-be competitors, and constitute valuable trade secrets that Copart owns.  The imaging functionality associated with the configuration specification for ZCL_IMAGING and its dependent tables, and the "class" of software needed for the imaging function, is not available in the standard SAP solution.  For the Project, such functionality was to be developed through customization of SAP to replicate software and processes in Copart's CAS system.

97.     On the Project, Copart sought to protect these (and other) valuable trade secrets by requiring Sparta to agree to ISA Section 11.4, which states that "Copart will be the sole and exclusive owner of all Deliverables, and without further consideration or action, [Sparta] hereby assigns to Copart all of [Sparta]'s right, title and interest in and to such Deliverables, including all Intellectual property rights therein."  Sparta also agreed that any "derivatives, modifications, enhancements or improvements to" existing Copart-owned intellectual property would be Copart's sole property.   ISA § 11.3.

98.     During their work on the Project, Sparta and KPIT needed special permission from Copart to access software materials in the AIMOS system, including materials related to ZCL_IMAGING.  Sparta and KPIT also needed special login instructions and passwords to access this system.

99.     Sparta and KPIT's willful and unlawful scheme to misappropriate Copart's trade secrets is set forth at length in internal emails that Sparta produced in this litigation in or around November 2015.  (Copart was unaware of the scheme before Sparta's production of incriminating materials in this litigation.)  Those emails reflect the following:  Sparta and KPIT explicitly

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

instructed their employees – including employees who were not even working on AIMOS – to use the special login and password credentials Sparta was given to work on the AIMOS project to access the AIMOS system to copy and replicate Copart's proprietary and unique software code, software configuration and software-related tables, which together embody Copart's unique business methods and processes, and then incorporate those software materials into the Sparta/KPIT AutoEdge software product.  Sparta and KPIT employees followed those instructions.  The software materials they stole from Copart in turn contained, referenced, described and enabled Copart's unique and proprietary business processes.  For example:

   a. In an October 10, 2012, email from Sparta employee Shivraj Sinha to employees from both Sparta and KPIT, Sinha provided the credentials, user and password information that were needed to access the AIMOS system. He then directed Sparta consultants Rahul Anand and Narenda Pratap Singh to steal Copart's trade secrets, writing:  "Please see the class ZCL_IMAGIN and its dependent tables from copart [sic] system and copy them into the Autoedge system."  In an earlier email that same day, Sinha had informed Ritesh Jha from Sparta:  "Password has been changed to Sparta@1 (all in small letters).  Please replicate the class ZCL_IMAGING to this system from copart [sic], class has already been copied you just need to copy the custom tables which are being used in the methods of this class."  In this context, "class" refers to a digital container that contains software code, and "methods" refers to the code itself.  Sparta consultant Narendra Pratap Singh later confirmed that Copart's materials had been copied into AutoEdge.

   b. On October 25, 2012, KPIT employee Tejas Shrishrimal accessed Copart's systems and copied additional material for the Sparta/KPIT AutoEdge product.  Shrishrimal's theft was on the orders of Sparta consultant Sinha, who had asked his colleagues to "compare the class ZCL_IMAGING in

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Copart and Auto Edge system and copy the necessary changes in code and methods which has been done in Copart system to the Auto Edge system."

c. In addition, in a separate act of trade secret theft, on December 17, 2012, Sparta manager Namit Swaroop instructed Sparta consultant Roobal Sehgal to copy configuration data for credit card processing from the Copart system and place the copy in the Sparta/KPIT AutoEdge system. This software took substantial time for Copart to develop and was not available in standard SAP. Sehgal confirmed the copying of the software in a December 17 email to Swaroop, noting that after a few additional steps "we can run the process in autoedge system."

100. The software, information and business methods that Sparta and KPIT stole enabled them to develop, modify, augment, and enhance their own AutoEdge product by replicating within the AutoEdge product Copart's unique and proprietary methods to process, store, link and generate metadata from images.

101. Sparta never told Copart it was stealing this software code, configuration and tables, and information and methodologies related to Copart's unique and proprietary business methods and processes. This theft was expressly barred by the ISA, which states that such work product is owned by Copart, not Sparta (ISA § 11.4). Nor did Sparta ever pay Copart for the work product it stole.

102. Sparta and KPIT's theft of Copart's unique software code, software configuration, software-related tables and business methods was neither haphazard nor the result of happenstance – rather, Sparta and KPIT's theft was a carefully planned, choreographed and executed scheme to steal from under Copart's nose. Indeed, on January 23, 2013, a Sparta manager, Ajay Tiwari, distributed to his colleagues a strategy document that formalized Sparta and KPIT's theft of Copart's trade secrets. The document, entitled "Project Charter – AutoEdge Development under Copart Project," was literally a license to steal – it brazenly discussed the benefit of replicating "custom developments and configuration done for Portal, Imaging and Paymetrics Integration for

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  Copart Client" in order to incorporate them within Sparta and KPIT's proprietary AutoEdge

2  product.[5]   Sparta never disclosed its Project Charter for AutoEdge to Copart.

3         103.   Sparta and KPIT's goal in misappropriating Copart's property was to modify,

4  augment, and enhance the AutoEdge solution to enable Sparta and KPIT to expand their U.S.

5  sales.  The custom software developments and materials that Sparta and KPIT stole related to

6  business methods that Copart had formulated, developed, enhanced, and refined for decades, at

7  enormous cost and through exceptional efforts.  In fact, in the automobile auctioning sector,

8  Copart is at the leading edge of creating, integrating and streamlining extremely complex business

9  methods and processes to meet the needs of its customers and employees.  In 2013, as they were

10  pilfering Copart's trade secrets to bolster their AutoEdge product, Sparta and KPIT were touting to

11  potential customers that they would soon be unveiling an AutoEdge "Enhanced Offering" that was

12  "In-process."

13        104.   The Sparta/KPIT "Project Charter – AutoEdge Development under Copart Project"

14  also laid out a plan to divert consultants from the Project to work on developing the enhanced

15  AutoEdge product, notwithstanding the "[r]isk that the resources might get overloaded with the

16  simultaneous work."  Sparta and KPIT's scheme to strip the Project of resources to work on

17  AutoEdge occurred at a critical Project juncture, when Copart was in desperate need of skilled

18  consultants to rescue an implementation that was spiraling downward into chaos.

19        105.   Sparta and KPIT pursued their scheme to use the Project as a means of furthering

20  their own AutoEdge product even in the face of repeated complaints by Sparta consultants that

21  they could not possibly handle the workload required by their dual AutoEdge and Project roles.

22  Sparta rejected their consultants' pleas for relief, even as it was apparent that their AutoEdge

23  obligations were jeopardizing the Project.  For example:

24              a.  A key consultant on the Project, Shivraj Sinha, in an internal email dated

25                 February 19, 2013, asked to be taken off of the AutoEdge project because

26                 the dual workload was undermining his work and sapping his health.  A

27  _____

   [5] A copy of the Project Charter is appended to this Complaint as Exhibit F.

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Sparta manager expressly noted Sinha's lagging performance, acknowledging that Sinha was "stretching a lot from a long time between Copart and AutoEdge ABAP development but now [is] not keeping up well and I can witness the same while meeting him up here in [the] office."

b.   Internal emails reflect that by April 2013 – a period when the Project was at a critical fail point – Sparta and KPIT had diverted 11 consultants off the Project and onto the AutoEdge project.

c.   Internal emails reflect that by mid-April 2013, Sparta and KPIT were pulling consultants off the Project to perform overtime and weekend work on AutoEdge.

d.   Internal emails reflect that in 2013, KPIT consultants who were ostensibly working on the Copart Project were, in fact, focused solely on AutoEdge development.

106.   Sparta and KPIT's diversion of resources from the Project to AutoEdge became so intensive that the companies set up a separate accounting mechanism to track how their consultants were actually spending their time.  By the end of April 2013, 27% of the time billed by the "Copart Offshore Team" was on AutoEdge, not the Project.  Up until May 2013, when Sparta and KPIT created a separate billing code for AutoEdge, their consultants simply billed their time to the Project, even when they were in fact performing work on AutoEdge.  Moreover, consultants who questioned whether they should bill their expenses to AutoEdge because they were performing AutoEdge work were told to charge those expenses to Copart.  When discussing the treatment of those expenses, senior Sparta officials such as Denise Ferre, Prafulla Kharkar, and Vaibhav Nadgauda stated they did not want to discuss the issue in writing.

107.   Sparta never told Copart that Sparta and KPIT were stealing Copart's trade secrets, misrepresenting Project expenses, and diverting desperately-needed resources off the Project and onto AutoEdge.

108.   **The Amendment to the ISA.**  On June 18, 2013, at Copart's Dallas headquarters, management for Sparta, including senior executives Vaibhav Nadgauda and Ashu Bhalla, again

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   met with management for Copart, including Vincent Mitz, Jayson Adair and Vincent Phillips.  At

2   the June 18 meeting, Sparta's senior management, including Vaibhav Nadgauda and Ashu Bhalla,

3   represented that the source code work would be completed within four weeks.  As of that date,

4   Copart had identified 26 "functional gaps," in Sparta's software solution, i.e., CAS functionality

5   that was missing in AIMOS.

6        109.    At the June 18 meeting, Copart and Sparta established a plan to try to salvage the

7   AIMOS Project.

8        110.    But at the same time that Sparta's senior executives sought to reassure Copart's

9   senior executives that the Project was on track and that solutions to problems were straightforward

10  and imminent, Sparta was admitting internally that its system design, configuration and project

11  management had been abysmal failures.  For example, in June 2013:

12          a.   The Sparta/KPIT offshore team admitted in an internal "Causal Analysis"

13               report dated June 18, 2013, that scores of software defects had been caused

14               by massive failures on the part of the Sparta/KPIT team, including

15               inadequate staffing, inadequate skills, poor oversight and ineffective quality

16               review and analysis.  Sparta never disclosed these findings to Copart.

17          b.   Demian Esnaurrizar, a newly appointed Sparta consultant, raised serious

18               concerns about the failure of Sparta's documentation to appropriately

19               identify and mitigate Project risk:  "the documentation I have seen so far

20               does not seem to be self-standing to support any quality assurance…."

21               Esnaurrizar also identified multiple design and implementation defects

22               plaguing Sparta's SAP solution, and lapses in Sparta's performance,

23               including its failure to use basic quality controls for its software

24               development.  Sparta never disclosed these findings to Copart.

25          c.   Sparta's offshore team – after working on the project for over 18 months –

26               was still scrambling to understand Copart's basic business processes.  When

27               the offshore team requested basic design and technical documents from

28               their on-site colleagues, Chandra Bhuvanagiri, a Sparta executive, reported

1            in an internal email dated June 10, 2013 that these eleventh-hour requests

2            were sowing panic among Sparta's onsite team.  Sparta never disclosed this

3            information to Copart.

4      111.    On August 16, 2013, after a series of discussions and further representations by

5      Sparta, the parties entered into an Amendment to the ISA (the "Amendment").  A copy of the

6      Amendment to the ISA is attached hereto as Exhibit D.

7      112.    The Amendment restated the requirements of Milestone 8, extended the deadlines

8      for completion, required a plan for remediation of the listed functional gaps, and provided a fee

9      discount if the functional gaps were not completed.  *See* Amendment, at 1-2.

10     113.    In connection with the Amendment, Sparta's senior management, including

11     Vaibhav Nadgauda, represented that Sparta would provide massive additional resources to make a

12     final push to get Milestone 8 completed pursuant to the terms of the parties' contract.

13     114.    But Sparta failed again.  Although work on the plan to salvage the AIMOS Project

14     had begun before the Amendment, soon after the Amendment was signed Sparta missed internal

15     deadlines and failed to deliver working code.  And, at the same time Sparta was assuring Copart

16     that Sparta was on the verge of solving the functional gaps identified in the Amendment to the

17     ISA, Sparta internally acknowledged the opposite – that its work was further lagging behind.

18     Thereafter, Sparta began to remove and divert resources from the AIMOS Project.  Sparta

19     apparently realized it could not continue the charade any longer and effectively abandoned their

20     work on the AIMOS Project.  Sparta employees began to refuse to answer Copart's questions or

21     otherwise engage in information sharing with Copart; they refused to participate in overall project

22     planning or work on addressing the deficiencies in the system they designed and refused to allow

23     Copart access to the source code.  As a result, Sparta failed to remediate any of the functional

24     gaps, failed to pass the required testing, and failed to produce working source code.

25     115.    By letter dated September 17, 2013, Copart notified Sparta that it was terminating

26     the ISA.  A copy of the termination letter is attached hereto as Exhibit E.  Copart exercised its

27     right to terminate for convenience, pursuant to Section 15.2 of the ISA.  Under Section 15.2, there

28     is no cure period and Sparta is not entitled to any payment upon termination unless it has

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

34

1    completed the contractual "Services", provided proper documentation and obtained Copart's

2    agreement.  None of these conditions precedent was met.

3        116.    As a result of Sparta's fraud and misconduct, Copart has incurred significant

4    expenses, recording a $29.1 impairment charge for costs associated with the failed

5    implementation.  Further, Copart has suffered business injury related to the years-long delay of the

6    AIMOS Project and the implementation of a functioning ERP system, with 100% of the CAS

7    functionalities.  These expenses and injuries are a direct consequence of Sparta's actions as set

8    forth above.

9        117.    Sparta's contempt for Copart, and disregard for its intellectual property, continued

10   even after Copart terminated the contract.  Just hours after the termination, Sparta's project

11   manager, Kharkar, wanted to market the intellectual property that Sparta and KPIT had stolen

12   from Copart to Copart's competitors, asking, "can we not approach Copart's competitor?  I think

13   its AA or somet[h]ing…based out of Chicago."  Days later Sparta began to explore how Copart's

14   work product could be used on other Sparta projects.

15       118.    **Sparta's Motives**.  Sparta's motive for its misconduct is simple: It was determined

16   to obtain the multi-million dollar design and implementation contract.  By its misrepresentations,

17   Sparta induced Copart to hire Sparta and thereby pay Sparta millions of dollars.  Sparta knew it

18   could not perform the work and did not have the ability, experience or skill to build 100% of CAS

19   functionality in an SAP solution.  But Sparta knew it would get paid millions of dollars before its

20   fraud could be discovered.  Sparta also actively concealed its fraud throughout its engagement

21   with Copart, so that Copart would be obstructed in discovering the truth of Sparta's pre-contract

22   and continuing misrepresentations.

23       119.    In addition to the fees associated with the lucrative contract, there was another

24   motive for Sparta's misconduct.  In October 2009, Sparta's two founders, Lokesh Sikaria and Paul

25   Freudenburg (the "Sparta Founders"), sold Sparta to KPIT Cummins, an IT consulting firm based

26   in Pune, India.  To purchase Sparta, KPIT Cummins agreed to pay the Sparta Founders "up to"

27   $38 million.  KPIT initially paid approximately $11 million in cash to the Sparta Founders.  On

28   information and belief, the remaining $27 million was to be distributed over the following three

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   years based on the business performance of Sparta (the "Earn Out Money").  In other words, the

2   Sparta Founders would be paid the Earn Out Money based upon business Sparta signed up over

3   the next three years.  The more business Sparta signed up, and the faster they signed it up, the

4   more Earn Out Money they would receive and the faster they would receive it.  As demonstrated

5   by the events that unfolded to Copart's detriment, $27 million proved to be a powerful incentive

6   for the fraud Sparta perpetuated – laying bare the falsity of Sparta's representations, among them

7   that "Executive Management is very committed to the success of the engagement."   Indeed, once

8   the Earn Out target was met (after Sparta induced Copart to hire it for the Build Phase), the Sparta

9   Founders were out the door with their Earn Out Money, leaving the unsupported, doomed AIMOS

10   Project behind.

11        120.    Sparta and KPIT were also motivated by the opportunity to take Copart's

12   intellectual property to enhance the Sparta/KPIT AutoEdge product.

### FIRST CLAIM FOR RELIEF

### (Fraudulent Inducement Against Sparta)

15        121.    Copart incorporates by reference all of the preceding paragraphs as if fully set forth

16   herein.

17        122.    As set forth above, Sparta made numerous misrepresentations of material facts, and

18   failed to disclose material facts, to Copart regarding, among other things, Sparta's purported

19   abilities, skills, experience, expertise, resources, qualifications, credentials and intention to

20   perform and provide services in connection with the AIMOS Project.

21        123.    Such representations were false, and Sparta knew, or was reckless in failing to

22   know, that such statements were false at the time they were made.

23        124.    Sparta made these misrepresentations and concealed these material facts in order to

24   induce Copart to hire Sparta and execute the ISA, the Design SOW, the Build SOW and the

25   Amendment (the "AIMOS Agreements"), and Copart reasonably relied upon Sparta's

26   misrepresentations in retaining Sparta and entering into the AIMOS Agreements.

27        125.    Also, as set forth above, during the course of its work on the AIMOS Project,

28   Sparta made numerous misrepresentations of material facts, and failed to disclose material facts,

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   regarding risks to the AIMOS Project, the progress of its work, its services, its ability and

2   intention to correct problems with the AIMOS Project, its ability and intention to fulfill its

3   obligations as the implementer of the SAP solution and the ability of the designed system to

4   perform as required.  In fact, Sparta knew, or should have known, that it lacked the requisite skill,

5   experience, expertise and knowledge to properly design and implement the AIMOS solution.

6   Sparta further knew, or should have known, that it could not deliver an SAP system solution with

7   100% of CAS functionalities.

8        126.    Such representations made by Sparta during the course of its work on the AIMOS

9   Project were false, and Sparta knew, or was reckless in failing to know, that such statements were

10   false at the time they were made.

11        127.    Such misrepresentations and concealment of material facts by Sparta were made in

12   order to induce Copart into permitting Sparta to continue to purport to work and be paid on the

13   AIMOS Project, and Copart reasonably relied upon Sparta's misrepresentations in permitting

14   Sparta to do so.

15        128.    Sparta also made promises during the discussions and negotiations with Copart

16   leading up to the execution of the AIMOS Agreements with no intention of acting or delivering

17   upon those promises.

18        129.    Such promises by Sparta were made wrongfully in order to induce Copart to enter

19   into the AIMOS Agreements, and Copart reasonably relied upon such promises made by Sparta in

20   entering into the AIMOS Agreements.

21        130.    Had Sparta not engaged in these actions, Copart would not have retained Sparta for

22   its services and, instead, would have obtained the services of another consulting company and

23   would have avoided the costs, business losses and expenses it has suffered as a result of Sparta's

24   fraud.

25        131.    As a direct and proximate result of Sparta's fraud and deceit, Copart sustained

26   damages in an amount to be determined by the trier of fact, but in any event not less than $50

27   million.

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

132.   Additionally, because Sparta's omissions and misrepresentations were intentional, malicious, oppressive, or fraudulent, they give rise to liability for exemplary and punitive damages, which Copart seeks, and is entitled, to recover according to proof at trial.

## SECOND CLAIM FOR RELIEF

### (Fraud Against Sparta)

133.   Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

134.   Sparta's fraudulent misrepresentations and omissions continued after the ISA was signed.  Sparta fraudulently misrepresented, concealed, and/or failed to disclose the fact that Sparta did not have the skills, experience, expertise or ability to perform the services requested by Copart, and that Sparta at that time did not have the present intention to perform the services as represented.

135.   Sparta made these misrepresentations and omissions with reckless disregard or with the knowledge that they were false when made, and with the intent to induce Copart to continue to pay money to Sparta and to not terminate the AIMOS Agreements.  Copart reasonably relied on these misrepresentations and omissions when, among other things, it made, and continued to make, payments to Sparta and did not terminate the AIMOS Agreements.

136.   Had Sparta not engaged in these actions, Copart would have terminated Sparta earlier and would have stopped paying Sparta earlier, and would have begun its search for an alternative provider earlier, all of which would have saved Copart millions of dollars in fees and expenses paid to Sparta and would have avoided other business losses and expenses that Copart suffered as a result of Sparta's fraud.

137.   As a direct and proximate result of Sparta's material misrepresentations and omissions, Copart sustained damages in an amount to be determined by the trier of fact, but in any event not less than $50 million.

138.   Additionally, because Sparta's omissions and misrepresentations were intentional, malicious, oppressive, or fraudulent, they give rise to liability for exemplary and punitive damages, which Copart seeks, and is entitled, to recover according to proof at trial.

38

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

## THIRD CLAIM FOR RELIEF

### (Negligent Misrepresentation Against Sparta)

139.   Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

140.   In order to induce Copart to enter into the ISA and the other AIMOS Agreements, Sparta made numerous false and misleading representations about its ability, skills, experience and expertise to perform the services requested by Copart, including its ability to satisfy Copart's requirement that the new system have 100% of CAS functionalities

141.   Sparta made these representations without reasonable grounds for believing they were true and in a manner not warranted by the information in Sparta's possession.  For example, Sparta had no reasonable grounds for claiming that it had the ability to comply with Copart's requirement that the new system have 100% of CAS functionalities, and its representations concerning its ability to do so were not warranted by the information in Sparta's possession.

142.   After inducing Copart to enter into the AIMOS Agreements through the use of these negligent misrepresentations, Sparta continued to make misrepresentations to Copart.  Those misrepresentations included, among other things, statements about Sparta's ability to design and implement AIMOS, Sparta's intent to fully perform under the applicable agreements, and the nature of the implementation problems identified by Copart.  Sparta made these misrepresentations without reasonable grounds for believing they were true and in a manner not warranted by the information in Sparta's possession.

143.   Sparta's negligent misrepresentations were made by Sparta with the intent that Copart rely on them.  Sparta made these misrepresentations to induce Copart to enter into contracts with Sparta, to not terminate those contracts and to continue to pay money to Sparta.  Copart reasonably relied on these misrepresentations when, among other things, it contracted with Sparta, continued to pay Sparta during the term of the AIMOS Agreements, and did not terminate the AIMOS Agreements.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

144.   Copart's reliance on Sparta's negligent misrepresentations caused Copart to sustain damages in an amount to be determined by the trier of fact, but in any event not less than $50 million.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract Against Sparta)

145.   Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

146.   The AIMOS Agreements are valid, enforceable contracts.

147.   Copart has performed, or has substantially performed, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the AIMOS Agreements.  Copart is, and has been, entitled to Sparta's performance of its obligations under these agreements.

148.   Sparta has materially breached its contractual obligations to Copart, including the express terms and covenants set forth above and/or implied covenants within the AIMOS Agreements as described above. Those terms and covenants include, but are not limited to, sections 2.2, 2.3, 3.2, 4.5, 5.2, 7.2, 9.2, 9.4, 11.1, 11.2, 11.3, 11.4, 12.1, 12.2, 12.3, 12.6, 14.2 and 19.2 of the ISA.

149.   Because Sparta's breach of its obligations arose from its gross negligence and/or willful misconduct, Copart, in addition to contract damages, is entitled to indirect losses, consequential damages, and lost profits in accordance with Section 18 of the ISA.

150.   As a direct result of Sparta's breach of the AIMOS Agreements, Copart sustained damages in an amount to be determined by the trier of fact, but in any event not less than $50 million.

## FIFTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing Against Sparta)

151.   Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

152.   The AIMOS Agreements are valid, enforceable contracts.

153.     Copart has performed, or has substantially performed, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the AIMOS Agreements.  Copart is, and was, entitled to Sparta's performance of its obligations under these agreements.

154.     Each contract has an implied covenant of good faith and fair dealing.  Sparta breached this implied covenant by making the misrepresentations described above and by acting in bad faith with respect to the AIMOS Agreements.  Sparta further breached this implied covenant by stealing Copart's property.

155.     As a direct result of Sparta's breach of the implied covenant, Copart sustained damages in an amount to be determined by the trier of fact, but in any event not less than $50 million.

## SIXTH CLAIM FOR RELIEF

### (Request for Declaratory Relief)

156.     Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

157.     This dispute involves a justiciable controversy about the rights and status of the parties.  The controversy is real and substantial and involves a genuine conflict of tangible interests and is not merely a theoretical dispute.

158.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, Copart seeks a declaration concerning the rights, duties, and obligations of the parties under the AIMOS Agreements.

159.     Copart also seeks a declaration concerning the "termination for convenience" provision under Section 15.2 of the ISA.  Specifically, Copart seeks a declaration as to (a) Copart's right to terminate; (b) the limitations to any obligation by Copart to pay (including services that have been performed and completed and agreed to by Copart); and, (c) that any payment (if any) cannot exceed the Milestone payment amount associated with the Milestone during which the termination occurred.

WHEREFORE, Plaintiff prays for relief as set forth below.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**(Trade Secret Misappropriation Against Sparta,
KPIT Infosystems, And KPIT Technologies)**

160.    Copart repeats and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

161.    California Civil Code Section 3426 *et seq.*, the California Uniform Trade Secrets Act ("CUTSA"), prohibits the misappropriation of any "trade secret."  The term "trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:   (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

162.    Under the terms of the ISA between Copart and Sparta, Copart was the "sole and exclusive owner of all Deliverables" related to the Project, and Sparta assigned to Copart "all…rights, title and interest in and to such Deliverables, including all intellectual property rights therein."  ISA § 11.4.  "Deliverables" are defined as "all deliverables and other materials to be delivered to Copart by Service Provider in connection with the Services."  ISA § 1.12, at 2.

163.    Copart also had sole ownership of any "derivatives, modifications, enhancements or improvements" to Copart's existing intellectual property that were developed during the project."  ISA § 11.3.

164.    During the Project, Sparta and KPIT developed, created and worked on Deliverables related to software design, configuration, coding and functionality, and business processes, concerning Copart's operations. These Deliverables, in turn, contained, embodied, referenced, described and enabled unique and proprietary business methods and processes that Copart uses to carry out its operations.  In order to develop those Deliverables, Sparta was granted access to Copart's CAS and AIMOS systems, including software and information that enabled, embodied, and described Copart's unique and proprietary methods and processes.  Access to these materials was restricted to members of the Project team.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

165.    During their work on the Project, Sparta and KPIT instructed their employees –
including employees who were not even working on AIMOS – to use other employees' login and
password credentials for the AIMOS Project to copy Copart's proprietary methods and materials
and incorporate them into the Sparta/KPIT AutoEdge software product.

166.    For example, in an October 10, 2012, email from Sparta employee Shivraj Sinha to
employees from both Sparta and KPIT, Sinha provided the credentials, user and password
information that were needed to access the AIMOS system.  He then directed Sparta consultants
Rahul Anand and Narenda Pratap Singh to steal Copart's trade secrets related to certain imaging
functionality, writing:  "Please see the class ZCL_IMAGIN and its dependent tables from copart
[sic] system and copy them into the Autoedge system."  In an earlier email that same day, Sinha
had informed Ritesh Jha from Sparta:  "Password has been changed to Sparta@1 (all in small
letters).  Please replicate the class ZCL_IMAGING to this system from copart [sic], class has
already been copied you just need to copy the custom tables which are being used in the methods
of this class."  In this context, "class" refers to a digital container that contains software code, and
"methods" refers to the code itself.  Singh later confirmed that Copart's materials had been copied
into AutoEdge.

167.    On October 25, 2012, KPIT employee Tejas Shrishrimal accessed Copart's systems
and copied additional material for the Sparta/KPIT AutoEdge product.  Shrishrimal's theft was on
the orders of Sparta consultant Sinha, who had asked his colleagues to "compare the class
ZCL_IMAGING in Copart and Auto Edge system and copy the necessary changes in code and
methods which has been done in Copart system to the Auto Edge system."

168.    The imaging software, functionality, information and business process that Sparta
and KPIT stole – including the configuration specification for ZCL_IMAGING and its dependent
tables, and a "class" of software needed for the imaging function – relate to the method by which
Copart's computer systems: (i) process, store, and create links to images (photos) of vehicles, title
documents, or other documents necessary for Copart's operations; (ii) associate those images with
specific vehicles and business processes; and (iii) automatically populate metadata for specific
vehicles in Copart's inventory and auction system.  The stolen method and software also allows

Copart employees to process images for hundreds of different vehicles in a single batch, providing a substantial savings to the company and a competitive advantage over competitors.  This imaging functionality ultimately enables customers and potential customers who log onto Copart's virtual auction website to view different images related to each of Copart's vehicles up for auction – *e.g.*, photos of front and rear passenger sides and driver sides, odometers, dashboards, title papers, and numerous other features of each vehicle Copart offers for sale.

169.    The software and methods stolen by Sparta were developed by Copart over time and at significant expense, are non-public and proprietary to Copart, give Copart a competitive advantage over its existing and would-be competitors, and constitute valuable trade secrets owned by Copart.  The imaging functionality associated with the configuration specification for ZCL_IMAGING and its dependent tables, and the "class" of software needed for the imaging function, is not available in the standard SAP solution.  For the Project, such functionality was to be developed through customization of SAP to replicate software and processes in Copart's CAS system.

170.    In addition, in a separate act of trade secret theft, on December 17, 2012, Sparta manager Namit Swaroop instructed Sparta consultant Roobal Sehgal to copy configuration data for credit card processing from the Copart system and place the copy in the Sparta/KPIT AutoEdge system.  This software took substantial time for Copart to develop and was not available in standard SAP.  Sehgal confirmed the copying of the software in a December 17 email to Swaroop, noting that after a few additional steps "we can run the process in autoedge system."

171.    The Project-related software, information and methods that Sparta stole from Copart qualified as "trade secret" information under CUTSA.  By taking these materials, Sparta and KPIT engaged in a theft of Copart's trade secret information.

172.    Sparta and KPIT's theft of Copart's trade secrets was willful and malicious.  Sparta and KPIT knew these materials belonged to Copart, and they took these materials from Copart without informing Copart or obtaining Copart's consent to take them.  Moreover, Sparta and KPIT created a project charter that described processes, procedures and strategies to govern their misappropriation of Copart's trade secrets for use in enhancing and augmenting their own

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

proprietary AutoEdge product.  That charter, titled "Copart AutoEdge Development," had the stated purpose of providing for the transfer of "custom developments and configuration done for Portal, Imagining and Paymetrics Integration for Copart Client" from the Project's AIMOS solution into Sparta's AutoEdge product so that this intellectual property "can be utilized across other US Customers."  Sparta and KPIT's goal in misappropriating Copart's property was to expand their business in the United States by modifying, refining and enhancing KPIT's existing AutoEdge solution to better serve the U.S. market.  In marketing the AutoEdge product it had modified using Copart's property, Sparta and KPIT touted to potential new customers an "Enhanced Offering" for AutoEdge that was "In-process."

173.    Copart requests that this Court enjoin Sparta and KPIT from selling, licensing, servicing, implementing or otherwise commercializing any AutoEdge product or other product containing or utilizing Copart's trade secrets.  Copart also seeks an amount of damages reflecting Copart's loss and Sparta's unjust enrichment, or, in the alternative, a reasonable royalty related to Sparta and KPIT's misappropriation of Copart's trade secrets.  Because Sparta's theft of trade secrets was willful and malicious, Copart also seeks an award of exemplary damages by statute, and an award of attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

### (Common Law Misappropriation Against Sparta, KPIT Infosystems, And KPIT Technologies)

174.    Copart incorporates by reference all of the preceding paragraphs, with the exception of paragraphs 160 through 173, regarding Copart's trade secret misappropriation claim, as if fully set forth herein.

175.    Section 11.4 of the ISA gave Copart ownership of all work product that was generated or created as part of the Project.  That work product included software design, configuration, coding, applications and business processes related to the AIMOS solution.

176.    Copart also had sole ownership of any "derivatives, modifications, enhancements or improvements" to Copart's existing intellectual property that were developed during the project."  ISA § 11.3.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

177.   During the Project, Sparta and KPIT developed, created and worked on Deliverables related to software design, configuration, coding and functionality, and business processes, concerning Copart's operations. These Deliverables, in turn, contained, embodied, referenced, described and enabled unique and proprietary business methods and processes that Copart uses to carry out its operations.  In order to develop those Deliverables, Sparta was granted access to Copart's CAS and AIMOS systems, including software and information that enabled, embodied, and described Copart's unique and proprietary methods and processes.  Access to these materials was restricted to members of the Project team.

178.   During their work on the Project, Sparta and KPIT instructed their employees – including employees who were not even working on AIMOS – to use login and password credentials for the AIMOS Project to copy Copart's proprietary methods and materials and incorporate them into the Sparta/KPIT AutoEdge software product.  For example:

a.   In an October 10, 2012, email from Sparta employee Shivraj Sinha to employees from both Sparta and KPIT, Sinha provided the credentials, user and password information that were needed to access the AIMOS system. He then directed Sparta consultants Rahul Anand and Narenda Pratap Singh to steal Copart's materials related to certain imaging functionality, writing: "Please see the class ZCL_IMAGIN and its dependent tables from copart [sic] system and copy them into the Autoedge system."  In an earlier email that same day, Sinha had informed Ritesh Jha from Sparta:  "Password has been changed to Sparta@1 (all in small letters).  Please replicate the class ZCL_IMAGING to this system from copart [sic], class has already been copied you just need to copy the custom tables which are being used in the methods of this class."  In this context, "class" refers to a digital container that contains software code, and "methods" refers to the code itself.  Singh later confirmed that Copart's materials had been copied into AutoEdge.

b.   On October 25, 2012, KPIT employee Tejas Shrishrimal accessed Copart's systems and copied additional material for the Sparta/KPIT AutoEdge

product.  Shrishrimal's theft was on the orders of Sparta consultant Sinha, who had asked his colleagues to "compare the class ZCL_IMAGING in Copart and Auto Edge system and copy the necessary changes in code and methods which has been done in Copart system to the Auto Edge system."

c.  In addition, in a separate act of theft, on December 17, 2012, Sparta manager Namit Swaroop instructed Sparta consultant Roobal Sehgal to copy configuration data for credit card processing from the Copart system and place the copy in the Sparta/KPIT AutoEdge system.  This software took substantial time for Copart to develop and was not available in standard SAP.  Sehgal confirmed the copying of the software in a December 17 email to Swaroop, noting that after a few additional steps "we can run the process in autoedge [sic] system."

179.    On information and belief Sparta and KPIT used and continue to use this stolen property in their AutoEdge product.

180.    Copart believes that the materials that Sparta and KPIT misappropriated from Copart during the Project qualify as trade secrets.  However, in the event these materials somehow did not qualify as trade secrets, Copart pleads in the alternative that the materials were non-trade secret intellectual property.

181.    Sparta and KPIT's theft of intellectual property from Copart was planned.  Sparta and KPIT knew these materials belonged to Copart, and they took these materials from Copart without informing Copart or obtaining Copart's consent to take them.  Moreover, Sparta and KPIT created a project charter that described processes, procedures and strategies to govern their misappropriation of Copart's proprietary information for use in enhancing and augmenting their own proprietary AutoEdge product.  That charter, titled "Copart AutoEdge Development," had the stated purpose of providing for the transfer of "custom developments and configuration done for Portal, Imaging and Paymetrics Integration for Copart Client" from the Project's AIMOS solution into Sparta's AutoEdge product so that this intellectual property "can be utilized across other US Customers."  Sparta and KPIT's goal in misappropriating Copart's intellectual property was to

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  expand their business in the United States by modifying, refining and enhancing KPIT's existing

2  AutoEdge solution to better serve the U.S. market.  In marketing the AutoEdge product it had

3  modified using Copart's intellectual property, Sparta and KPIT touted to potential new customers

4  an "Enhanced Offering" for AutoEdge that was "In-process."

5       182.    As a direct and proximate result of Sparta and KPIT's misappropriation of Copart's

6  intellectual property, Copart seeks an amount of damages reflecting Copart's loss and Sparta's

7  unjust enrichment, or, in the alternative, a reasonable royalty related to Sparta and KPIT's

8  misappropriation of Copart's property.

9  **NINTH CLAIM FOR RELIEF**

10  **(Conversion Against Sparta, KPIT Infosystems, And KPIT Technologies)**

11       183.    Copart incorporates by reference all of the preceding paragraphs, with the

12  exception of paragraphs 160 through 173, regarding Copart's trade secret misappropriation claim,

13  as if fully set forth herein.

14       184.    Section 11.4 of the ISA gave Copart ownership of all work product that was

15  developed, generated or created as part of the Project.  That work product included software

16  design, configuration, coding, applications, functionality, and business processes related to the

17  AIMOS solution.

18       185.    Copart also had sole ownership of any "derivatives, modifications, enhancements

19  or improvements" to Copart's existing intellectual property that were developed during the

20  project."  ISA § 11.3.

21       186.    During the Project, Sparta and KPIT developed, created, generated and worked on

22  Deliverables related to software design, configuration, coding, applications, and functionality, and

23  business processes, concerning Copart's operations. These Deliverables, in turn, contained,

24  embodied, referenced, described and enabled unique and proprietary business methods and

25  processes that Copart uses to carry out its operations.  In order to develop those Deliverables,

26  Sparta was granted access to Copart's CAS and AIMOS systems, including software and

27  information that enabled, embodied, and described Copart's unique and proprietary methods and

28  processes.  Access to these materials was restricted to members of the Project team.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

187.    During their work on the Project, Sparta and KPIT instructed their employees –
including employees who were not even working on AIMOS – to use login and password
credentials for the AIMOS Project to copy Copart's unique and proprietary methods and materials
and incorporate them into the Sparta/KPIT AutoEdge software product.  For example:

a.   In an October 10, 2012, email from Sparta employee Shivraj Sinha to
employees from both Sparta and KPIT, Sinha provided the credentials, user
and password information that were needed to access the AIMOS system.
He then directed Sparta consultants Rahul Anand and Narenda Pratap Singh
to steal Copart's trade secrets related to certain imaging functionality,
writing:  "Please see the class ZCL_IMAGIN and its dependent tables from
copart [sic] system and copy them into the Autoedge system."  In an earlier
email that same day, Sinha had informed Ritesh Jha from Sparta:
"Password has been changed to Sparta@1 (all in small letters).  Please
replicate the class ZCL_IMAGING to this system from copart [sic], class
has already been copied you just need to copy the custom tables which are
being used in the methods of this class."  In this context, "class" refers to a
digital container that contains software code, and "methods" refers to the
code itself.  Singh later confirmed that Copart's materials had been copied
into AutoEdge.

b.   On October 25, 2012, KPIT employee Tejas Shrishrimal accessed Copart's
systems and copied additional material for the Sparta/KPIT AutoEdge
product.  Shrishrimal's theft was on the orders of Sparta consultant Sinha,
who had asked his colleagues to "compare the class ZCL_IMAGING in
Copart and Auto Edge system and copy the necessary changes in code and
methods which has been done in Copart system to the Auto Edge system."

c.   In addition, in a separate act of theft, on December 17, 2012, Sparta
manager Namit Swaroop instructed Sparta consultant Roobal Sehgal to
copy configuration data for credit card processing from the Copart system

1   and place the copy in the Sparta/KPIT AutoEdge system.  This software

2   took substantial time for Copart to develop and was not available in

3   standard SAP.  Sehgal confirmed the copying of the software in a December

4   17 email to Swaroop, noting that after a few additional steps "we can run

5   the process in autoedge system."

6   188.   Sparta and KPIT's theft of intellectual property from Copart was deliberate,

7   purposeful, and planned.  Sparta and KPIT knew these materials belonged to Copart, and they

8   took these materials from Copart without informing Copart or obtaining Copart's consent to take

9   them.  Moreover, Sparta and KPIT created a project charter that described processes, procedures,

10   and strategies to govern their misappropriation of Copart's property for use in enhancing and

11   augmenting their own proprietary AutoEdge product.  That charter, titled "Project Charter –

12   AutoEdge Development under Copart Project," had the stated purpose of providing for the transfer

13   of "custom developments and configuration done for Portal, Imagining and Paymetrics Integration

14   for Copart Client" from the Project's AIMOS solution into Sparta's AutoEdge product so that this

15   intellectual property "can be utilized across other US Customers."  Sparta and KPIT's goal in

16   misappropriating Copart's intellectual property was to expand their business in the United States

17   by modifying, augmenting and enhancing KPIT's existing AutoEdge solution to better serve the

18   U.S. market.  In marketing the AutoEdge product it had modified using Copart's intellectual

19   property, Sparta and KPIT touted to potential new customers an "Enhanced Offering" for

20   AutoEdge that was "In-process."

21   189.   As remedies for Sparta and KPIT's conversion, Copart seeks compensation for the

22   time and property expended in pursuit of the property, the value of the stolen property, and interest

23   from the time of the theft of the property.

24   190.   Sparta and KPIT's actions were intentional, malicious, oppressive, or fraudulent,

25   and therefore also give rise to liability for punitive damages, according to proof at trial.

26   **TENTH CLAIM FOR RELIEF**

27   **(Professional Negligence against Sparta, KPIT Infosystems and KPIT Technologies)**

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 California Street, Suite 2300
SAN FRANCISCO, CALIFORNIA 94111

191.   Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

192.   California law recognizes that professional negligence can be pursued in contract and in tort.

193.   Within the ERP implementation industry, there are accepted standards for skill, prudence and diligence that govern and apply to the work and conduct of ERP implementation professionals such as the employees and contractors who were assigned to the Project by Sparta and KPIT.  In their work and conduct on the Project, Sparta and KPIT failed to adhere to, work pursuant to, employ and utilize this standard skill, prudence and diligence in designing, configuring, coding, testing, building and implementing the AIMOS solution; in managing manage the Project; and in identifying, managing and mitigating risk on the Project.  Sparta and KPIT's failures included the following:

   a.  Creating and providing deliverables and work product that Sparta and KPIT admitted internally were "extremely poor quality," "[p]athetic" and "a mess."

   b.  Creating and delivering a software system that Sparta and KPIT admitted internally was "unstable" and "does not have stable design/solution."

   c.  Creating and delivering an unreliable testing environment that destabilized the system at a "critical juncture" in the project.

   d.  Giving the responsibility to create, develop and deliver critical design documents, including functional specifications, to an offshore team of consultants who lacked the requisite skills and experience, and who had no access to the existing CAS system whose functionality the AIMOS solution was supposed to replicate, and who had no contact with the Copart users who were familiar with the existing CAS system, its functionality, and Copart's business processes.

   e.  Delivering a software system that was riddled with design, configuration, integration and coding defects caused by Sparta and KPIT's inadequate

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

51

staffing, incompetence, lack of appropriate and necessary skills and experience, deficient project management, failure to apply and adhere to an appropriate implementation methodology, deficient testing, deficient data conversion, and a failure to appropriately identify, escalate, manage and mitigate project risk.

    f.   Delivering a defective software system caused by a failure to use basic quality controls that are accepted practice in the software industry.

194.    Sparta and KPIT knew that the services they were providing and the software solution they were designing and implementing was for Copart, and that Copart would suffer harm if those services and the software solution were provided negligently.  It was reasonably foreseeable that Copart's losses would include payments for AIMOS-related work, delays in Copart's international expansion plans, impairments to Copart's operational efficiency, and the continued costs of maintaining Copart's CAS system.

195.    Sparta and KPIT also knew that the theft of client property, and giving unauthorized persons access to client intellectual property, was contrary to professional standards applicable to their industry.  Sparta and KPIT nonetheless stole Copart property and gave unauthorized persons access to that property.

196.    Sparta and KPIT's breaches of the professional standards applicable to their industry resulted in damages to Copart, including millions of dollars that Copart wasted by paying Sparta fees and expenses for a software solution that was unstable, unusable, defectively designed, defectively configured, defectively coded, defectively integrated and deficiently tested, on a project that was deficiently managed.  Copart further suffered additional losses by paying fees and expenses to third-party vendors, lost profits stemming from delays in its international expansions caused by the failure of the Project, impaired operational efficiency, and the continued costs of maintaining Copart's CAS system.  Copart also suffered losses due to unauthorized access to and theft of Copart's intellectual property.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

197.    Copart seeks compensatory damages for the losses it suffered as a result of the defendants' professional negligence, in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF

### (Violation Of Computer Fraud And Abuse Act, 18 U.S.C. § 1030, Against Sparta, KPIT Infosystems, And KPIT Technologies)

198.    Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

199.    The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, prohibits the unauthorized access to a company's computer system for purposes of committing fraud.  Copart's computer systems were subject to the CFAA because they were used in and affected interstate commerce or communication.

200.    Shivraj Sinha was a Sparta employee who worked on the Project in 2012.  Like other Sparta consultants on the Project, Copart granted Sinha special access, involving personal login and password information, to its computer systems to enable him to perform work related to the Project.  In October 2012, Sinha distributed his personal login and password information for Copart's computer systems to other Sparta and KPIT employees who were not working on the Project.  Sinha's distribution of this information was encouraged by both KPIT and Sparta management.  Sinha distributed his access information for the purpose of enabling Sparta and KPIT employees who were not even working on the Project to gain access to Copart's computer systems in order to take Copart's property, including its unique and valuable trade secret information.

201.    At least one Sparta employee who was not working on the Project, Narenda Pratap Singh, used Sinha's login and password information in October 2012 to take Copart's property, including its trade secret information.  Singh was not authorized to access Copart's computer system at all, much less to access it for the purpose of stealing Copart's property.  On information and belief, other Sparta and KPIT employees who were not authorized to access Copart's computer systems also used the same login and password information to gain unauthorized access to Copart's computer systems, also for the purpose of stealing Copart's property.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

202.    The value of the materials stolen from Copart as a result of this unauthorized access was well in excess of $5,000, reflecting both the cost of producing the materials and their market value.  The value of any license to use the stolen materials would also greatly exceed $5,000. Copart has also expended resources investigating the nature and scope of Sparta and KPIT's unauthorized access to Copart's computer systems.  As a result of Sparta and KPIT's unauthorized access to its computer systems, Copart suffered losses in an amount to be proven at trial, but in any event in excess of $5,000 in value.

203.    As remedies for Sparta and KPIT's violation of the CFAA, Copart seeks compensatory damages and economic damages. Copart further seeks an injunction requiring KPIT and Sparta to disclose all materials stolen from Copart's systems or derived from stolen materials, to return those materials to Copart, and to cease their use of those materials.

## TWELFTH CLAIM FOR RELIEF

**(Violation Of Comprehensive Computer Data Access And Fraud Act, Cal. Penal Code § 502, Against Sparta, KPIT Infosystems, And KPIT Technologies)**

204.    Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

205.    The Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), Cal. Penal Code § 502, prohibits, *inter alia*, accessing computer systems for purposes of stealing data or committing fraud.  Under the CCDAFA a person commits a felony if he: (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data; or (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.  Cal. Penal Code § 502(c).

206.    There is a private cause of action for violations of the CCDAFA.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

207.     Shivraj Sinha was a Sparta employee who worked on the Project in 2012.  Like other Sparta consultants on the Project, Copart granted Sinha special access, involving personal login and password information, to its computer systems to enable him to perform work related to the Project.  In October 2012, Sinha distributed his personal login and password information for Copart's computer systems to other Sparta and KPIT employees who were not working on the Project.  Sinha's distribution of this information was encouraged by both KPIT and Sparta management.  Sinha distributed his access information for the purpose of enabling Sparta and KPIT employees who were not even working on the Project to gain access to Copart's computer systems in order to take Copart's property, including its unique and valuable trade secret information.

208.     At least one Sparta employee who was not working on the Project, Narenda Pratap Singh, used Sinha's login and password information in October 2012 to take Copart's property, including its trade secret information.  Singh was not authorized to access Copart's computer system at all, much less to access it for the purpose of stealing Copart's property.  On information and belief, other Sparta and KPIT employees who were not authorized to access Copart's computer systems also used the same login and password information to gain unauthorized access to Copart's computer systems, also for the purpose of stealing Copart's property.  These actions all violated the CCDAFA.

209.     Sparta and KPIT committed other acts in violation of the CCDAFA.  For example:

a. In October 2012, KPIT employee Tejas Shrishrimal accessed Copart's systems and copied additional material for incorporation within Sparta and KPIT's AutoEdge product.  Shrishrimal carried out this theft at the instructions of Sparta consultant Sinha, who had asked his colleagues to "compare the class ZCL_IMAGING in Copart and Auto Edge system and copy the necessary changes in code and methods which has been done in Copart system to the Auto Edge system."

b. In December 2012, Sparta manager Namit Swaroop instructed Sparta consultant Roobal Sehgal to copy configuration data for credit card

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

processing from the Copart system and place the copy in the Sparta/KPIT AutoEdge system.  This software took substantial time for Copart to develop and was not available in standard SAP.  Sehgal confirmed that he had stolen the data, noting in a December 17, 2012 email to Swaroop that he had copied the software and that, after a few additional steps, "we can run the process in autoedge system."

210.    As a result of Sparta and KPIT's unauthorized access to its computer systems, Copart suffered damages and losses in an amount to be proven at trial, but in any event in excess of $5,000 in value.

211.    Copart seeks compensatory damages for losses suffered as a result of KPIT and Sparta's violations of the CCDAFA, along with attorneys' fees, according to proof at trial.  Copart further seeks an injunction requiring Sparta and KPIT to disclose all materials stolen from Copart's systems or derived from stolen materials, to return those materials to Copart, and to cease their use of those materials.  Additionally, because Sparta and KPIT's violations of the CCDAFA were willful, and Sparta and KPIT acted with oppression, fraud, and malice, Copart seeks punitive damages according to proof at trial.

## THIRTEENTH CLAIM FOR RELIEF

### (Unfair Competition Against Sparta, KPIT Infosystems, And KPIT Technologies)

212.    Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

213.    California Business and Professions Code Section 17200 *et seq.*, the Unfair Competition Law ("UCL"), prohibits unfair competition, which includes any unlawful, unfair and/or fraudulent acts or practices and any unfair, deceptive, untrue or misleading advertising.

214.    Sparta has violated the UCL by engaging in the unlawful, unfair and/or fraudulent business acts and/or practices alleged herein, including its false representations to Copart that Sparta possessed the ability, skills, experience, expertise, resources, qualifications, credentials and intention to perform and provide services in connection with the design and implementation of an SAP software system, when Sparta knew or should have known that it did not have the special

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

skills, resources, expertise and experience needed.  In addition, as alleged above, Sparta concealed material facts from Copart regarding its fraudulent activities and its utter failure to properly design and implement an SAP system.  Sparta also violated the UCL by diverting resources from the Project to work on the development of Sparta and KPIT's proprietary AutoEdge product.  Sparta and KPIT further violated the UCL by taking materials and work product from the Project that in fact belonged to Copart, and using that work product and those materials in their proprietary AutoEdge product.

215.    Copart has suffered actual injury and has lost money or property by virtue of the unlawful, unfair and fraudulent acts of Sparta and KPIT

216.    The UCL provides for restitution for violations.  Copart thereby requests that this Court order Sparta and KPIT to restore all property, real or personal, which they have acquired by means of the unfair competition described herein.  This includes, at a minimum, all monies and fees paid by Copart to Sparta, and all monies, revenues and profits earned by Sparta and KPIT related to the AutoEdge enhancements that Sparta and KPIT took from Copart related to the Project, and all monies, revenues and profits earned by Sparta and KPIT on any other software, solution or product that was developed using the enhancements or other materials that were taken from Copart related to the Project.  Copart also seeks an injunction requiring Sparta and KPIT to return the materials they took, and the AutoEdge enhancements, to Copart, along with any other software or product that was developed using those enhancements.

## FOURTEENTH CLAIM FOR RELIEF

### (Unjust Enrichment Against Sparta, KPIT Infosystems, And KPIT Technologies)

217.    Copart incorporates by reference all of the preceding paragraphs as if fully set forth herein.

218.    Copart conferred benefits to Sparta in the form of millions of dollars in payments.  Sparta received those benefits as a result of its fraud, negligence, and other improper conduct.  It would be unjust for Sparta to retain those benefits.

219.    Sparta and KPIT received benefits from their theft of work product from the AIMOS project.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

220.     Copart seeks an order restoring to it any money or property, real or personal, which Sparta and KPIT acquired by means of the unfair competition described herein.  This includes, at a minimum, all payments made by Copart to Sparta, any and all work product and materials taken from the AIMOS project by Sparta and KPIT, any products, enhancements or solutions derived from such work product, and all monies, revenues and profits made by Sparta and KPIT through the use of that work product and related materials.

## DEMAND FOR JURY TRIAL

Copart demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Copart respectfully requests that this Court enter judgment against Sparta, KPIT Infosystems, and KPIT Technologies and provide the following relief:

1.     Actual, indirect, economic, consequential, and compensatory damages, including lost profits, against Sparta, KPIT Infosystems, and KPIT Technologies in an amount to be determined at trial;

2.     Restitution of all amounts paid to Sparta by Copart;

3.     An injunction against Sparta, KPIT Infosystems, and KPIT Technologies from using work product or materials they took from Copart related to the Project, or from using any product, solution or enhancements derived from such work product or materials;

4.     An injunction against Sparta, KPIT Infosystems, and KPIT Technologies requiring them to return to Copart any work product or materials they took from Copart related to the Project, and any other product, solution or enhancements derived from such work product or materials;

5.     Punitive and/or exemplary damages;

6.     Declaratory relief as described above;

7.     Reasonable and necessary attorneys' fees;

8.     Pre- and post-judgment interest at the maximum rate allowed by law;

9.      All costs of suit; and

10.      All such other and further relief, both general and special, at law or in equity, to which Copart may show itself justly to be entitled or as this Court may deem appropriate.

Dated:  June 8, 2016

                                         Respectfully submitted,

                                         /s/ Mark P. Ressler

                                         MARK P. RESSLER (admitted *pro hac vice*)
                                         KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                                         1633 Broadway
                                         New York, New York 10019
                                         Telephone:      (212) 506-1700
                                         Facsimile:      (212) 506-1800
                                         mressler@kasowitz.com

                                         JASON S. TAKENOUCHI (SBN 234835)
                                         KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                                         101 California Street, Suite 2300
                                         San Francisco, California 94111
                                         Telephone:      (415) 421-6140
                                         Facsimile:      (415) 398-5030
                                         jtakenouchi@kasowitz.com

                                         Attorneys for Plaintiff COPART, INC.