MARK P. RESSLER (*admitted pro hac vice*)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:     (212) 506-1700
Facsimile:     (212) 506-1800
mressler@kasowitz.com

JASON S. TAKENOUCHI (SBN 234835)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 California Street, Suite 2300
San Francisco, California 94111
Telephone:     (415) 421-6140
Facsimile:     (415) 398-5030
jtakenouchi@kasowitz.com

Attorneys for Plaintiff COPART, INC.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COPART, INC., | Case No: 2:14-CV-00046-KJM-CKD |
| Plaintiff, | **PLAINTIFF-COUNTERDEFENDANT COPART INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON DEFENDANT SPARTA CONSULTING INC.'S COUNTERCLAIMS, AND FOR PARTIAL SUMMARY JUDGMENT ON CERTAIN ELEMENTS OF COPART'S CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| v. | |
| SPARTA CONSULTING, INC., KPIT INFOSYSTEMS, INC., and KPIT TECHNOLOGIES, LTD., | |
| Defendants. | |
| SPARTA CONSULTING, INC., | |
| Counterplaintiff, | Hearing Date: February 10, 2017 |
| v. | Time:          10 a.m. |
| COPART, INC., | Before:        Hon. Kimberly J. Mueller |
| Counterdefendant. | Trial Date:    August 14, 2017 |

*KASOWITZ, BENSON, TORRES & FRIEDMAN LLP*
*101 California Street, Suite 2300*
*San Francisco, California 94111*

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on February 10, 2017, at 10:00 a.m. before the Honorable Kimberly J. Mueller, Courtroom 3 of the United States District Court for the Eastern District of California, 501 "I" Street, Sacramento, California, Plaintiff-Counterdefendant Copart, Inc. ("Copart"), by and through its counsel of record, will and hereby does move for an order granting summary judgment to Copart on the counterclaims by defendant-counterplaintiff Sparta Consulting Inc. ("Sparta"). Copart also moves for an order granting partial summary judgment on certain elements of the following claims it has asserted against Sparta: (3) fraud and fraudulent inducement; (4) breach of contract; (5) conversion; and (6) violations of the federal Computer Fraud and Abuse Act and the California Comprehensive Data Access and Fraud Act. Copart's motion is made on the grounds that there is no genuine dispute of material fact as to the subject claims for which Sparta bears the burden of proof, or with respect to certain elements of the subject claims for which Copart bears the burden of proof.

This motion (the "Motion") is brought pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Local Rule 260 of the Rules of the United States District Court for the Eastern District of California, and this Court's Amended Pretrial Scheduling Order (Dkt. No. 140). This Motion is based on and supported by the attached memorandum, Copart's separate Rule 260(a) Statement of Undisputed Facts, the supporting Declaration of Jason Takenouchi, the supporting Declaration of Vincent Phillips, and such other filings and matters that may be presented to the Court before or at the hearing on the Motion.

**CERTIFICATION OF MEET AND CONFER**

Copart notified defendants in December that it intended to move for summary judgment on Sparta's counterclaims and for partial summary judgment on certain elements of Copart's claims. The parties held a conference call on January 3, 2017, but did not resolve their differences.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1

**TABLE OF CONTENTS**

2

3

**Page**

4

I.      INTRODUCTION ................................................................................................... 1

II.     SUMMARY OF COPART'S MOTION ................................................................. 2

III.    FACTUAL BACKGROUND ................................................................................ 2

   A.   The Implementation Services Agreement (ISA) ............................................ 2

   B.   The Design SOW And The Design Phase ..................................................... 4

   C.   The Realization SOW And The Build Phase ................................................ 7

IV.     ARGUMENT ........................................................................................................ 13

   A.   Legal Standard ............................................................................................ 13

   B.   Sparta Cannot Establish A Genuine Issue Of Material Fact In Support Of Its Claims ........ 14

      1.   Sections 9.3, 15.2, 15.5 and 18 of the ISA limit Sparta's recovery, if any, to the value of work "accepted" by Copart ...................... 14

      2.   Sparta cannot recover on its claims because it has failed to produce evidence or calculations supporting its alleged damages ......... 16

   C.   Copart Has Sufficient Evidence In Support Of Certain Elements Of Its Claims For Fraud/Fraudulent Inducement, Breach Of Contract, Conversion, And Computer Fraud, For Purposes Of Partial Summary Judgment ........................ 18

V.      CONCLUSION ..................................................................................................... 19

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................. 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................. 13

*Cohen v. Hansen*,
2014 WL 1873968 (D. Nev. May 8, 2014) ........................................................... 16

*Denevi v. LGCC*,
121 Cal. App. 4th 1211 (2004) ............................................................................. 18

*Fi Teq Inc v Venture Corp.*,
169 F. Supp. 3d 948 (2016) .................................................................................. 15

*Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*,
209 Cal. App. 4th 1118 (2012) ............................................................................. 15

*Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*,
2013 WL 3803911 (E.D. Cal. July 19, 2013) ....................................................... 17

*Graham-Sult v. Clainos*,
756 F.3d 724 (9th Cir. 2014) ................................................................................ 19

*Hebert v. Rapid Payroll, Inc.*,
2005 WL 6172659 (C.D. Cal. Feb. 9, 2005) ......................................................... 15

*Ingenco Holdings, LLC v. ACE Am. Ins. Co.*,
2016 WL 4703758 (W.D. Wash. Sept. 7, 2016) ................................................... 17

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ............................................................................................. 14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................................. 14

*Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*,
578 F.Supp.2d 1242 (E.D. Cal. 2008) .................................................................. 18

*Nexsales Corp. v. Salebuild, Inc.*,
2012 WL 216260 (N.D. Cal. Jan. 24, 2012) ......................................................... 19

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000) .............................................................................. 13

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

*Oasis W. Realty, LLC v. Goldman*,
  51 Cal. 4th 811 (2011)..............................................................................................18

*Peregrine Pharm., Inc. v. Clinical Supplies Mgmt., Inc.*,
  2014 WL 3791567 (C.D. Cal. July 31, 2014) ........................................................16

*Porter v. Cal. Dep't of Corr.*,
  419 F.3d 885 (9th Cir. 2005)...................................................................................13

*Pro-Concepts, LLC v. Resh*,
  2013 WL 5741542 (E.D. Va. Oct. 22, 2013) ..........................................................17

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
  809 F.2d 626 (9th Cir. 1987).............................................................................13, 14

*tagTrends, Inc. v. Nordstrom, Inc.*,
  2014 WL 12561604 (C.D. Cal. Sept. 30, 2014) .....................................................16

**Statutes**

Cal. Civ. Code
  § 1638.......................................................................................................................14

18 U.S.C.
  § 1030.......................................................................................................................19

**Rules**

Fed. R. Civ. P.
  56(c) .........................................................................................................................13

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

This action arises out of the misconduct and performance failures of Sparta, a purported expert in the design and implementation of enterprise resource planning ("ERP") business software systems, and of its parent companies KPIT Technologies and KPIT Infosystems.  As detailed in Copart's Third Amended Complaint (Dkt. No. 126) (the "Complaint"), in 2011 Sparta made misrepresentations and omissions that induced Copart to hire Sparta to design a new ERP system, called AIMOS[1], based on a software platform developed by SAP, a German software company.  The parties' contract, called the Implementation Services Agreement (the "ISA"), provided that Sparta would receive fixed-fee payments for each "Milestone" (*i.e.*, each specified collection of project work product) that it completed and Copart formally accepted.  During the initial "Design Phase" of the project, Sparta concealed its failure to design a usable SAP system and misrepresented to Copart that Sparta's team was properly prepared, skilled and equipped to build a usable SAP system.  Sparta's team, which included KPIT employees, also concealed serious projects risks that would later lead AIMOS to fail.

In reliance on Sparta's misrepresentations and omissions, Copart signed off on Sparta's design work in early 2012 and later hired Sparta to handle the "Build Phase" of the project.  But by 2013, after extended delays and ongoing problems with Sparta's defective software code and flawed design, Copart began considering whether to terminate Sparta from the project.  After Sparta again committed to improving and completing its work, Copart agreed in August 2013 to a final 30-day window for Sparta to fix a subset of critical flaws and other system problems that were preventing AIMOS from running even basic operations.

When Sparta failed to fix the system's flaws within the 30-day window, Copart canceled the contract in September 2013 and tried to negotiate a clean break with Sparta.  But Sparta demanded payment for the entirety of its contract – over \$12 million – and accused Copart of wrongdoing, despite the fact that Sparta had never delivered the majority of work it was required

---

[1] AIMOS is an acronym for Auction Inventory Management and Operating System.

1    to deliver, and had instead saddled Copart with a worthless, non-functioning SAP system.  Copart

2    filed the instant lawsuit soon thereafter, and Sparta responded with counterclaims.

3          During the course of discovery, Sparta produced documents showing that it had concealed

4    critical failures in its design and project team before Copart terminated the project.  Sparta later

5    produced other documents showing that it stole Copart's intellectual property during the AIMOS

6    project, even creating a "Project Charter" in early 2013 that was approved by Sparta's upper

7    management and that described Sparta's plan to steal work product developed for AIMOS and use

8    it for Sparta's own purposes.  Declaration of Jason Takenouchi ("Takenouchi Decl.") Ex. 47.

9    **II.     SUMMARY OF COPART'S MOTION**

10          Copart's instant motion seeks summary judgment or, in the alternative, partial summary

11   judgment, on Sparta's counterclaims on the grounds that: (1) Sparta's claims are barred by

12   Sections 9.3, 15.2, 15.5 and 18 of the ISA, which prohibit Sparta from recovering anything other

13   than agreed-to, contractual milestone-based payments for *completed and accepted* work; and (2)

14   Sparta's claims fail because Sparta has not produced calculations and evidence supporting its

15   alleged damages.

16          Copart's motion also seeks partial summary judgment on the following elements relating to

17   Copart's claims: (1) the first element of Copart's fraud and fraudulent inducement claims

18   (misrepresentation or concealment of material fact); (2) the third element of Copart's breach of

19   contract claims (Sparta's breach); (3) the first and second elements of Copart's conversion claim

20   (plaintiff's ownership and defendant's conversion); and (4) the first four elements of Copart's

21   federal Computer Fraud and Abuse Act and California Comprehensive Data Access and Fraud Act

22   claims (intentional access to a computer, without authorization or exceeding authorization,

23   obtaining information, from a protected computer).

24   **III.    FACTUAL BACKGROUND**

25          **A.      The Implementation Services Agreement (ISA)**

26          Copart, a publicly-traded NASDAQ company, sells vehicles for a variety of consignors

27   (including insurance companies, finance companies, banks and rental car companies) to a variety

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    of buyers (including dealers, dismantlers, rebuilders and exporters).[2]  Copart uses a legacy

2    software system called Copart Auction Systems ("CAS") to support its operations.

3          In 2011, Copart sought outside help to design and implement a new software system.

4    Copart initially hired consulting firm Accenture to design and build the new system, but in mid-

5    2011 Copart ended the contract with Accenture and Sparta submitted a bid for the project.  In the

6    discussions that ensued, Sparta made various specific representations to Copart about Sparta's

7    purported experience, technical expertise, and ability to design and build a system using SAP

8    software that would have all the functionality of Copart's existing CAS system.  *See, e.g.*,

9    Takenouchi Decl. Ex. 1.  Copart relied on those representations, and on October 6, 2011, Copart

10   and Sparta signed the ISA, a 21-page contract governing the terms of Sparta's work on AIMOS.

11   *See id.* Ex. 2.  The ISA's provisions included the following:

- Section 5.2 (Project Staff) provides that Sparta "shall appoint to the Project Staff only individuals with suitable training and skills to perform the Services."

- Section 9.3 (No Other Charges Permitted) provides "Copart shall not be responsible for the payment of…any charges, fees or other amounts other than the Fees," which are defined in Section 9.1 as "fixed-fee" payments that are due "upon Acceptance [by Copart] of the applicable Milestones."

- Section 11.4 (Ownership of Deliverables) provides that Copart is "the sole and exclusive owner of all Deliverables" (*i.e.*, work product delivered by Sparta) and "without further consideration or action, [Sparta] hereby assigns to Copart all of [Sparta]'s right, title and interest in and to such Deliverables, including all intellectual property rights therein."

- Section 12 (Confidentiality) includes clauses requiring, among other things, that Sparta hold "in confidence" any data from Copart and use it only for AIMOS (ISA §12.1), use data security measures that satisfy Copart's data security policies (ISA §12.6) and notify Copart of any security breach or possible breach (ISA §12.6).

- Section 14(a) (Additional Covenants by Service Provider) provides that Sparta shall "provide the Services with promptness, diligence and in a professional manner, in accordance with the practices and professional standards used in well-managed operations performing services similar to the Services," and shall only use

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

---

[2] Copart was founded in Vallejo, California, but later moved its headquarters to Dallas.  Copart still operates offices in Vallejo and elsewhere in California.

COPART MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

"qualified individuals with suitable training, education, experience and skill to perform the Services."

- Section 15.2 (Termination for Convenience) provides that if Copart terminates the contract "for convenience," "Copart shall pay Service Provider only for the portion of the Services that have been performed and completed as of the termination date, as such portion agreed by Copart and calculated and documented by Service Provider's project management software system."

- Section 15.5 (No Termination Fees) provides that, except as provided under Section 15.2, "Copart shall not be obligated to pay any costs, fees, charges or other amounts in connection with any termination of this Agreement pursuant to this Section 15."

- Section 18 (Limitations of Liability) prohibits the recovery of "indirect, incidental, special or consequential damages," and further limits Sparta to recovery of "amounts actually paid or payable by Copart…pursuant to this agreement." These limitations apply unless there is "gross negligence or willful misconduct."

- Section 19.2 (Compliance with Laws) provides that Sparta "shall provide the Services, including accessing and handling Copart personal Data, in compliance with all Laws."

The ISA provided that AIMOS work would occur in several phases, with each phase governed by a separate written Statement of Work ("SOW") containing specific milestones. The ISA gave Copart the "sole discretion" to determine whether a milestone had been satisfied. ISA §4.4. The ISA is governed by California law and can only be amended by a writing signed by both sides. Id. §§19.14, 19.11.

## B.   The Design SOW And The Design Phase

Copart and Sparta signed a Statement of Work governing the Design Phase of the Project (the "Design SOW") on October 6, 2011. Takenouchi Decl. Ex. 3. The Design SOW contained several milestones, and listed payments that would be made by Copart after each milestone was completed. Id. at 25. In the Design SOW Sparta committed to "[d]esign the replacement of 100% of CAS Functionalities" using a mix of standard and customized SAP functionality. Id. at 4. Sparta also committed to perform all the investigation necessary to deliver 100% of CAS Functionality, and to deliver "sufficient information for [Sparta] or another service provider, to prepare a complete fixed price, fixed duration BUILD project for the delivered design." Id. at 22. Copart paid Sparta several million dollars for work under the Design SOW. See id. Ex. 77

4

(reflecting milestone payments for four milestones[3] in early 2012).

During the Design Phase of the project, Copart noticed that Sparta's design documents were incomplete, and that some business functions were missing or were inadequately described. Sparta assured Copart that this was normal in an SAP project, and that any missing or incomplete documentation and functions would be addressed later in the project. *See id.* Exs. 7, 10, 12. Based on Sparta's assurances, Copart ultimately approved incomplete Design Phase deliverables, including functional and technical specifications (Milestones 2.8 and 2.9), the "final" Requirements Traceability Matrix (Milestone 3.1), Change Impact Assessment (Milestone 3.2), Data Migration & Governance Strategy (Milestone 3.6) and the Interface Test Plan & Schedule (Milestone 3.8).

During the Design Phase, Sparta concealed from Copart the problems that Sparta's own team was having with the design and project management of AIMOS.  Sparta chronicled its own problems in repeated rounds of scathingly self-critical internal emails, in which Sparta consultants and executives lamented their poor performance on the project.  Those problems – which would eventually contribute to the failure of AIMOS – included:

- The ECC/CRM Design: Sparta designed AIMOS to rely on two different SAP components – ECC and CRM[4] – that were difficult to integrate.  A subsequent independent analysis by SAP confirmed that this design error made Sparta's AIMOS design unstable and unsustainable.  *Id.* Ex. 68 at 10.

- Sparta's Solution Architect And Team Manager: Sparta chose a recently hired employee, Prafulla Kharkar, to act in the critically important role of "solution architect" (*i.e.*, the primary designer of the SAP system), even though Kharkar had never designed a system that used both ECC and CRM.  *Id.* Ex. 80 at 30.  Sparta also put Kharkar in charge of managing Sparta's entire team, even though he had previously been convicted of a misdemeanor for assault and battery of an employee. *Id.* at 13-17.  Kharkar later faced allegations of mistreating female employees on

---

[3] The Design SOW contained three milestones.  A fourth milestone was added on Jan. 5, 2012.
[4] ECC stands for ERP Central Component.  CRM stands for Customer Relationship Management.

5

COPART MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

the AIMOS project (Takenouchi Decl. Ex. 20), and other employees complained about his mismanagement of the project (*id.* Ex. 44).

- Other Sparta personnel problems: At the beginning of the project, in November 2011, a Sparta consultant warned his managers that Sparta had a "poor performing team" on the Project, and that turnover was already a problem. *Id.* Ex. 4. Days later, when another Sparta consultant went "missing," Sparta told Copart that he had "food poisoning" rather than admit the consultant had abandoned the project. *Id.* Exs. 5, 6. Another key Sparta consultant who was in charge of creating a project plan for AIMOS was later discharged after Sparta's project manager complained about his work. *Id.* Ex. 16. Sparta had also hired a contractor to design the critical interfaces between ECC and CRM, but he stopped working with Sparta after a dispute over Sparta's delayed payments for his work. *Id.* Exs. 9, 11. Sparta never shared any of these problems with Copart.

- Other design decisions: When Sparta began work on AIMOS, it was given all the work product that Copart's prior ERP consultant, Accenture, had generated. Sparta decided at first to simply adopt and modify Accenture's design documentation without confirming the validity and value of Accenture's design work. *See id.* Ex. 17. Sparta later decided to do its own design documentation, which threw the defendants' design team, and especially its offshore (India-based) design team, into disarray, leading a KPIT consultant in India to complain in January 2012 that "[t]he process we followed from beginning has led to confusion." *Id.* Ex. 8. Sparta's consultants later complained internally about an "unstable product design." *Id.* Ex. 31.

- Sparta's failure to document Copart's business processes and Sparta's designs for those processes: Sparta's failure to adequately investigate and document Copart's business processes, and Sparta's proposed SAP solution for those processes, resulted in a design that missed critical business functionality and fell far short of

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

6

1   100% CAS functionality.  For example, Sparta/KPIT manager Ajay Tiwari

2   complained in an April 24, 2012 email about "the lack of adequate and complete FS

3   [functional specification] & TS [technical specification] Documents."  *Id.* Ex. 23 at

4   7.  Sparta's project manager Kharkar would later admit internally that there was "a

5   lack of documentation" from the early stages of the project.  *Id.* Ex. 45 at 1.  And

6   Sparta manager Mark Stanish would later admit that Sparta's poor design and

7   documents resulted in substantial "rework" by defendants' team.  *Id.* Ex. 50 at 2.

8       As the deadlines for Sparta to deliver on the Milestones in the Design SOW approached,

9   Sparta's team scrambled to patch together documentation for Copart, sending out reams of

10  documents just days before the deadline and pressuring Copart to approve them.  Copart approved

11  these documents in reliance on Sparta's representations that any missed requirements or

12  functionality could be added later, and that it was normal SAP practice for design documents to be

13  incomplete.  *See, e.g.*, *id.* Ex. 7; Declaration of Vincent Phillips ("Phillips Decl.") ¶5.  At one point

14  in late February 2012, Sparta executive Namit Swaroop instructed KPIT offshore consultants to

15  draft and update scores of functional specifications and other design documents, even though the

16  offshore team never had direct contact with the Copart employees who understood the business

17  functions these design documents were supposed to describe.  Takenouchi Decl. Ex. 12.  A

18  Sparta/KPIT internal report later noted that because these documents were written by the offshore

19  team "without even system access, it is likely that the same would not be having possible details to

20  start the development."  *Id.* Ex. 24 at 10.

21  **C.**    **The Realization SOW And The Build Phase**

22      At the end of the Design Phase in February 2012, Copart and Sparta began discussing the

23  Build Phase of the project.  On February 29, Sparta manager Swaroop distributed a draft

24  PowerPoint presentation to two other Sparta managers that described Sparta's plan for the Build

25  Phase of the project.  *Id.* Ex. 13.  Swaroop's presentation included a blank page dedicated to

26  project risks, with a placeholder note that instructed Sparta manager Kharkar "to update" using his

27  "excel for risk."  *Id.* at 10.  Kharkar replied with an email listing his concerns about the

28  

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

presentation, including his concerns about Sparta committing to deliver 100% of CAS functionality: "Its [*sic*] dangerous to go in realization with still this open ended scope of 100% CAS." *Id.* Ex. 14 at 1.  Kharkar also attached an Excel spreadsheet that included a long list of acutely critical project risks, including: "Open scope," "Humungous Documentation," "OFFSHORE," "Performance/speed of transactions," and "dependability on multiple initiatives at a time." *Id.* at 3.  Kharkar suggested the PowerPoint slide describing risks should be moved up in the presentation. *Id.* at 2.

Sparta sent Copart the PowerPoint presentation hours later.  *But that presentation did not include any of the project risks that Kharkar listed in his internal spreadsheet.  See id.* Ex. 15. Moreover, the final presentation stated that there was no need to include a contingency for "scope creep" – *i.e.*, there was no risk of the project's scope growing beyond what Sparta currently estimated. *Id.* at 15, 16.  Sparta never shared the dangerous risks that Kharkar had identified with Copart. *Id.* at Ex. 82 at 35:13-36:5; Phillips Decl. ¶6.

In the days that followed Sparta's submission of its Build Phase proposal, Copart solicited other bidders for the Build Phase.  As one potential bidder, PWC, was preparing its bid, Sparta executive Ashu Bhalla received a call from SAP employee Jerry Brooner.  According to Bhalla, Brooner said he would "make sure [PWC's] numbers are higher than [Sparta's]." Takenouchi Decl. Ex. 19.  Sparta never reported this planned bid manipulation to Copart.

Unaware of Sparta's performance failures, internal dysfunction, and exclusion of the list of project risks from its Feb. 29 submission, Copart chose Sparta for the Build Phase at the end of March 2012. *See* Phillips Decl. ¶¶4, 6.  This phase was governed by a second Statement of Work (the "Realization SOW").  Takenouchi Decl., Ex. 18.  As with the Design SOW, the Realization SOW contained a list of milestones (starting with Milestone 5), each with a specific set of requirements, a specific completion schedule, and a fixed fee to be paid only after Sparta's completion and Copart's acceptance of the work associated with that particular milestone.  Copart paid Sparta several million dollars for Milestones 5, 6 and 7, and for the Sparta team's expenses during the Build Phase. *See id.* Ex. 77.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

8

During the Build Phase, defendants' team continued to struggle with technical defects, its inadequately skilled consultants, and poor project management.  Those problems – which would eventually contribute to the failure of AIMOS – included:

- Faulty software design, development and testing: As soon as Sparta's team began building AIMOS in 2012, it began to discover critical gaps in functionality – *i.e.*, the failure of Sparta's design to account for necessary Copart business processes – and a continuing stream of "bugs" in the software code that defendants' offshore team was developing for AIMOS.  The software code that Sparta delivered for Milestone 5 – the first "drop" of software code for AIMOS – was flawed, and a test of the system "failed" due to errors by Sparta's team.  *Id.* Exs. 27, 26.  Sparta promised to deliver better software for the second code drop, which was part of Milestone 6, but this code was equally flawed.  *See, e.g., id.* Ex. 30.

  As AIMOS development continued, Copart and Sparta began tracking software flaws using a program called Bugzilla; by the end of 2012, the Bugzilla count reflected scores of bugs that were preventing basic system testing.  *Id.* Ex. 42.  In many cases Sparta's team would claim to have fixed a bug, only to have the bug reappear in later testing.  *Id.* Exs. 51, 53.  Defendants' internal reports admitted that many of these bugs were the result of mistakes by defendants' own development team.  *Id.* Exs. 58, 59.

  By March 2013, continuing problems with gaps and bugs led Sparta executive Swaroop to demand action from defendants' development team in an email titled, "AIMOS Software Quality."  Swaroop's criticisms included his team's failure to test software code, the incorrect loading of data which resulted in "bring[ing] down entire system," and programming mistakes that resulted in the system being unable to take in new vehicles.  *Id.* Ex. 52 at 5.  KPIT manager Mandar Deshpande responded by blaming Sparta's onsite team for a faulty design and ongoing miscommunications, writing "[t]he system does not have stable design/solution," and criticizing Sparta's "[p]oor change management and change control" which led to parts of the AIMOS

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

9

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

system being delivered without time for testing and quality review. *Id.* at 1-3. Deshpande also blamed the Sparta team's high turnover, failure to pass on business and technical information as consultants left the project, and failure to fully document the AIMOS solution. *Id.* at 3-4.

- <u>FI team failures and turnover</u>: The Financial Intelligence (FI) function in an SAP system is designed to collect and track the company's internal accounting and financial results. During the first year of AIMOS, Sparta's team had *seven different* FI leads, resulting in project delays and the need for Copart to continually re-train Sparta's new leads. *Id.* Exs. 32, 54.

- <u>BI team failures and turnover</u>: The Business Intelligence (BI) function in an SAP system is designed to track and report on business performance, allowing company executives to spot business problems early and monitor ongoing business performance. The defendants' BI team was a failure from the beginning. After one of Sparta's first BI leads, Pramod Nair, complained about "red flags" in the BI design and development in early 2012, he was placed on a list of "misfits" who were removed from the project. *Id.* Exs. 21, 25, 28. His successors also left the project, and eventually, in mid-2013, the BI function was handed to a new Sparta employee, Demian Esnaurrizar. Esnaurrizar reported that he was unable to find basic documentation for Sparta's BI development, and was unable to get information from his predecessor (who had already moved on to another project). Within weeks he identified serious problems with Sparta's BI development, but Sparta never reported Esnaurrizar's concerns to Copart. *Id.* Exs. 67, 66.

- <u>Other inexperienced and underperforming consultants</u>: Sparta's managers acknowledged throughout the project that Sparta's team had incompetent consultants. For example, in a September 29, 2012 email, Sparta manager Kharkar admitted that "we have team members who are slower than a dead man," and that specific consultants "cannot even tests [sic] interfaces by themselves." *Id.* Ex. 33 at 1. As a

1    result, he wrote, "[w]e have 50 plus resources onsite and we even now deal through

2    only selected few for everything." *Id.* at 1. *See also id.* Exs. 55, 22.

3        Sparta's system was supposed to begin operating Copart's Canadian operations, something

4    known in the industry as "go-live," on October 1, 2012.  As the go-live date approached without a

5    working system, and as the count of software "bugs" and other system problems continued to rise,

6    Copart decided on September 19, 2012 to delay the Canada go-live to December 2012.  The delay

7    was attributable to problems with Sparta's project team and design, many of which Sparta had not

8    disclosed to Copart, and to the Sparta team's continuing failure to do basic software testing.

9        Around that same time, as Sparta's team was struggling with internal mismanagement and

10   technical problems (*see id.* Exs. 29, 39), Sparta executives began internal discussions about how

11   Sparta could take technology from AIMOS for use in Sparta's own AutoEdge product.  On

12   October 10, 2012, a Sparta consultant distributed his personal login and password information for

13   the Copart system to Sparta and KPIT consultants with instructions to copy "the class

14   ZCL_IMAGIN and its dependent tables from copart system and copy them into the Autoedge

15   system." *Id.* Ex. 34 at 1.  Hours later another Sparta consultant, Narenda Pratap Singh, confirmed

16   that the material had been copied into the AutoEdge system.  *Id.* Ex. 35 at 1.  At that time Singh

17   did not have access to AIMOS – in fact, he did not even work on AIMOS until late October, after

18   working at least one week exclusively on AutoEdge.  *See id.* Ex. 78.

19       Soon after taking this imaging technology from AIMOS, and after making sure that later

20   improvements in the AIMOS system were copied into AutoEdge (*id.* Ex. 36), Sparta managers

21   discussed other technology that could be taken from AIMOS by "replicating Copart code," and

22   "[c]opying code for what is developed for Copart." *Id.* Exs. 41, 43.  During that same period

23   Sparta set up demonstrations for imaging functions in AutoEdge.  *Id.* Ex. 38.  Sparta executives

24   later approved what they called a Project Charter that discussed how Sparta would copy

25   technology developed for Copart into Sparta's own AutoEdge systems for testing and later use for

26   other Sparta customers.  *Id.* Exs. 47, 48.  During this same period, Sparta was advertising its

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

11

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    AutoEdge product as a feature to entice potential customers to retain Sparta for ERP projects (*id.*

2    Ex. 65) and began diverting resources from AIMOS to AutoEdge (*id.* Ex. 49).

3         When Sparta's AIMOS system continued to flounder in early 2013, largely due to recurring

4    software "bugs" and missing functionality (*see* Takenouchi Decl. Exs. 52 (internal Sparta email

5    describing flaws in Sparta's design and software development), 62 (same), 46), Copart put off the

6    Canada "go-live" indefinitely.

7         By August 2013, 10 months after the original Canada go-live date, the system was still not

8    working, but Sparta convinced Copart to sign an amendment to the ISA that gave Sparta 30 days to

9    design, document, and deliver solutions to a subset of functional problems, known as "functional

10   gaps," that had prevented the system from running basic tasks.  *Id.* Ex. 69 (the "ISA

11   Amendment").  At the time, Sparta had not revealed its theft of AIMOS property, and had not told

12   Copart about dire warnings by Sparta consultants that the AIMOS system had been poorly

13   designed, tested, and documented.  *See, e.g., id.* Exs. 67 (internal Sparta report describing "severe

14   problems" with AIMOS and need to take "corrective action immediately"), 70 (internal Sparta

15   email describing failure to fully test software; noting that such testing is an "essential part of many

16   software development methodologies"), 75.  Nor had Sparta disclosed the fact that it was actively

17   recruiting Copart's primary project manager, Terry Ash, at the same time that Ash was shaping

18   Copart's negotiations with Sparta.  *See id.* Exs. 61 (June 30, 2013 Terry Ash cover letter and CV

19   for Sparta), 64 (July 15, 2013 Ash email to Copart executives with advice re: Sparta negotiations),

20   63 (July 9, 2013 Ash email noting that he sent Sparta's request for additional payment to Copart

21   executive Phillips "for approval").

22        Sparta failed to deliver the solutions described in the ISA Amendment by the deadline (*see*

23   *id.* Exs. 71, 72), and on September 17, 2013 Copart terminated the contract with Sparta, invoking

24   the "termination for convenience" clause in ISA Section 15.2 in an effort to make a clean break.

25   *Id.* Ex. 73.  When Copart asked Sparta what it felt it was owed for work on Milestone 8 – the

26   milestone that Sparta failed to complete in September, and that was worth a total of $1.88 million

27   under the Realization SOW – Sparta demanded $12.2 million.  *Id.* Ex. 76.

28

COPART MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

1   Soon after Sparta was terminated, Sparta's executives proposed working with Copart

2   competitors as a way to punish Copart for ending the contract. *Id.* Ex. 74. Sparta never told

3   Copart about the imaging technology that Sparta had copied into its AutoEdge system, and for at

4   least another year Sparta kept the stolen technology in Sparta's AutoEdge system without

5   monitoring what was done with that property. *See id.* Exs. 86 at 139-140 ("It's a Sparta

6   sandbox…I can't tell you what they were testing or for what they were doing [with] it."), 88.

7   **IV.   ARGUMENT**

8         **A.   <u>Legal Standard</u>**

9   The purpose of summary judgment is to dispose of factually unsupported claims and

10  defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548 (1986). Summary

11  judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and

12  any affidavits show that there is no genuine issue as to any material fact and that the movant is

13  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Porter v. Cal. Dep't of*

14  *Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

15  The moving party has an initial burden to demonstrate the absence of any genuine issue of

16  material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

17  1987) (citing *Celotex*, 477 U.S. at 323). The moving party may meet its burden by producing

18  evidence negating an essential element of the nonmoving party's case, or, after suitable discovery,

19  the moving party may show that the nonmoving party does not have enough evidence of an

20  essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Nissan*

21  *Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the

22  moving party carries its burden, the nonmoving party "must set forth specific facts showing that

23  there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.

24  *Porter*, 419 F.3d at 891 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

25  When evaluating a motion for summary judgment, the court views the evidence through the

26  prism of the evidentiary standard of proof that would pertain at trial. *Anderson*, 477 U.S. at 255.

27  The court draws all reasonable inferences in favor of the non-moving party, including questions of

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

13

credibility and of the weight that particular evidence is accorded.  *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).  The court determines whether the non-moving party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.  *T.W. Elec. Serv.*, 809 F.2d at 631.  Where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

Under California law, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."  Cal. Civ. Code § 1638.

**B.**      **Sparta Cannot Establish A Genuine Issue Of Material Fact In Support Of Its Claims**

    **1.**      **Sections 9.3, 15.2, 15.5 and 18 of the ISA limit Sparta's recovery, if any, to the value of work "accepted" by Copart**

The express terms of the ISA limit any recovery by Sparta:

- Section 9.3 provides that "Copart *shall not* be responsible for the payment of…any charges, fees or other amounts *other than* the Fees," which are defined as "fixed-fee" payments that are due "upon Acceptance [by Copart] of the applicable Milestones" (emphasis added).

- Section 15.2 provides that if Copart terminates the contract for convenience, "Copart shall pay [Sparta] only for the portion of the Services that have been performed and completed as of the termination date, as such portion agreed by Copart and calculated and documented by Service Provider's project management software system."

- Section 15.5 provides that if Copart terminates the contract "for convenience," which is the case here, "Copart shall not be obligated to pay any costs, fees, charges or other amounts in connection with any termination" other than payments for completed and accepted work as described in Section 15.2.

- Section 18 prohibits the recovery of "indirect, incidental, special or consequential damages" and limits Sparta to recovery of "amounts actually paid or payable by Copart…pursuant to this agreement."  Section 18 applies unless there is "gross negligence or willful misconduct."

Takenouchi Decl. Ex. 2.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   Sparta has not alleged, and has presented no evidence of, any gross negligence or willful

2   misconduct by Copart that would invalidate the limitation of damages contained in Section 18 of

3   the ISA.  Nor has Sparta presented a basis for ignoring the plain meaning of Sections 9.3 and 15.5,

4   which restrict the damages that Sparta can seek.  As a result, Sparta's non-contract claims

5   (Promissory Estoppel, Quantum Meruit, Unjust Enrichment) are barred on their face, as they seek

6   recovery for "indirect, incidental, special or consequential damages" that are not allowed by

7   Section 9.3, 15.5, and 18.  *See Hebert v. Rapid Payroll, Inc.*, No. CV 02-4144 DT (PJWx), 2005

8   WL 6172659, at *7 (C.D. Cal. Feb. 9, 2005) (granting partial summary judgment where the

9   contractual limitation of liability to barred plaintiff from recovering lost profits); *Fi Teq Inc. v.*

10  *Venture Corp.*, 169 F. Supp. 3d 948 (2016) (same).[5]

11  Sparta's claims for breach of contract and breach of the implied covenant of good faith and

12  fair dealing suffer from two similarly fatal flaws.  First, to the extent these contract claims seek to

13  recover anything other than what is allowed under Section 15.2 of the ISA, such recovery is barred

14  by Section 15.5, 9.3 and 18 of the ISA.  Second, to the extent Sparta seeks to recover what is

15  allowed under Section 15.2 – *i.e.*, "the portion of the Services that have been performed and

16  completed as of the termination date, as such portion agreed by Copart and calculated and

17  documented by Service Providers project management software system" – Sparta has failed to

18  produce evidence establishing that: (a) Sparta maintained a "project management software system"

19  that "calculated and documented" the portion of Services for which Sparta seeks recovery; or that

20  (b) Copart "agreed" that any portion of Services for which Sparta seeks recovery had been

21  "performed and completed as of the termination date."  As a result, under the express terms of the

22  ISA, Sparta is not entitled to any damages under its contract claims.  *See, e.g.*, *Food Safety Net*

23  *Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1127 (2012) (limitation of liability

24  provision barred damages sought for alleged breach of contract); *Peregrine Pharm., Inc. v.*

25  _____

26  [5] Copart expects Sparta to argue that Sparta's equitable claims are outside the ISA because they are
    based on services that were outside the scope of the ISA.  Sparta will be unable to present evidence

27  that this is the case, as the ISA extends to all services "related to the SAP Software" (ISA at 1) and
    expressly includes any "new services" that are not in the parties' initial Statements of Work (*id.*

28  §§2.1, 2.2).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

*Clinical Supplies Mgmt., Inc.*, No. SACV 12-1608 JGB ANx, 2014 WL 3791567, at *11 (C.D. Cal. July 31, 2014) (applying limitation provision to breach of contract damages).

### 2. Sparta cannot recover on its claims because it has failed to produce evidence or calculations supporting its alleged damages

Even if Sparta's claims were viable in the face of Sections 9.3, 15.2, 15.5 and 18 of the ISA, which they are not, Sparta's claims fail for a separate and independent reason: Sparta has failed to produce evidence and calculations supporting damages for its claims. Copart Statement Of Undisputed Facts ("CSOUF") at 1-4.

Sparta has presented two bases for its damages: (1) that it completed "approximately 84 percent" of Milestones 8 through 15, therefore entitling Sparta to 84% of the milestone-based payments under the Realization SOW and ISA Section 15.2[6]; and (2) Sparta's team expended "nearly 235,000 hours on onsite and offshore services between March 28, 2012 and September 17, 2013" on the AIMOS Project.[7]

Sparta has never explained how it reached its estimate that it completed 84% of Milestones 8 through 15. Sparta's Initial Disclosures do not include a calculation of this figure, and in response to two separate Copart interrogatories seeking Sparta's contentions about the percentage of milestones it completed and how it calculated those percentages, Sparta refused to provide any information. *See* Takenouchi Decl. Exs. 87, 89, 85. At deposition last year, Sparta's corporate designee refused to explain how Sparta calculated this figure, invoking attorney-client privilege. *Id.* Ex. 83 at 295-296. Sparta's refusal to provide information about how it calculated its damages is fatal to its claims. *See, e.g., Cohen v. Hansen*, No. 2:12-CV-01401-JCM-PAL, 2014 WL 1873968, at *12 (D. Nev. May 8, 2014) (barring party from claiming or introducing evidence of quantifiable economic harm due to party's failure to provide damages calculations in discovery); *tagTrends, Inc. v. Nordstrom, Inc.*, No. SAC V13-00563 JVS (JPRx), 2014 WL 12561604, at *5

---

[6] Sparta's "84 percent" figure was disclosed in the report of Sparta's proposed damages expert, Richard Eichmann. Takenouchi Decl. Ex. 90, May 31, 2016 Eichmann Report ("Eichmann Report") ¶23. Eichmann's report does not describe the factual basis for this figure, other than the fact that Sparta asked him to assume that Sparta completed 84% of these milestones. *Id.*

[7] The 235,000 hour estimate is also cited in the Eichmann Report. *Id.* Ex. 90 ¶18.

COPART MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   (C.D. Cal. Sept. 30, 2014) (granting summary judgment on damages where the plaintiffs "failed to

2   supplement their disclosures and responses to interrogatories with a damages computation as

3   required by Rule 26").

4        Nor has Sparta provided support for its estimate of the number of hours spent on the Build

5   Phase of AIMOS.  In response to a Copart interrogatory seeking the identity of Sparta's AIMOS

6   team and the time periods they worked on AIMOS, Sparta produced and cited to a spreadsheet

7   with the bates number SPARTA-0000000024, which purports to show which individuals worked

8   on AIMOS, and the hours each spent on AIMOS on a week-to-week basis.  Takenouchi Decl. Ex.

9   81.  But Sparta never produced the data that was used to build this spreadsheet, despite Copart

10  Requests For Production that targeted this data.  *See id.* Ex. 79, ¶94.  And the individual that

11  Sparta claimed created the spreadsheet, Sandeep Kayal, testified at deposition that he had no

12  knowledge of it.  *Id.* Exs. 83 at 57-60, 84 at 70-73.  This bars Sparta's damages on all its contract

13  and non-contract claims.  *See, e.g.*, *Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*, No. 1:11-CV-

14  00845-SKO, 2013 WL 3803911, at *8 (E.D. Cal. July 19, 2013) (denying plaintiff's belated

15  attempt to include undisclosed billing records to support damages claim); *Ingenco Holdings, LLC

16  v. ACE Am. Ins. Co.*, NO. C13-543RAJ, 2016 WL 4703758, at *3-5 (W.D. Wash. Sept. 7, 2016)

17  (finding willfulness and bad faith where party did not produce documents on which damages

18  calculations were based, despite specific requests; ordering complete preclusion).

19       Sparta also failed to provide the salary information for the consultants that it listed on

20  SPARTA-0000000024.  *See* Takenouchi Decl. Ex. 85.  Having failed to produce this foundational

21  evidence, Sparta cannot now rely on SPARTA-0000000024, or any other unsupported spreadsheet

22  that purports to summarize the hours spent on AIMOS,[8] to support Sparta's damages claims.  *See*

23  *Pro-Concepts, LLC v. Resh*, No. 2:12CV573, 2013 WL 5741542, at *19 (E.D. Va. Oct. 22, 2013)

24  (barring recovery where party failed to produce salary information supporting damages).

25

26  _____

27  [8] Sparta's purported damages expert, Eichmann, originally relied on SPARTA-0000000024.
    Eichmann Report fn.37 & Ex. 4.  He later claimed to also use a "corrected" spreadsheet that was

28  produced by Sparta a day before the fact discovery cut-off.  Eichmann Errata Report fn.37 & Ex. 4.

COPART MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

**C.    Copart Has Sufficient Evidence In Support Of Certain Elements Of Its Claims For Fraud/Fraudulent Inducement, Breach Of Contract, Conversion, And Computer Fraud, For Purposes Of Partial Summary Judgment**

Fraud and fraudulent inducement: A claim for fraud or fraudulent inducement has five elements: misrepresentation or (where there is a duty to disclose) concealment of material fact, knowledge of falsity, intent to defraud or induce, reliance, and damage. *Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*, 578 F.Supp.2d 1242, 1250 (E.D. Cal. 2008). Copart has presented evidence establishing the first element, that Sparta: (1) concealed known project risks to Copart and misrepresented that there was no risk of "scope creep" before Copart hired Sparta for the Build Phase (*see* Takenouchi Decl. Exs. 15, 14), and hid other project risks and problems from Copart during the project (*see id.* Exs. 39, 52); and (2) did not disclose Sparta's theft of Copart property before Copart and Sparta executed the ISA Amendment, and during the Build Phase (Phillips Decl. ¶7). *See also* CSOUF at 4-15.

Breach of contract: A claim for breach of contract has four elements: a valid contract, plaintiff's performance, defendant's breach, and damages. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).[9] Copart has presented evidence establishing the third element, that Sparta breached the ISA when it: (1) failed to use "qualified individuals with suitable training, education, experience and skill to perform the Services" to Copart, and failed to "appoint to the Project Staff only individuals with suitable training and skills to perform the Services," a breach of ISA Sections 14(a) and 5.2; (2) failed to "provide the Services with promptness, diligence and in a professional manner, in accordance with the practices and professional standards used in well-managed operations performing services similar to the Services," in breach of ISA Section 14(a); and (3) stole, and assisted in the theft of, Copart's intellectual property, in violation of ISA

---

[9] Copart alleges the contracts were procured by fraud, alongside its breach of contract claims. *See* Complaint ¶¶122-132, 145-150. Copart can enforce the contract against the defrauding party while simultaneously pursuing fraudulent inducement claims. *See, e.g., Denevi v. LGCC*, 121 Cal. App. 4th 1211, 1220-21 (2004).

COPART MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

Sections 11, 12, and 19.2.  Takenouchi Decl. Exs. 52, 33, 8, 57, 56, 37, 21.[10]  *See also* CSOUF at 15-24.

Conversion:  A claim for conversion has three elements: plaintiff's ownership or right of possession, defendant's conversion, and damages.  *Graham-Sult v. Clainos*, 756 F.3d 724, 737 (9th Cir. 2014).  Copart has presented evidence establishing the first element (Copart's ownership).  Takenouchi Decl. Exs. 2 §11.4 (Ownership of Deliverables), 41, 43.  Copart has also presented evidence establishing the second element (Sparta's theft).  *Id.* Exs. 35, 41, 43, 47. *See* CSOUF at 24-26.

Computer fraud:  Claims under the federal Computer Fraud and Abuse Act ("CFAA") and the California Comprehensive Data Access and Fraud Act ("CDAFA") have four elements in common: intentional access to a computer, without authorization or exceeding authorization, obtaining information, from a protected computer.  *Nexsales Corp. v. Salebuild, Inc.*, No. C-11-3915 EMC, 2012 WL 216260, at *3 (N.D. Cal. Jan. 24, 2012).[11]  Copart has presented evidence establishing that at least one Sparta agent intentionally accessed a computer, without authorization or exceeding authorization, and obtained information from a protected computer.  *Id.* Exs. 34, 35, 36.  *See* CSOUF at 26-27.

## V.    CONCLUSION

Sparta's counterclaims are barred by the terms of the parties' contract, and by Sparta's failure to produce calculations and evidence supporting its damages.  The Court should grant summary judgment to Copart on those counterclaims.

Copart has presented evidence establishing the first element of its fraud and fraudulent inducement claims (misrepresentation or concealment of material fact), the third element of its breach of contract claims (Sparta's breach), the first and second elements of its conversion claim (plaintiff's ownership and defendant's conversion), and the first four elements of its CFAA and CDAFA claims (intentional access to a computer, without authorization or exceeding

---

[10] Copart's breach of contract claims are supported by other misconduct by defendants, but Copart's instant motion is limited to these three types of misconduct by Sparta.

[11] The CFAA has an additional element: the loss of at least $5,000 in value.  18 U.S.C. § 1030.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    authorization, obtaining information, from a protected computer).  The Court should grant partial

2    summary judgment and find that these elements of Copart's claims are established.

3    DATED:  January 13, 2017

4                                               /s/ Mark P. Ressler

5

6                                               MARK P. RESSLER (admitted *pro hac vice*)
                                              KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

7                                               1633 Broadway
                                              New York, New York 10019

8                                               Telephone:      (212) 506-1700
                                              Facsimile:       (212) 506-1800

9                                               mressler@kasowitz.com

10                                              JASON S. TAKENOUCHI (SBN 234835)
                                              KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

11                                              101 California Street, Suite 2300
                                              San Francisco, California 94111

12                                              Telephone:      (415) 421-6140
                                              Facsimile:       (415) 398-5030

13                                              jtakenouchi@kasowitz.com

14
                                              Attorneys for Plaintiff COPART, INC.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

COPART MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

**CERTIFICATION OF SERVICE**

The undersigned hereby certifies that on the 13th day of January, 2017, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

/s/ Mark P. Ressler

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111