MARK P. RESSLER (*admitted pro hac vice*)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:     (212) 506-1700
Facsimile:     (212) 506-1800
mressler@kasowitz.com

JASON S. TAKENOUCHI (SBN 234835)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 California Street, Suite 2300
San Francisco, California 94111
Telephone:     (415) 421-6140
Facsimile:     (415) 398-5030
jtakenouchi@kasowitz.com

Attorneys for Plaintiff COPART, INC.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COPART, INC., | Case No: 2:14-CV-00046-KJM-CKD |
| Plaintiff, | **PLAINTIFF COPART INC.'S OPPOSITION TO DEFENDANT SPARTA CONSULTING, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| SPARTA CONSULTING, INC., KPIT INFOSYSTEMS, INC., and KPIT TECHNOLOGIES, LTD., | |
| Defendants. | Hearing Date: February 24, 2017<br>Time:          10 a.m.<br>Judge:        Hon. Kimberly J. Mueller<br>Location:    Courtroom 3, 15th Floor |
| SPARTA CONSULTING, INC., | |
| Counterplaintiff, | Trial Date:    August 14, 2017 |
| v. | |
| COPART, INC., | |
| Counterdefendant. | |

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................................... 1

II.    FACTUAL BACKGROUND ............................................................................. 2

    A.  The Implementation Services Agreement (ISA) ..................................... 2

    B.  The Design SOW And The Design Phase ............................................... 4

    C.  The Realization SOW And The Build Phase .......................................... 4

    D.  The ISA Amendment And Sparta's Termination ................................... 6

III.   ARGUMENT ..................................................................................................... 8

    A.  Legal Standard ....................................................................................... 8

    B.  There Are Genuine Disputes Of Material Fact Regarding Copart's Claims For Fraud, Fraudulent Inducement, And Negligent Misrepresentation ........................................... 8

        1.   Copart has cited evidence showing several instances of fraud and fraudulent inducement that raise genuine disputes of material fact ......................................... 8

        2.   Copart has cited evidence showing justifiable reliance, which is a jury question that is inappropriate for summary judgment ........................................ 10

        3.   Copart has cited evidence showing fraudulent intent, which is a jury question that is inappropriate for summary judgment ................................................ 11

        4.   The Economic Loss Rule is inapplicable to Copart's fraud claims, and does not bar Copart's negligent misrepresentation claim .................................................. 13

    C.  There Are Genuine Disputes Of Material Fact Regarding Copart's Breach Of Contract Claim ................................................................................................................ 15

        1.   Copart's decision to terminate "for convenience" under Section 15.2 of the ISA does not foreclose Copart's from suing for breach of contract ........................... 15

        2.   There are genuine disputes of material fact regarding Copart's approvals of Sparta deliverables and design documents, which are the basis for Sparta's purported "waiver" ................................................................................................ 16

        3.   There are genuine disputes of material fact regarding Copart's damages ............ 17

    D.  There Are Genuine Disputes Of Material Fact Regarding Copart's UCL, Unjust Enrichment, Breach Of The Implied Covenant, And Declaratory Relief Claims .......... 18

        1.   The UCL and unjust enrichment claims are viable ............................................... 18

        2.   The breach of implied covenant and declaratory relief claims are viable .............. 19

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

i

E.  Copart's Professional Negligence Claim Is Not Time-Barred ........................................ 19

IV.     CONCLUSION .................................................................................................................. 20

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

**TABLE OF AUTHORITIES**

1

2

**Cases**

*Aldapa v. Fowler Packing Co. Inc.*,
   310 F.R.D. 583 (E.D. Cal. 2015)...............................................................................9

*Alfaro v. Cmty. Housing Imp. System & Planning Ass'n, Inc.*,
   171 Cal. App. 4th 1356 (2009)................................................................................10

*Anand v. BP West Coast Prods. LLC*,
   484 F. Supp. 2d 1086 (C.D. Cal. 2007)....................................................................9

*Ash v. Bank of America*,
   2014 WL 301027 (E.D. Cal. Jan. 28, 2014)............................................................18

*Banducci v. Frank T. Hickey, Inc.*,
   93 Cal. App. 2d 658 (1949)......................................................................................16

*BNSF Ry. Co. v. San Joaquin Valley R. Co.*,
   2012 WL 1355662 (E.D. Cal. Apr. 18, 2012)..........................................................17

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..................................................................................................8

*City and County of San Francisco v. Cambridge Integrated Servs. Grp., Inc.*,
   2007 WL 1970092 (N.D. Cal., July 2, 2007)...........................................................14

*Clark v. County of Placer*,
   923 F. Supp. 1278 (E.D. Cal. 1996).........................................................................8

*Copart, Inc. v. Sparta Consulting, Inc.*,
   2015 WL 3622618 (E.D. Cal., June 9, 2015).....................................................13, 18

*Corelogic, Inc. v. Zurich Am. Ins. Co.*,
   2016 WL 4698902 (N.D. Cal., Sept. 8, 2016)..........................................................14

*Diamond Woodworks, Inc. v. Argonaut Ins. Co.*,
   109 Cal. App. 4th 1020 (2003)...........................................................................11, 13

*Dias v. Nationwide Life Ins. Co.*,
   700 F. Supp. 2d 1204 (E.D. Cal. 2010)...................................................................10

*Equal Employment Opportunity Comm'n v. Am. Int'l Grp., Inc.*,
   1994 WL 376052 (S.D.N.Y. July 18, 1994)..............................................................9

*Farhang v. Indian Inst. of Tech., Kharagpur*,
   2010 WL 3504897 (N.D. Cal. Sept. 7, 2010)..........................................................17

*Fed. Land Value Ins. Co. v. Taylor*,
   56 F.2d 351 (9th Cir. 1932)......................................................................................18

*Field v. Mans*,
   516 U.S. 59 (1995)...................................................................................................11

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

iii

*Fruin-Colnon Corp. v. Niagara Frontier Transp. Auth.*,
  180 A.D.2d 222 (1992) ................................................................................................ 16

*Garrett v. Perry*,
  53 Cal.2d 178 (1959) ................................................................................................... 11

*Gutierrez v. Wells Fargo & Co.*,
  622 F. Supp. 2d 946 (N.D. Cal. 2009) ........................................................................ 12

*Hartong v. Partake, Inc.*,
  266 Cal. App. 2d 942 (1968) ....................................................................................... 11

*In re Eashai*,
  87 F.3d 1082 (9th Cir. 1996) ....................................................................................... 11

*In re Software Toolworks Inc. Sec. Litig.*,
  50 F.3d 615 (9th Cir. 1994) ......................................................................................... 13

*J'Aire Corp. v. Gregory*,
  24 Cal. 3d 799 (1979) ............................................................................................ 13, 14

*JMP Sec. LLP v. Altair Nanotechnologies Inc.*,
  880 F. Supp.2d 1029 (N.D. Cal. 2012) .................................................................. 14, 15

*Kamar v. Krolczyk*,
  2008 WL 2880414 (E.D. Cal., July 22, 2008) ............................................................ 20

*Krupski v. Costa Crociere S. p. A.*,
  560 U.S. 538 (2010) ..................................................................................................... 20

*Lazar v. Superior Court*,
  12 Cal. 4th 631 (1996) ................................................................................................. 13

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
  2016 WL 829210 (E.D. Cal., Mar. 3, 2016) .......................................................... 14, 15

*Lisbon Contractors, Inc. v. U.S.*,
  828 F.2d 759 (Fed. Cir. 1987) ..................................................................................... 16

*Lovejoy v. AT&T Corp.*,
  92 Cal. App. 4th 85 (2001) .......................................................................................... 11

*Martell v. Trilogy Ltd.*,
  872 F.2d 322 (9th Cir. 1989) ....................................................................................... 19

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991) ....................................................................................................... 8

*Miranda v. Field Asset Servs.*,
  2013 WL 3283701 (S.D. Cal., June 27, 2013) ........................................................... 14

*N. American Chemical Co. v. Superior Court*
  59 Cal. App. 4th 764 (1997) .................................................................................. 13, 14

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

iv

*Paragon Restoration Grp., Inc. v. Cambridge Square Condominiums,*
2006 WL 4094363 (Sup. Ct. 2006) ........................................................................16

*Patriot Rail Corp. v. Sierra R. Co.,*
2011 WL 318400 (E.D. Cal., Feb. 1, 2011) ..........................................................12

*People ex rel. Dept. of Transp. v. Grocers Wholesale Co.,*
214 Cal. App. 3d 498 (1989) ..................................................................................11

*Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n,*
55 Cal.4th 1169 (2013) ...........................................................................................17

*Robinson Helicopter Co., Inc. v. Dana Corp.,*
34 Cal.4th 979 (2004)........................................................................................11, 13

*Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp.,*
32 Cal. App. 4th 985 (1995) ...................................................................................17

*Shelter Prod. Inc. v. Steelwood Const., Inc.,*
257 Or. App. 382 (2013) .........................................................................................16

*Singletary v. Pa. Dept. of Corrections,*
266 F.3d 186 (3rd Cir. 2001)...................................................................................20

*Spirtos v. Allstate Ins. Co.,*
2004 WL 5803855 (C.D. Cal., May 3, 2004) ........................................................19

*Stewart v. Screen Gems-EMI Music, Inc.,*
81 F. Supp. 3d 938 (N.D. Cal. 2015) .....................................................................18

*Tubbs v. Sacramento Cty. Jail,*
2008 WL 863974 (E.D. Cal. Mar. 28, 2008) ...........................................................9

*U.S. ex rel. EPC Corp. v. Travelers Cas. & Sur. Co. of Am.,*
423 F. Supp.2d 1016 (D. Ariz. 2006) .....................................................................15

*Walter E. Heller Western, Inc. v. Tecrim Corp.,*
196 Cal. App. 3d 149 (1987) ..................................................................................11

*Young v. U.S.,*
298 F.2d 108 (9th Cir. 1962) ..................................................................................13

**Statutes**

Cal. Civ. Code
§ 1638 ........................................................................................................................8
§ 1574 ......................................................................................................................11

Cal. Code Civ. Proc.
§ 1856 ......................................................................................................................17

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

**Rules**

Fed. R. Civ. P.
  15(c)(1)............................................................................................................................19, 20
  56(c) ...............................................................................................................................8

**Treatises**

14A Cal. Jur. 3d
  Contracts § 279............................................................................................................17

8A Charles A. Wright, Arthur R. Miller & Mary Kay Kane,
  Fed. Prac. & Proc. Civ. § 2049.1 (3d ed.) ......................................................................9

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

I.     **INTRODUCTION**

        This action arises out of the misconduct and performance failures of Sparta Consulting Inc. ("Sparta"), a purported expert in the design and implementation of enterprise resource planning ("ERP") business software systems.[1]   As detailed in Copart's Third Amended Complaint (Dkt. No. 126) (the "Complaint" or "Compl."), in 2011 Sparta made misrepresentations and omissions that induced Copart to hire Sparta to design a new ERP system, called AIMOS, based on a software platform developed by German software company SAP.  The parties' contract, called the Implementation Services Agreement ("ISA"), provided that Sparta would receive fixed-fee payments for each "Milestone" that Sparta completed and Copart formally accepted.

        During the initial "Design Phase" of the project, Sparta concealed its failure to design a usable SAP system and misrepresented to Copart that Sparta's team was properly prepared, skilled and equipped to build a usable SAP system.  Sparta's team also told Copart that certain design documents, which were required "deliverables" under the parties' contract, did not have to be complete in order for Copart to sign off on them, and that Sparta would address any missing items during the "Build Phase" of the project.  Sparta's team also concealed serious projects risks that would lead AIMOS to fail.

        In reliance on Sparta's misrepresentations and omissions, Copart signed off on Sparta's design work in early 2012 and later hired Sparta to handle the Build Phase of the project.  But by 2013, after extended delays and ongoing problems with Sparta's defective software code and flawed design, Copart began considering whether to terminate Sparta from the project.  After Sparta again committed to improving and completing its work, Copart agreed in August 2013 to a final 30-day window for Sparta to fix a subset of critical flaws and other system problems that were preventing AIMOS from running even basic operations.

        When Sparta failed to fix the system's flaws within the 30-day window, Copart canceled the contract in September 2013 and tried to negotiate a clean break with Sparta.  But Sparta demanded

_____

[1] Copart's claims against Sparta's parent companies, KPIT Technologies, Ltd. and KPIT Infosystems, Inc., are the subject of separate motions for summary judgment by those companies.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  payment for the entirety of its contract – over $12 million – despite the fact that Sparta had come

2  nowhere close to delivering what it was required to deliver, and had instead saddled Copart with a

3  worthless, non-functioning SAP system.  Copart filed the instant lawsuit soon thereafter, and Sparta

4  responded with counterclaims.

5       During the course of discovery, Sparta produced documents showing that during the project

6  it had concealed critical failures in its design and major deficiencies in its project team, and that it

7  stole materials from AIMOS for use in developing Sparta's own AutoEdge product.  Those

8  documents included:

9    • An email in which a Sparta consultant distributed his login and password for
10     Copart's systems so that others could copy AIMOS materials into Sparta's AutoEdge
       system.  Dkt. No. 198 (Takenouchi Decl.) ("TD") Ex. 34 at 1.

11    • Emails in which Sparta managers discussed "replicating Copart code" and
       "[c]opying code for what is developed for Copart."  *Id.* Exs. 41 at 1, 43 at 1.

12    • A March 2013 email in which Sparta team members excoriated each other for
13     defective code, design and development mistakes, and mismanagement.  *Id.* Ex. 52.

     • A July 2013 internal Sparta report warning about "severe problems" with AIMOS
14     and recommended "corrective action immediately."  *Id.* Ex. 67 at 8.

15      Sparta's motion for summary judgment (the "Motion" or "Mot.") presents an incomplete

16  and inaccurate description of the factual record, and misapplies governing law.  There is ample

17  evidence that Sparta committed fraud, breached the ISA, and committed other misconduct to

18  support Copart's claims, and certainly enough to create a genuine dispute of material fact regarding

19  these claims.  The Court should deny Sparta's motion in its entirety.

20  II.  **FACTUAL BACKGROUND**[2]

21       A.    **The Implementation Services Agreement (ISA)**

22      Copart sells vehicles for a variety of consignors (including insurance companies and rental

23  car companies) to a variety of buyers (including dealers and exporters).  Copart uses a software

24  system called Copart Auction Systems ("CAS") to support its operations.

25      In 2011 Sparta made various specific representations to Copart about Sparta's purported

26  experience, technical expertise, and ability to design and build a system using SAP software that

27  ─────────────────

28  [2] A more complete discussion of the background of this litigation is provided in Copart's Motion
    For Summary Judgment ("Copart MSJ"), Dkt No. 197 at 2-13.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

would have all the functionality of Copart's existing CAS system. *See, e.g.*, TD Ex. 1 at 10-13, 15, 48-52. Copart relied on those representations, and on October 6, 2011, Copart and Sparta signed the ISA. *Id.* Ex. 2. The ISA's provisions included the following:

- Section 5.2 (Project Staff) provided that Sparta "shall appoint to the Project Staff only individuals with suitable training and skills to perform the Services."

- Section 9.4 (Diligence) provided that Sparta "acknowledges and agrees that Copart has delivered or made available to [Sparta] all information and documents [Sparta] has deemed necessary for [Sparta] to determine the requirements to achieve the replacement of 100% of CAS Functionalities."

- Section 9.7 (Payment) provided that payment by Copart for any deliverables "will not constitute…a waiver by Copart of any rights."

- Section 11.4 (Ownership of Deliverables) provided that Copart is "the sole and exclusive owner of all Deliverables" (*i.e.*, work product delivered by Sparta) "without further consideration or action."

- Section 12 (Confidentiality) included clauses requiring, among other things, that Sparta hold "in confidence" any data from Copart and use it only for AIMOS (ISA §12.1) and notify Copart of any security breach or possible breach (ISA §12.6).

- Section 14(a) (Additional Covenants) required that Sparta "provide the Services with promptness, diligence and in a professional manner, in accordance with the practices and professional standards used in well-managed operations performing services similar to the Services," and only use "qualified individuals with suitable training, education, experience and skill to perform the Services."

- Section 15.2 (Termination for Convenience) provided that if Copart terminates the contract "for convenience," "Copart shall pay Service Provider only for the portion of the Services that have been performed and completed as of the termination date, as such portion agreed by Copart and calculated and documented by Service Provider's project management software system."

- Section 15.5 (No Termination Fees) provided that, except as provided under Section 15.2, "Copart shall not be obligated to pay any costs, fees, charges or other amounts in connection with any termination of this Agreement pursuant to this Section 15."

- Section 18 (Limitations of Liability) prohibited the recovery of "indirect, incidental, special or consequential damages," and further limits any recovery to the "amounts actually paid or payable by Copart…pursuant to this agreement." These limitations apply unless there is "gross negligence or willful misconduct."

- Section 19.2 (Compliance with Laws) provided that Sparta "shall provide the Services, including accessing and handling Copart personal Data, in compliance with all Laws."

The ISA provided that AIMOS work would occur in several phases, with each phase governed by a separate written Statement of Work ("SOW") containing specific milestones. The ISA gave Copart the "sole discretion" to determine whether a milestone had been satisfied. *Id.* Ex. 2 §4.4. The ISA is governed by California law. *Id.* Ex. 2 §§19.14, 19.11.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

B.       **The Design SOW And The Design Phase**

Copart and Sparta signed a Statement of Work governing the Design Phase of the Project (the "Design SOW") on October 6, 2011.  TD Ex. 3 at 26.  The Design SOW contained several milestones, and listed payments that would be made by Copart after each milestone was completed and accepted by Copart.  *Id.* at 25.  In the Design SOW Sparta committed to "[d]esign the replacement of 100% of CAS Functionalities" using a mix of standard and customized SAP functionality.  *Id.* at 4.  Sparta also committed to perform all the investigation necessary to deliver 100% of CAS Functionality.  *Id.* at 22.  Copart paid Sparta several million dollars for work under the Design SOW.  *See* TD Ex. 77 at 2.

During the Design Phase of the project, Copart noticed that Sparta's design documents were incomplete, and that functionality in the software that was necessary to handle essential Copart business processes was either missing or inadequately described.  Sparta assured Copart that this was normal in an SAP project, and that any missing or incomplete documentation and functionality would be addressed later in the project.  *See id.* Exs. 7, 10 at 1, 12 at 1.  Based on Sparta's assurances, Copart ultimately approved Design Phase deliverables that Copart and Sparta knew were incomplete.  *See* Dkt. No. 199 (Declaration of Vincent Phillips) ("Phillips Decl.") ¶5.

Internal Sparta emails reveal ongoing problems within the Sparta team during the Design Phase, including incompetent consultants, poor project management, and flawed design documents. *See, e.g.,* TD Exs. 4, 5, 8, 11, 12, 15, 17.  Copart never saw those communications.  Opposition Declaration of Vincent Phillips ("Phillips Opp. Decl.") ¶6.

C.       **The Realization SOW And The Build Phase**

On February 29, 2012, as the Design Phase was nearing an end, Sparta sent Copart a proposal for the Build Phase.  TD Ex. 15.  Sparta's presentation *excluded* a list of project risks that Sparta's management had been discussing internally and that Sparta had initially planned to present to Copart as part of the Build Phase proposal.  *See id.* Exs. 13 at 10 (placeholder page for a list of project risks), 14 at 3 (chart of project risks).  Those risks included the risk of the project's scope expanding beyond what Sparta was prepared to deliver, or "scope creep."  *Id.* at 1, 3.  The final

1    Sparta presentation to Copart did not discuss *any* risks, and it stated there was no need to include a

2    contingency for "scope creep" because there was no risk of the project's scope growing beyond

3    what Sparta currently estimated.  *Id.* Ex. 15 at 15-16.  Had Copart known about these risks, Sparta's

4    proposed mitigation plan, and Sparta's withholding of this information, Copart would not have

5    signed the Realization SOW.  Phillips Decl. ¶6.

6          At the same time the parties were discussing the Build Phase, Copart was signing off on

7    Sparta's Design Phase documents in reliance on Sparta's representations that any missing

8    functionality or other details could be picked up during the Build Phase.  TD Exs. 7, 10 at 1, 12 at

9    1; Phillips Decl. ¶5.  But contemporaneous internal Sparta communications indicate that Sparta

10   planned to limit its Build Phase work to only those items that were documented during the Design

11   Phase.  TD Ex. 14 at 1 (discussing need to limit Build Phase to "what there is in RTM and To-be

12   Documentation," and "NOT 100% of CAS").

13         Copart hired Sparta for the Build Phase of the project in March 2012.  At that time Copart

14   was unaware that Sparta was suffering from ongoing staffing problems and internal dysfunction

15   (and that Sparta had internally acknowledged and chronicled these failures), that Sparta had

16   excluded from its Feb. 29 submission a list of project risks Sparta had internally acknowledged, and

17   that Sparta that planned to limit the Build Phase to the incomplete Design Phase documentation.

18   *See* Phillips Decl. ¶¶4, 6.  The Build Phase was governed by a second Statement of Work (the

19   "Realization SOW") that contained a list of milestones, each with a specific set of requirements, a

20   specific completion schedule, and a fixed fee to be paid only after Sparta's completion and Copart's

21   acceptance of the work associated with that particular milestone.  TD Ex. 18.  Copart paid Sparta

22   several million dollars for Milestones 5, 6 and 7, and for the Sparta team's expenses during the

23   Build Phase.  *See id.* Ex. 77.

24         During the Build Phase, Sparta's team continued to struggle with technical and design

25   defects, inadequately skilled consultants, and poor project management.  *See, e.g., id.* Exs. 21, 22,

26   25, 28, 29, 32, 33, 42, 51, 52, 66, 67; Copart Statement Of Disputed Facts ("CSDF") 11.  Sparta's

27   system was supposed to begin operating Copart's Canadian operations, something known in the

28

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

industry as "go-live," on October 1, 2012.  But as the go-live date approached without a working system, and as the count of software "bugs" and other system problems continued to rise, Copart decided to delay the Canada go-live until such time as the system could pass User Acceptance Testing (UAT).

Around that same time, Sparta executives began internal discussions about how Sparta could take technology from AIMOS for use in Sparta's own AutoEdge product.  On October 10, 2012, a Sparta consultant distributed his personal login and password information for the Copart system to Sparta and KPIT consultants with instructions to copy "the class ZCL_IMAGIN and its dependent tables from copart system and copy them into the Autoedge system."  TD Ex. 34 at 1. Hours later another Sparta consultant, Narenda Pratap Singh, confirmed that the material had been copied into the AutoEdge system.  *Id.* Ex. 35 at 1.  At that time Singh did not have access to AIMOS – in fact, he did not even work on AIMOS until late October, after working at least one week exclusively on AutoEdge.  *See id.* Ex. 78; *see also* Opposition Declaration of Jason Takenouchi ("TOD") Exs. 117, 119.

Weeks later a KPIT consultant confirmed he had copied additional work from AIMOS into AutoEdge.  TD Ex. 36.  And by January 2013 Sparta/KPIT drafted a "Project Charter" describing how functionality from AIMOS, including imaging and Paymetric credit card functions, would be tested for use in Sparta's AutoEdge product to benefit Sparta's other customers.  *Id.* Exs. 47, 48.

### D.    The ISA Amendment And Sparta's Termination

In July 2013 Sparta's AIMOS system was still not working, and Sparta executives met with Copart management to discuss what could be done to salvage the project after months of delays and recurring defects.   TOD Exs. 147, 163 at 180:6-181:5.  At that time, and unbeknownst to Copart, Sparta began negotiations to hire Copart project manager Terry Ash, whose duties included overseeing and approving Sparta's work on AIMOS.  TD Ex. 61.  Neither Sparta nor Ash revealed these discussions to Copart, even though Ash continued to take part in decisions that Copart was making about whether Sparta's performance was appropriate, and whether Copart should pay Sparta for its work.  TOD Ex. 169 at 223:2-226:21, 230:23-231:23, 241:14-246:8, 256:3-257:4; TD

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

1  Exs. 63, 64.

2      In August 2013, as discussions about AIMOS defects dragged on, Copart told Sparta the

3  contract was in "severe jeopardy."  TOD Ex. 151 at 3.  But rather than terminate the contract

4  immediately, and based on Sparta's assurances that its performance would improve, Copart agreed

5  to an ISA Amendment that would give Sparta 30 days to design, document, and deliver solutions to

6  a subset of functional problems, known as "functional gaps," that had prevented the system from

7  running basic tasks.  TD Ex. 69.  At the time, Sparta had not revealed its theft of AIMOS materials,

8  and had not told Copart that Sparta managers had internally voiced dire warnings that Sparta

9  consultants had failed to properly design, test, and document the AIMOS system.  *See, e.g., id.* Exs.

10  67 at 8-15 (internal Sparta report describing "severe problems" with AIMOS and need to take

11  "corrective action immediately"), 70 at 1 (internal Sparta email describing failure to fully test

12  software, an "essential part of many software development methodologies"), 75 at 1; Phillips Opp.

13  Decl. ¶5.

14      Sparta failed to deliver the solutions described in the ISA Amendment by the deadline (*see*

15  TD Exs. 71, 72), and on September 17, 2013 Copart terminated the contract with Sparta, invoking

16  the "termination for convenience" clause in ISA Section 15.2.  *Id.* Ex. 73; TOD Ex. 163 at 181:6-

17  184:10.  When Copart asked Sparta what it felt it was owed for work on Milestone 8 – the

18  milestone that Sparta failed to complete in September, and that was worth a total of $1.88 million

19  under the Realization SOW – Sparta demanded $12.2 million. TD Ex. 76 at 7.

20      Soon after Sparta was terminated, Sparta's executives proposed working with Copart

21  competitors as a way to punish Copart for ending the contract.  *Id.* Ex. 74.  Sparta never told Copart

22  about the imaging technology that Sparta had copied into its AutoEdge system, and for at least

23  another year Sparta kept the stolen technology in Sparta's AutoEdge system without monitoring

24  what was done with that property.  *See id.* Exs. 86 at 139-140 ("It's a Sparta sandbox…I can't tell

25  you what they were testing or for what they were doing [with] it."), 88.

26

27

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

III.     ARGUMENT

A.     <u>Legal Standard</u>

The purpose of summary judgment is to dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment can only be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To defeat summary judgment "the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that 'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Clark v. County of Placer*, 923 F. Supp. 1278, 1282 (E.D. Cal. 1996).

When evaluating a motion for summary judgment, the court draws all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight that particular evidence is accorded. *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

Under California law, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code §1638.

B.     <u>There Are Genuine Disputes Of Material Fact Regarding Copart's Claims For Fraud, Fraudulent Inducement, And Negligent Misrepresentation</u>

1.     <u>Copart has cited evidence showing several instances of fraud and fraudulent inducement that raise genuine disputes of material fact</u>

There is ample evidence supporting Copart's claim for fraud and fraudulent inducement, and certainly enough to establish a genuine dispute of material fact. *See, e.g.,* Dkt. No. 200 (Copart Statement Of Undisputed Facts) ("CSOUF") at 4-15. That evidence includes:

- Before signing the ISA, which contains an express representation by Sparta that it had all the information necessary to design a system with 100% of CAS Functionality (TD Ex. 2 at 9 §9.4 (Diligence)), Sparta executive Vaibhav Nadgauda wrote in an internal draft: "This is not accurate we do not have ALL the information to identify 100% CAS functionality." TOD Ex. 102 at 9. Sparta nonetheless signed the ISA with the language of this representation unchanged. TD Ex. 2 at 9 §9.4.

- The exclusion of a list of project risks from Sparta's Build Phase presentation to Copart, and Sparta's representation to Copart in the final presentation that there was no risk of "scope creep." TD Exs. 15 at 16, 13 at 10, 14 at 1-3.

- During the Design Phase, at the same time Sparta was supposedly fulfilling its contractual commitment to design an SAP system that "must include…100%

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

replacement of CAS Functionalities" (*id.* Ex. 3 at 5) and telling Copart that it was perfectly okay if design documentation was incomplete (*see id.* Exs. 7, 10 at 1, 12 at 1; Phillips Decl. ¶5), Sparta managers were internally discussing their plan to only deliver what was in the design documents, regardless of whether those documents accounted for "100% replacement of CAS Functionalities." TD Ex. 14 at 1.

- Starting in October 2012 Sparta began copying materials from AIMOS into Sparta's own AutoEdge system. *See id.* Exs. 34 at 1, 41 at 1 (describing "replicating Copart code"), 43 at 1 (describing "[c]opying code for what is developed for Copart"). Copart was not told about this activity. Phillips Decl. ¶7.

- In June and July 2013, at the same time that Sparta was negotiating the ISA Amendment, Sparta consultant Demian Esnaurrizar reported to Sparta management that the BI/BW module in AIMOS was not functioning, and had "severe" problems that could case Copart to lose business. TD Ex. 67 at 8; *see also id.* Ex. 66 at 1. Sparta never reported this to Copart. Phillips Opp. Decl. ¶¶5-6.

- From the beginning of the project in late 2011 to the end of the project in 2013, Sparta and KPIT managers described ongoing, critical failures of their project team in internal emails. *See, e.g.*, TD Exs. 8, 21, 28, 52, 62, 70; CSOUF at 4-5, 8-12. These emails – which revealed Sparta's failure to use adequately skilled consultants, abide by basic industry standards, and engage in appropriate project management – were never shared with Copart. Phillips Opp. Decl. ¶¶5-6.

Sparta's challenge to Copart's fraud evidence is premised on Sparta's claim that Copart's interrogatory responses and deposition testimony failed to describe in detail every instance of fraud that had been uncovered in discovery – mostly in documents produced by Sparta – or about which Sparta's witnesses have been questioned. Mot. at 9 (citing Dkt. No. 187 at 66). This is not the standard for summary judgment.[3] *See* 8A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2049.1 (3d ed.) ("…supplementation or correction [of discovery responses] is not required if the added information has been made known to the other parties during the discovery process or in writing"); *Anand v. BP West Coast Prods. LLC,* 484 F. Supp. 2d 1086, 1092 n.11 (C.D. Cal. 2007) ("Documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions

---

[3] Nor is it the standard for interrogatory responses or Rule 30(b)(6) depositions. *See Aldapa v. Fowler Packing Co. Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("[c]ontention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for "each and every fact" and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome'") (citation omitted); *Tubbs v. Sacramento Cty. Jail*, No. CIV S-06-0280 LKK GGH, 2008 WL 863974, at *1 (E.D. Cal. Mar. 28, 2008) ("plaintiff is not required to present his entire case in discovery responses…Taking a general liability theory in a complaint and asking for each and every fact which supports such is an example of a facially overbroad interrogatory"); *Equal Employment Opportunity Comm'n v. Am. Int'l Grp., Inc.*, 93 CIV. 6390 (PKL) (RLE), 1994 WL 376052, at *3 (S.D.N.Y. July 18, 1994) ("Rule 30(b)(6) is not designed to be a memory contest.").

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

of a party opponent.").

Sparta also misstates the record.  In fact, Copart's responses to Sparta's overbroad interrogatories describe in great detail many of the instances of fraud that Copart will present at trial.  *See* TOD Ex. 179 at 14-15.[4]  And Copart's corporate designee described a wide range of misconduct, despite not having memorized the text of particular Sparta internal emails.  *Id.* Ex. 170 at 37:2-6, 37:17-38:6, 90:5-12, 92:1-96:23; TD Ex. 82 at 34:2-36:8.

> ## 2. Copart has cited evidence showing justifiable reliance, which is a jury question that is inappropriate for summary judgment

There is ample evidence that Copart relied on Sparta's fraudulent misrepresentations and omissions, and certainly more than enough to create a genuine dispute of material fact.  *See, e.g.*, Phillips Decl. ¶¶4-7; Phillips Opp. Decl. ¶¶5-6; TD Ex. 82 at 74:1-75:3; TOD Ex. 162 at 294:10-295:11.  Whether that reliance was justifiable is a question of fact for the jury to decide.  *See Dias v. Nationwide Life Ins. Co.*, 700 F. Supp. 2d 1204, 1218 (E.D. Cal. 2010) ("[j]ustifiable reliance is normally a question of fact for a jury" except in "rare cases").[5]

This is not a "rare case" where justifiable reliance can be decided on summary judgment. The evidence shows that before Copart signed the ISA and Design SOW with Sparta, Sparta represented that it was an expert in SAP design and implementation (*see* TD Ex. 1 at 5-6, 48), and that Sparta continued to make false representations and omissions regarding its staff, experience, and project management during the design and build of the AIMOS system (*see* Phillips Decl. ¶¶4-6; Phillips Opp. Decl. ¶¶5-6).  Copart – which paid Sparta millions of dollars for its professional services – did not believe that Sparta would lie about these issues; indeed, "[n]o rational party would enter into a contract anticipating that they are or will be lied to."  *Robinson Helicopter Co.*,

---

[4] Sparta's Interrogatory No. 4, which seeks "the content of each material misrepresentation that you allege was made by Sparta in Copart's Complaint," was expressly limited to those allegations that are "in Copart's Complaint."  *See* TOD Ex. 179 at 14-15.  Moreover, Copart's objections made clear that it was excluding "omissions" from its response.  *Id.* at 15.

[5] *See also Alfaro v. Cmty. Housing Imp. System & Planning Ass'n, Inc.*, 171 Cal. App. 4th 1356, 1383 (2009) ("Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.") (citation omitted).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

*Inc. v. Dana Corp.*, 34 Cal.4th 979, 993 (2004).

Contrary to Sparta's assertion (Mot. at 13), the "justifiable reliance" test does not require an analysis of what Copart *could have* or *should have* done to investigate the truth of Sparta's representations.  Courts have rejected that formulation of the standard, holding instead that "justifiable reliance" focuses on whether "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'"  *In re Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996) (citing *Field v. Mans*, 516 U.S. 59 (1995)); *see also People ex rel. Dept. of Transp. v. Grocers Wholesale Co.*, 214 Cal. App. 3d 498, 508 (1989) ("[t]he recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.").[6]  Even if this were not a jury question, which it is, there is ample basis here to find a genuine dispute regarding whether it was justifiable for Copart to rely on an ERP implementation firm that touted its "delivery excellence," bragged about its "team of highly experienced senior level SAP consultants" (TD Ex. 1 at 5, 46) and made repeated promises that it would eventually address any functionality or other requirements that were missed during the Design Phase of the AIMOS Project (*see id.* Exs. 7, 10 at 1, 12 at 1; Phillips Decl. ¶5).

### 3.    Copart has cited evidence showing fraudulent intent, which is a jury question that is inappropriate for summary judgment

The only intent by a defendant necessary to prove a case of fraud is the intent to induce reliance.  *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 93 (2001).  The existence of such intent is "always a question of fact" under California law.  *Walter E. Heller Western, Inc. v. Tecrim Corp.*, 196 Cal. App. 3d 149, 160–61 (1987); *see also* Cal. Civ. Code § 1574 ("Actual fraud is always a question of fact.").  Accordingly, "[f]raudulent intent is an issue for the trier of fact to decide." *Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal. App. 4th 1020, 1046 (2003) *overruled on*

---

[6] *See also Garrett v. Perry*, 53 Cal.2d 178, 181 (1959) ("The fact that a buyer makes an independent investigation does not preclude him from relying on representations made by the seller where, as here, the seller has a superior knowledge.  Nor did the receipt of some unfavorable information preclude plaintiff from such reliance as a matter of law.") (citations omitted); *Hartong v. Partake, Inc.*, 266 Cal. App. 2d 942, 966 (1968) (citing *Garrett*).

1 | *other grounds, Simon v. San Paolo U.S. Holding Co., Inc.*, 35 Cal.4th 1159, 1182 (2005).

Even if this were not an obvious jury question, which it is, there would be no merit to Sparta's apparent claim that Copart needs a signed confession to prove fraudulent intent (*see* Mot. at 14).  Because guilty parties will often refuse to admit fraudulent intent, the existence of such intent is often proved by circumstantial evidence.  *See Patriot Rail Corp. v. Sierra R. Co.*, No. 2:09-CV-00009-MCE, 2011 WL 318400, at *10 (E.D. Cal., Feb. 1, 2011) ("fraudulent intent must often be demonstrated by circumstantial evidence, which can be inferred from circumstances surrounding the defendant").  There is ample circumstantial evidence here, including:

- Sparta managers admitted in internal emails and reports that certain Sparta consultants were incompetent, and that there were critical failures in Sparta's AIMOS solution, project management and documentation, but Sparta never forwarded those emails and reports to Copart.  *See, e.g.*, TD Exs. 8 at 1, 12 at 1, 14 at 1-3, 28 at 1, 33 at 1, 44 at 1, 45 at 1, 52, 66 at 1, 67 at 8-15; CSDF 1-2, 11-12.

- At the same time Sparta was telling Copart that it was okay if design documentation was incomplete (*see id.* Exs. 7, 10 at 1, 12 at 1; Phillips Decl. ¶5), Sparta managers planned to only deliver what was in the design documents, regardless of whether those documents accounted for "100% replacement of CAS Functionalities."  TD Ex. 14 at 1.  After the Build/Realization SOW was signed, Copart repeatedly used 100% CAS as a touchstone for what Sparta was required to deliver during the Design Phase, and Sparta did not reject Copart's characterization.  *See* TOD Exs. 110, 131, 151.

- Sparta's presentation to Copart on Sparta's plan for the Build Phase of the project excluded a page dedicated to project risks, which Sparta had internally acknowledged in the draft presentation.  TD Exs. 15, 13 at 10.  Sparta manager Kharkar had told his Sparta superiors that the risks should be included in the presentation, but that they should be presented in a "politically correct" manner for "public consumption."  *Id.* Ex. 14 at 2.

- In September 2012, during a discussion about "custom development" for Copart, Sparta manager Kharkar asked for "a list of things we can move from current client (no names plz) to autoedge."  TOD Ex. 113.  Weeks later Sparta began copying material from AIMOS into Sparta's AutoEdge product (TD Exs. 34 at 1), and later discussed "replicating Copart code" and "[c]opying code for what is developed for Copart."  *Id.* Exs. 41 at 1, 43 at 1.

- Sparta executive Nadgauada signed the ISA, which contains an express representation by Sparta that it had all the information necessary to design a system with 100% of CAS Functionality (*id.* Ex. 2 §9.4 (Diligence)), even though he admitted internally that "we do not have ALL the information to identify 100% CAS functionality."  TOD Ex. 102 at 9.

There is ample evidence supporting a genuine dispute about Sparta's intent.  *See Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 958 (N.D. Cal. 2009) (evidence that defendant decided not to inform customers of the change in its allegedly fraudulent practices, and absence of a formal

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

policy to disclose to customers the challenged practices, were sufficient to survive a summary judgment challenge; "a jury could reasonably find that fraudulent intent exists"). A jury should decide whether Sparta acted with fraudulent intent, or if it rather was "just" grossly incompetent. *See Diamond Woodworks,* 109 Cal. App. 4th at 1046.[7]

### 4.     The Economic Loss Rule is inapplicable to Copart's fraud claims, and does not bar Copart's negligent misrepresentation claim

The "economic loss rule" is a doctrine that in certain cases restricts a party from suing in tort for conduct that also violates a contract. There are several caveats and exceptions to the economic loss rule. First and foremost, as the Court has held in this case, the rule does not apply "when a defendant breaches a legal duty independent of the contract, irrespective of whether damages are economic." *Copart, Inc. v. Sparta Consulting, Inc.*, No. 2:14-CV-00046-KJM-CKD, 2015 WL 3622618, at *12 (E.D. Cal., June 9, 2015) (citing *Robinson Helicopter,* 34 Cal. 4th at 991; *see also Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) (rejecting application of the economic loss rule to a fraudulent inducement claim). The authority is clear on this point, making Sparta's challenge to Copart's fraud claims (Mot. at 15) baseless.

The economic loss rule is also of limited application when the contract at issue involves services rather than the sale of goods. In the leading case of *North Am. Chem. Co. v. Superior Court*, the court rejected the application of the traditional economic loss rule where the contract involved services rather than goods. 59 Cal. App. 4th 764, 780-81 (1997). The court reasoned that "a different rule supported by an entirely different line of cases" applied to a services contract; under this "different rule," a negligence claim is viable if the plaintiff can satisfy the six-prong test from *J'Aire Corp.* v. *Gregory,* 24 Cal. 3d 799 (1979). *See N. American*, 59 Cal. App. 4th at 782. The *N. American* court's analysis has been applied repeatedly by federal courts. *See, e.g., City and County of San Francisco v. Cambridge Integrated Servs. Grp., Inc.*, No. C 04-1523 VRW, 2007

---

[7] *See also In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 627 (9th Cir. 1994) (denying summary judgment; "the evidence permits a reasonable inference that [defendants] had access to all information that was available and deliberately chose to conceal the truth"); *Young v. U.S.*, 298 F.2d 108, 111 (9th Cir. 1962) (holding that the truth of defendant's purported, innocent motive for failing to disclose information "was for the jury to decide").

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

WL 1970092, at *4 (N.D. Cal., July 2, 2007) (affirming *N. American* in the context of professional services contracts).[8]

It is indisputable that this case involves professional services. *See* TD Ex. 2 §§2.1 (describing the "services" to be provided by Sparta), 14.2(a) (committing Sparta to "provide the Services with the promptness, diligence and in a professional manner"). And there is ample evidence showing a genuine dispute whether Copart can meet the *J'Aire* test, as there is evidence showing: (1) the transaction was clearly "intended to affect" the plaintiff (*i.e.*, Copart), (2) the "foreseeability of harm to the plaintiff," (3) a "degree of certainty that the plaintiff suffered injury," (4) "closeness of the connection between the defendant's conduct" and the "injury suffered" by Copart (*i.e.*, the failure of AIMOS and Copart's losses due to that failure); (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. *N. American*, 59 Cal. App. 4th at 782. Copart's evidence on this issue includes the plain language of the ISA, the scores of internal Sparta reports and emails showing fraud and incompetence, documents showing Sparta made knowingly false or at least negligently incomplete or inaccurate representations to Copart to induce Copart to sign contracts and approve deliverables, and the invoices and other records establishing Copart's losses from the failure of AIMOS. *See, e.g.*, TD Exs. 7, 8 at 1, 12 at 1, 14 at 1-3, 15 at 15-16, 28 at 1, 33 at 1, 45 at 1, 52; CSOUF at 1, 4-15; CSDF 1-6, 8-12, 15-16.

Sparta's reliance on *Lennar Mare* and *JMP Securities* (Mot. at 15) is misplaced. *Lennar Mare* did not involve a professional services contract, there was no claim for fraudulent inducement, and the court never addressed *N. American*. *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, No. 2:12-CV-02182-KJM-KJN, 2016 WL 829210, at *7-9 (E.D. Cal., Mar. 3, 2016). Similarly, *JMP Securities* did not involve a fraudulent inducement claim and did not address *N. American*, and the court never addressed the application of the economic loss rule to a professional services-related claim because the only claims at issue were the professional's claims *against the client. See JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp.2d 1029, 1042 (N.D. Cal.

---

[8] *See also Corelogic, Inc. v. Zurich Am. Ins. Co.*, No. 15-CV-03081-RS 2016 WL 4698902, at *5 (N.D. Cal., Sept. 8, 2016) (applying *N. American* to professional services contract); *Miranda v. Field Asset Servs.*, No. 3:11-CV-1514-GPC-JMA 2013 WL 3283701, at *4 (S.D. Cal., June 27, 2013) (same).

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

2012).  *Lennar Mare* and *JMP Securities* are also distinguishable on their facts.  Here, unlike in *Lennar Mare* and *JMP Securities*, there are numerous misrepresentations and omissions – including misrepresentations and omissions to induce Copart to sign contracts and approve deliverables – that are distinct from the incompetent performance and staffing that breached the ISA.  *See, e.g.*, TD Exs. 7, 12, 14 at 1, 15 at 15-16; TOD Ex. 102 at 9; Phillips Opp. Decl. ¶¶5-6; CSOUF at 1, 4-15; CSDF 1-6, 8-12, 15-16.

### C.   There Are Genuine Disputes Of Material Fact Regarding Copart's Breach Of Contract Claim

#### 1.   Copart's decision to terminate "for convenience" under Section 15.2 of the ISA does not foreclose Copart's from suing for breach of contract

The ISA provided that Copart could terminate the contract "for convenience" under Section 15.2, "for specified events" under Section 15.3, or "for cause" under Section 15.4.  TD Ex. 2 at 14-15 §§15.2-15.4.  Had Copart terminated under Sections 15.3 or 15.4, Copart *would not* have been required to pay "any costs, fees, charges or other amounts" to Sparta.  *Id.* at 15 §15.5.  Copart instead terminated under Section 15.2, a decision that was potentially more costly to Copart, in an attempt to negotiate a clean break.  Copart, which only terminated Sparta after Sparta failed to meet the 30-day cure deadline set by the ISA Amendment, invoked Section 15.2 because of the incomplete information that Copart had at the time.  Had Copart known the truth about Sparta's performance failures, fraud and theft, Copart would have terminated for cause.  Phillips Opp. Decl. ¶7.

Nothing in the ISA bars Copart from seeking damages after a Section 15.2 termination, and elsewhere in the ISA there is language that contemplates that Copart may recover "amounts actually paid…by Copart to Service Provider pursuant to this agreement."  *See* TD Ex. 2 §§15.2, 15.5, 18. Where, as here, the contract does not bar a party from claiming breach after termination, the courts should not impose such a limitation.  *See U.S. ex rel. EPC Corp. v. Travelers Cas. & Sur. Co. of Am.*, 423 F. Supp.2d 1016, 1018 (D. Ariz. 2006) (allowing customer to claw back payments after terminating contract for convenience).  And where, as here, the defendant had ample opportunity to cure the alleged defects before termination, courts have held that damages for breach of contract

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

can be recovered after a termination "for convenience."  *In Aydin Corp*, EBCA No. 355-5-86, 1989 WL 74785, *40 (June 1, 1989) (rejecting the argument that damage claims for defective work are not recoverable where there has been a termination for convenience); *see also Lisbon Contractors, Inc. v. U.S.*, 828 F.2d 759, 769 (Fed. Cir. 1987) (expressly declining to hold that "[breach of contract damages] cannot be made for [defective] work where a convenience termination is involved").

Sparta's reliance on *Fruin-Colnon Corp. v. Niagara Frontier Transp. Auth.*, 180 A.D.2d 222 (1992); *Shelter Prod. Inc. v. Steelwood Const., Inc.*, 257 Or. App. 382 (2013), and *Paragon Restoration Grp., Inc. v. Cambridge Square Condominiums*, 2006 WL 4094363 (Sup. Ct. 2006), *aff'd as modified*, 42 A.D.3d 905 (2007) (Mot. at 15-16) is misplaced.  None of those cases involved situations where, as here, the defendant received ongoing complaints about its defective work over a period of years, and was terminated *after being given a 30-day period to correct a set of mistakes that had been the subject of extensive discussion between the parties for months*.[9]

### 2. There are genuine disputes of material fact regarding Copart's approvals of Sparta deliverables and design documents, which are the basis for Sparta's purported "waiver"

The ISA provides that payment by Copart for any deliverables "will not constitute…a waiver by Copart of any rights" (TD Ex. 2 §9.7), and nothing in the ISA restricts Copart from suing for breach of contract for defects in previously accepted deliverables (*see id.* §§4.4, 9.1).  Where, as here, the contract does not restrict a party from suing for breach of contract based on approved deliverables, there is no basis for imposing such a restriction.  *See Banducci v. Frank T. Hickey, Inc.*, 93 Cal. App. 2d 658, 662 (1949) ("[a] mere acceptance, without more, does not necessarily preclude the owner from showing that the work was done in an unworkmanlike manner").

In any event, there is ample evidence – and certainly enough to create a genuine dispute – that Copart's acceptance of Sparta's deliverables was procured by fraud, including Sparta's representations that it would address any missing functionality later, and Sparta's omissions

---

[9] Indeed, in all those cases the alleged defects were not discussed until *after* the defendant was terminated.  *Fruin-Colnon*, 180 A.D.2d at 234, *Shelter Prod.*, 257 Or. App. at 402-03, *Paragon Restoration*, 2006 WL 4094363 at *4.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1   regarding the ongoing failures of its design, its team, and its project management.  *See, e.g.*, TD

2   Exs. 8 at 1, 12 at 1, 14 at 1-3, 28 at 1, 33 at 1, 44 at 1, 45 at 1, 52, 66 at 1, 67 at 8-15; CSDF 1-6, 8-

3   12, 15-16; Phillips Decl. ¶¶4-7.  This fraud, which is provable by parol evidence, nullifies any

4   alleged waiver.  *See Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55

5   Cal.4th 1169, 1182 (2013) (reaffirming rule that parol evidence is always admissible to prove

6   fraud).[10]

7        Sparta's claim that the scope of the Build Phase was limited to the incomplete documents

8   that were approved during the Design Phase is contrary to Sparta's own internal admissions.  For

9   example:

10       •   In May 2012, just weeks after the Realization SOW was signed, Sparta manager
             Kharkar admitted "we agreed for 100% CAS."  TOD Ex. 109 at 1.
11       •   In April 2012 Copart manager Ash made clear that Copart expected Sparta to add
12            any "100% CAS" functionality that had been missed during the Design Phase, and
             Sparta did not disagree with Ash's assessment.  *Id.* Ex. 110 at 1.
13       •   In April 2013, when Copart rejected a series of Sparta change requests, Kharkar
             admitted the reason was "100% cas!"  *Id.* Ex. 131 at 1.

14

15       Sparta's reliance on *Farhang* and *BNSF* (Mot. at 16-17) is misplaced.  The waiver at issue

16   in *Farhang* was based on the plaintiffs aiding in the alleged contract breach by giving "specific

17   directives" to defendants regarding use of the technology at issue.  *Farhang v. Indian Inst. of Tech.,*

18   *Kharagpur*, No. C-08-02658 RMW, 2010 WL 3504897, at *2 (N.D. Cal. Sept. 7, 2010).  And in

19   *BNSF* the plaintiff never complained about the defendant's performance.  *BNSF Ry. Co. v. San*

20   *Joaquin Valley R. Co.*, No. CV F 08-1086 AWI SMS, 2012 WL 1355662, at *12-13 (E.D. Cal. Apr.

21   18, 2012).  Neither *Farhang* nor *BNSF* applies to the facts in this case.

22            **3.    There are genuine disputes of material fact regarding Copart's damages**

23       The express terms of the ISA contemplate that Copart could recover payments already

24   made.  TD Ex. 2 §§18 (noting the potential recovery of "amounts actually paid…by Copart to

25   _____

26   [10] *See also Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp.*, 32 Cal. App. 4th 985,
     995 (1995) (discussing "the well-settled rule that parol evidence is admissible to prove fraud in the
27   inducement"); Cal. Code Civ. Proc. §1856; 14A Cal. Jur. 3d Contracts §279 ("when a party has,
     through oral representations and conduct…induced the other party to rely on the representations...
28   it would be inequitable to deny the relying party the benefit of the other party's apparent
     modification of the written contract").

Service Provider"), 9.7 ("Payment of an invoice will not constitute…waiver by Copart of any rights."). Such payments would be, by definition, the result of approved deliverables, but there is ample evidence that those approvals were the result of fraud. *See, e.g.,* Phillips Decl. ¶¶4-7. At a minimum, there is ample evidence that Sparta told Copart that if Copart signed off on incomplete deliverables, those incomplete elements would be addressed during the Build Phase of the project. Having made that commitment, Sparta cannot now try to claim that Copart's approval of incomplete deliverables is a waiver of Copart' claims that are based, in part, on those incomplete deliverables. *See Fed. Land Value Ins. Co. v. Taylor*, 56 F.2d 351, 357 (9th Cir. 1932) ("equity does not permit a wrongdoer to set up its own wrong to estop an innocent person").

### D. There Are Genuine Disputes Of Material Fact Regarding Copart's UCL, Unjust Enrichment, Breach Of The Implied Covenant, And Declaratory Relief Claims

#### 1. The UCL and unjust enrichment claims are viable

Copart's claims for violation of the Unfair Competition Law (UCL) and unjust enrichment are based on a wide range of misconduct by Sparta, including fraud, negligence, professional negligence, conversion, and violations of state and federal computer fraud statutes. *See* Compl. ¶¶ 212, 214, 217. Copart has cited substantial evidence in support of the underlying misconduct. *See, e.g.,* TD Exs. 8 at 1-2, 21 at 1, 28, 29, 35, 43 at 1, 47, 52, 62 at 1, 4, 67 at 8-15, 70 at 1; CSOUF at 4-24; Phillips Opp. Decl. ¶¶5-6. This conduct triggers UCL liability under the unlawful, unfair, and fraudulent prongs of the UCL.

Sparta's argument that Copart's UCL claim is limited to fraud (Mot. at 18) is contradicted by the plain text of Copart's Complaint, which incorporates into Copart's UCL claim a range of misconduct that is both "unfair" (*e.g.*, fraud, negligence, gross incompetence) and "unlawful" (*e.g.*, fraud and computer fraud). *See* Compl. ¶¶ 212, 214; *see generally Stewart v. Screen Gems-EMI Music, Inc.,* 81 F. Supp. 3d 938, 967 (N.D. Cal. 2015) ("unfair" prong can be satisfied by conduct that also supports a breach of contract claim).[11] The Court has already ruled that Sparta would be liable under the fraud prong of the UCL if it "fraudulently induced the contract and misrepresented

---

[11] *See also Ash v. Bank of America,* No. 2:10-cv-02821-KJM-KJN, 2014 WL 301027, at *14 (E.D. Cal. Jan. 28, 2014) (a "common law" violation can satisfy the UCL "unlawful" prong).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    its capabilities and the functionality of the AIMOS system" (*Copart*, 2015 WL 3622618 at *13),

2    and Copart has presented ample evidence on this point.  *See, e.g.*, CSOUF at 4-15.

3            Sparta's challenge to Copart's unjust enrichment claim (Mot. at 18) is similarly misguided.

4    Copart is entitled to restitution because Copart paid for flawed design and development, after Sparta

5    concealed the depth of its incompetence and faulty work, and after Sparta misrepresented (either

6    fraudulently or negligently) that it would correct any defects or missed functionality.  *See* Compl.

7    ¶¶ 217 (incorporating allegations), 218-220.  There is ample evidence showing a genuine dispute

8    regarding the underlying misconduct.  *See, e.g.*, CSOUF at 4-15; Phillips Decl. ¶¶4-6; CSDF 1-6, 8-

9    12, 15-16.

10                    **2.    The breach of implied covenant and declaratory relief claims are viable**

11           Copart has submitted substantial evidence showing that Sparta misrepresented "its expertise

12   capabilities and handling of problems with the AIMOS program," which as Sparta notes (Mot. at

13   19) was the basis for the Court denying Sparta's motion to dismiss Copart's claim for breach of the

14   implied covenant of good faith and fair dealing.  *See, e.g.*, CSOUF at 15-24.  Copart has also

15   supported its fraud claims with evidence that shows, at an absolute minimum, a genuine dispute of

16   material fact about whether Sparta and the other defendants committed fraud.  *See id.* at 4-15.

17   Sparta's challenge to Copart's claim for breach of the implied covenant (Mot. at 19) is baseless.

18           Sparta's challenge to Copart's claim for declaratory relief is based on a bald

19   misrepresentation of *Spirtos v. Allstate Ins. Co.*, No. CV 02-8798-RGK AJWX, 2004 WL 5803855

20   (C.D. Cal., May 3, 2004).  *See* Mot. at 19.  The *Spirtos* court held that the plaintiff's declaratory

21   relief claim failed because there was no evidence supporting a breach of contract.  *Id.* at *5.  The

22   court *did not* rule that a declaratory relief claim cannot overlap with a breach of contract claim.

23           **E.    Copart's Professional Negligence Claim Is Not Time-Barred**

24           Copart filed its original complaint in 2013, and filed an amended complaint in 2014.  Those

25   complaints share a common core of operative facts – *i.e.*, Sparta's incompetence during the design

26   and implementation of the AIMOS system – with the operative Complaint.  *Compare, e.g.,* Dkt. No.

27   38 (Copart Second Amended Complaint) ¶¶4-7, 36-79 *with* Dkt. No. 126 (Copart Third Amended

28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

Complaint) ¶¶7-12, 191, 193; *see also* Mot. at 20 (discussing contents of Copart's prior complaint). Where, as here, the new claim shares a common core of operative facts with claims in the prior complaint, the new claim "relates back" to the prior complaint. *Martell v. Trilogy Ltd.*, 872 F.2d 322, 327 (9th Cir. 1989); Fed. R. Civ. P. 15(c)(1). The same analysis applies to the newly added KPIT defendants. *See id.; Singletary v. Pa. Dept. of Corrections*, 266 F.3d 186, 196-97 (3rd Cir. 2001) (notice of action involving subsidiary is imputed to parent corporation, especially where counsel is shared); *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 548 (2010).

Even if Rule 15(c)(1) were not applicable, which it is, Copart's professional negligence claim would not be time-barred under the doctrine of equitable tolling. *See Kamar v. Krolczyk,* No. 1:07-CV-0340 AWITAG, 2008 WL 2880414, at *9 (E.D. Cal., July 22, 2008) (applying equitable tolling where there was (1) timely notice to the defendant; (2) lack of prejudice to defendant in gathering evidence on the second claim; and, (3) good faith by the plaintiff).

## IV.    CONCLUSION

There are genuine disputes of material fact regarding Copart's claims for fraud, fraudulent inducement, negligent misrepresentation, breach of contract, unfair competition, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and declaratory relief. The Court should deny Sparta's motion in its entirety.

DATED:  February 10, 2017

/s/ Mark P. Ressler
_____

MARK P. RESSLER (admitted *pro hac vice*)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:     (212) 506-1700
Facsimile:      (212) 506-1800
mressler@kasowitz.com

JASON S. TAKENOUCHI (SBN 234835)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 California Street, Suite 2300
San Francisco, California 94111
Telephone:     (415) 421-6140

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

Facsimile:      (415) 398-5030
jtakenouchi@kasowitz.com

Attorneys for Plaintiff COPART, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

COPART'S OPPOSITION TO SPARTA'S MOTION FOR SUMMARY JUDGMENT
Case No. 2:14-cv-00046-KJM-CKD

**CERTIFICATION OF SERVICE**

The undersigned hereby certifies that on the 10th day of February, 2017, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

/s/ Mark P. Ressler