UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COPART, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>SPARTA CONSULTING, INC., KPIT INFOSYSTEMS, INC., AND KPIT TECHNOLOGIES LTD.,<br><br>    Defendants.<br><hr>SPARTA CONSULTING, INC.,<br><br>    Counterplaintiff,<br><br>    v.<br><br>COPART, INC.,<br>    Counterdefendant. | No. 2:14-cv-0046-KJM-CKD<br><br><u>ORDER</u> |

In this order the court resolves four issues reserved by the parties or raised by the parties by motion following the jury verdict handed down on May 22, 2018. ECF No. 497. Specifically, the court addresses the following: a limitation of liability clause in a contract between Copart, Inc. and Sparta Consulting, Inc.; Copart's equitable unjust enrichment and California Unfair Competition Law (UCL) claims; the question of prejudgment interest to Sparta on its successful breach of the implied covenant of good faith and fair dealing claim against

1

Copart; and dismissal of Copart's trade secrets misappropriation claim. The court provides its conclusions and reasoning below.

## I. BACKGROUND

### A. Trial

At trial, the court gave the jury Preliminary Instruction No. 2, which the court excerpts below:

> In this action, the plaintiff and counterdefendant is Copart, Inc. The defendants in this case are Sparta Consulting, KPIT Infosystems, Inc. and KPIT Technologies Ltd. Sparta is also the counterplaintiff in this action.
>
> Copart processes damaged or donated vehicles that it then sells for insurers or nonprofit organizations during online auctions. Sparta designs and builds custom business management software systems for companies. KPIT Infosystems is Sparta's parent company, and KPIT Technologies is Sparta's parent company's parent, or grandparent.
>
> . . . .
>
> In October 2011, Copart hired Sparta to design a new business management software system to replace Copart's existing software system. Following the completion of the design, Copart hired Sparta to build the new system. Before Sparta finished building the new system, in September 2013, Copart terminated the contract with Sparta.
>
> Copart and Sparta have sued each other for damages related to the project. Copart has also sued Sparta's parent company, KPIT Infosystems, and its parent company's parent, KPIT Technologies.
>
> Copart contends that it is owed money by Sparta for fraud, professional negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, violations of computer fraud statutes and other misconduct. Copart also contends that it is owed money by KPIT Infosystems and KPIT Technologies for misappropriation of trade secrets, violations of computer fraud statutes and other misconduct. Sparta and the KPIT entities deny Copart's claims.
>
> Sparta claims that Copart has failed to pay money that it owes to Sparta for work performed on the new software system. Copart denies that it owes anything to Sparta.

Preliminary Instruction No. 2, ECF No. 398 at 3-4.

Copart and Sparta executed multiple contracts during their business relationship. One of these agreements was the Implementation Services Agreement (ISA). Trial Ex. JX-1

2

(JX-1[1]).  Under the parties' agreements, Sparta would complete numbered "milestones" by certain dates, Copart would approve those milestones and Copart would pay a fee to Sparta for completion.  *See* ISA §§ 1.22-1.24, 3.1, 4.1-4.4, 9.1.  The first four milestones comprised a design phase for the new business management software system.  *See* JX-2 (Design Statement) at 25; D-1055.  The remaining milestones, Milestones 5 through 15, comprised the build phrase for the software system.  JX-3 (Build Statement or Realization Statement) at 33.  Copart paid Sparta $11,364,460.88 for completing Milestones 1 through 7.  Copart terminated Sparta "for convenience" on September 17, 2013 without paying any other milestone fees.  ISA § 15.2; D-301-1.  The parties dispute how much work Sparta completed before Copart terminated Sparta.  *See, e.g.*, P-1041.

Before trial, the court ordered "the parties to meet and confer and provide, by the first day of trial, a joint annotated version of the relevant contracts, or their competing versions, showing contract terms the parties request be construed either by the court or the jury."  Order on Mot. in Lim. and Mot. to Bifurcate, ECF No. 390 at 18, 51.  The parties "exchanged terms that [they] believe[d] the court or the jury can interpret," and the court directed the parties to provide a joint binder reflecting which contract provisions the court should construe and which provisions the jury should interpret.  April 23 Trial Tr. at 41:19-43:20, ECF No. 414.  The court received this jointly annotated binder, listing Copart and defendants' positions as to multiple contract provisions.  For ISA § 18, only defendants have presented a position: "This section should be interpreted by the [c]ourt, consistent with the [c]ourt's prior interpretation of this [s]ection as set forth in the Summary Judgment Order [ECF No. 264 at 16], and as set forth in [d]efendants' Trial Brief [ECF NO. 383 at 22-24]."  Long Decl. Ex. A at 17, ECF No. 519-1.

---

[1] The court will refer to all joint trial exhibits as "JX-" followed by the exhibit's number; all plaintiff's trial exhibits as "P-" followed by the exhibit's number; and all defendants' trial exhibits as "D-" followed by the exhibit's number.  The court will refer to any declaration exhibits submitted in connection with the motions resolved by this order as declaration exhibits. *E.g.*, Takenouchi Decl. Ex. A, ECF No. 506.  The court typically returns trial exhibits following trial.  Here, the court has retained trial exhibits to resolve post-trial motions.  The court will return trial exhibits once the court has resolved all post-trial motions.

ISA § 18 is a limitation of liability clause. Defendants had initially proposed an instruction on this clause, ECF No. 388 at 98-100 (defendants' proposed instruction and Copart's objections), but the parties later agreed the court would construe this clause following trial, instead of putting it before the jury. *See* May 11 Trial Tr. at 56:7-15, ECF No. 471; May 16 Trial Tr. at 244:25-248:4, ECF No. 482; *see also* May 17 Trial Tr. at 3:22-4:3, ECF No. 490 (confirming parties' agreement, that "as needed, the [c]ourt will conduct essentially a bench trial," making "any legal decisions" but "to the extent there are any factual decisions," the court also would make those).

When discussing Copart's unjust enrichment and UCL claims with the court, Copart at one point stated, "We'd like the jury to decide the facts and for those facts then to be binding on the [c]ourt with respect to its determination." May 11 Trial Tr. at 19:13-15. Defendants stated their view was that the court "should decide those claims" as "equitable" claims. *Id.* at 19:17-21. The court stated it had contemplated "the latter" view and would let the parties know if that changed. *Id.* at 19:22-25.

Regarding prejudgment interest for an award on contract claims, defendants asserted this interest was "an issue for the [c]ourt to decide." May 11 Trial Tr. at 57:9-10. The parties later jointly agreed to the court's deciding prejudgment interest, "[e]ven the fact of" prejudgment interest, "[e]ntirely." May 16 Trial Tr. at 225:7-12, 226:3-15.

During trial, Copart withdrew its trade secrets misappropriation claim. ECF No. 468 at 1 (discussing "Copart's withdrawal of its trade secret misappropriation [claim]," offer to stipulate to dismissal with prejudice and request that "this particular dispute be the focus of motion practice after trial, on a full record"). The parties agreed Copart's withdrawn trade secrets misappropriation claim "should not go to the jury" and that they would address whether the court should dismiss "with prejudice or without prejudice . . . after trial." *Id.* at 5:21-24.

The court granted defendants' "motion for judgment as a matter of law" as to Copart's agency claims. May 14 Trial Tr. at 5:9-14, ECF No. 476.

After closing arguments, the court provided the jury its final instructions.  *See* Final Jury Instructions (Instructions), ECF Nos. 485, 488 (correcting Instruction Nos. 45 and 52, and adding Instruction No. 51A).

The jury reached a verdict, finding Sparta liable for "fraud against Copart in the form of concealment" and awarding Copart $4.69 million.  Verdict Form at 2, ECF No. 497.  The jury also found Sparta committed professional negligence and awarded Copart $20.37 million.  *Id.* at 4.  But the jury found Copart "20%" responsible for this negligence.  *Id.*  The jury awarded Sparta $4.88 million for Copart's breach of the implied covenant of good faith and fair dealing based on Sparta's work performed and completed and unreimbursed expenses.  *Id.* at 8; Instruction No. 52; ISA § 15.2

## B.    Post-Verdict Briefing and Hearing

After the verdict, Copart and defendants filed briefs addressing four issues: (1) the application of ISA § 18, the limitation of liability clause, to the jury verdict; (2) defendants' liability under Copart's unjust enrichment and UCL claims; (3) Sparta's entitlement to prejudgment interest for its successful breach of the implied covenant of good faith and fair dealing counterclaim; and (4) whether Copart's withdrawn trade secrets claim should be dismissed with prejudice.  *See* ECF Nos. 503 (defendants' brief), 505 (Copart's brief).  The court held a hearing on these issues on July 13, 2018.  ECF Nos. 510, 515.  After the hearing, Copart and defendants submitted supplemental briefs, then final reply briefs.  ECF Nos. 516, 518, 520, 521.

The court resolves the four issues below.

## II.    LEGAL STANDARD

The Seventh Amendment provides that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.  According to the Ninth Circuit, "it would be a violation of the Seventh Amendment right to jury trial for the court to disregard a jury's finding of fact."  *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (citing *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991)).  "Thus, in a case where legal claims are tried by a jury and equitable claims are tried

by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.'" *L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (citation omitted).

"Where 'substantial commonality' exists between the factual questions presented by legal and equitable claims, jury findings pertaining to the legal claims constrain the court's determination of equitable claims." *Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 818 F. Supp. 2d 1193, 1204 (E.D. Cal. 2011), *reinstating jury verdict on reconsideration in part*, No. 05-CV-1411-MLH (GSA), 2012 WL 13040409 (E.D. Cal. May 7, 2012) (citation omitted); *see Tu Thien The, Inc. v. Tu Thien Telecom, Inc.*, No. CV1109899MWFJEMX, 2014 WL 12580249, at *7-9 (C.D. Cal. July 11, 2014) (reasoning "[t]he UCL claims are based on the same factual allegations as the trademark claims decided by the jury," finding UCL violations consistent with the jury verdict on trademark claims and concluding the UCL "remedies are redundant with those awarded under the trademark claims").

III.     ANALYSIS

    A.     New Evidence and the Seventh Amendment

Copart contends the court "can—and should—consider evidence that was not admitted during the jury trial" in resolving "equitable claims and legal issues that were not presented to the jury." ECF No. 516 at 2. Defendants assert the Seventh Amendment precludes examining new evidence that would in effect re-examine any fact tried by the jury and impermissibly contradict the jury's verdict. ECF No. 518 at 3 n.4.

Copart's citation to *Consumerinfo.com, Inc. v. Chang*, No. CV 09-3783-VBF(MANX), 2011 WL 13190163, at *1 (C.D. Cal. June 3, 2011), does not support its position. Notwithstanding its at most persuasive status, in *Chang*, the court "held a bench trial on equitable issues, and allowed the parties to introduce new evidence and argument on the issues to be tried." *Id.* The case did not involve a dispute about the jury's factual determinations and how those bind a court's ruling on equitable issues. Rather, the court referred to new evidence presented on equitable issues to support a party's lack of consent to try an issue because that party "had

voluntarily dismissed its counterclaims before its opportunity to present evidence closed." *Id.* (emphasis removed).

The case of *State Auto Mut. Ins. Co. v. McIntyre*, 652 F. Supp. 1177, 1178-79 & n.2 (N.D. Ala. 1987), also does not persuade this court to consider new evidence not admitted at trial, because that case involved a declaratory judgment action as a bench trial where plaintiff insurance company sought to exclude coverage under a homeowner's insurance policy in relation to an underlying tort action for sexual abuse tried before a jury. There, final judgment was entered on the underlying action and that trial was pending on appeal before the court issued its opinion under Federal Rule of Civil Procedure 52. *Id.* at 1179.

Nor does Copart's third example case, *Synopsys, Inc. v. ATopTech, Inc*, No. 13-CV-02965-MMC, 2016 WL 6158216, at *2 n.4 (N.D. Cal. Oct. 24, 2016), shift the calculus. There, the court stated "[i]t was the court's understanding, as well as [defendant's], that evidence relevant only to equitable estoppel would not be introduced at the jury trial," meaning "a finding against [defendant] in that earlier proceeding . . . would not serve to bar a finding based on additional evidence offered at the bench trial." *Id.*

To understand how *ATopTech* is distinguishable from this case, it is important to understand the process for finalizing jury instructions here. The parties proposed jury instructions and verdict forms contemplating instructing the jury on ISA § 18, as well as Copart's unjust enrichment claim and Copart's UCL claim. *See* ECF Nos. 370 at 77-81 (Copart's proposed instructions on UCL and unjust enrichment), 371 at 8-10 (Copart's proposed verdict form for unjust enrichment and UCL liability and restitution), 374 at 76-77, 82 (defendants' proposed final instructions for unjust enrichment and limitation of liability under ISA § 18). The court began discussing final jury instructions with the parties after Copart rested its case-in-chief. *See* May 10 Trial Tr. at 10:23-11:21, ECF No. 460 (Copart resting); May 11 Trial Tr. at 17:23-63:20 (first working session on jury instructions). Defendants rested before the court finalized discussions regarding instructions and ruling on formal objections by the parties. *See* May 16 Trial Tr. at 213:3-12 (defendants' resting and Copart's resting), 224:22-259:7 (second working session to finalize jury instructions).

In other words, the parties here had a different understanding than the defendant in *ATopTech*, 2016 WL 6158216, at \*2 n.4. At the time Copart presented its case-in-chief, Copart had proposed instructing the jury and obtaining a jury verdict on its unfair competition and UCL claims. Copart also had notice of defendants' proposed limitation of liability instruction based on ISA § 18. Likewise, defendants presented their entire case before the parties agreed that the court, not the jury, should decide how ISA § 18 applied to the parties' claims and defenses, if at all. Although defendants understood Copart's unjust enrichment and UCL claims would not go to the jury before defendants rested, defendants knew the court had not yet clearly decided whether the jury's factfinding would bind the court or the court would conduct independent factfinding. *See* May 11 Trial Tr. at 19:22-25.

Considering the procedural history here, the court follows Ninth Circuit authority and considers new evidence only where "the legal and equitable claims do not involve common issues." *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996) (citation omitted); *see Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) (concluding district court "did not tread on" the "right to a jury trial" where the court "ruled as a matter of law" and stated "[t]he purpose of the hearing [on the equitable defense] was not to weigh evidence"); *Sierra Pac. Power Co. v. Hartford Steam Boiler Inspection and Ins. Co.*, No. 03:04-CV-00034-LRH-RAM, 2014 WL 4699564, at \*3 n.5 (D. Nev. Sept. 19, 2014) (declining to consider document not admitted at bench trial before appeal when making factual determination of dam project depreciation after Ninth Circuit remand), *amended in part*, 2014 WL 6883056 (Dec. 5, 2014), *order clarified*, 2015 WL 476294 (Feb. 5, 2015), *aff'd in relevant part*, 673 F. App'x 739, 741 (9th Cir. Dec. 23, 2016).

B.    Limitation of Liability Clause

1.    New Evidence: Contract

Copart contends the court "must consider extrinsic evidence relative to the scope of" ISA § 18. ECF Nos. 505 at 32-33; ECF No. 516 at 6 (citing ECF No. 422). Copart requests the court rely on exhibits P-54 and P-63, which were not admitted at trial. *See* Takenouchi Suppl. Decl. (TSD) TSD Exs. K-L, ECF Nos. 517-11, 517-12; ECF No. 483-1 (Admitted Exhibits List).

Copart characterizes TSD Exhibit L as a "redline rejecting Sparta's proposed language for [ISA § 18]" during contract negotiation. ECF No. 516 at 5 n.12.

Defendants object to Copart's supplying drafting history of the ISA in P-54, only now, post-trial. ECF No. 503 at 6; ECF No. 509 at 1. Defendants refer to the party's responses during trial to the court's request for a joint submission on contract interpretation issues, in which Copart offered no suggestion on how to interpret ISA § 18. ECF No. 518 at 2 n.2 (citing Long Decl. Ex A at § 18, ECF No. 519-1; ECF Nos. 502, 503, 505). Additionally, defendants assert "Copart has never argued that [ISA § 18] is ambiguous, and therefore cannot now offer extrinsic evidence . . . to interpret the clear provision").

Copart is correct that "it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face." *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004), *as modified on denial of reh'g* (Feb. 19, 2004); *see also Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1223 (9th Cir. 2008) (citing *Morey v. Vannucci*, 64 Cal. App. 4th 904, 913 (1998)). And "[e]xamination of prior drafts of a contract to show an intentional omission of a term in the final version is accepted under California law, even when the contract was fully integrated." *Wells v. Hair Sols. By M E, Inc.*, No. LACV1200996JAKPLAX, 2012 WL 12882426, at *5 (C.D. Cal. Dec. 28, 2012) (citing *City of Stockton v. Stockton Plaza Corp.*, 261 Cal. App. 2d 639, 643 (1968)).

At the same time, defendants are correct that Copart did not suggest a need for extrinsic evidence to interpret the contract during trial, and Copart never has "contended that [ISA § 18] is ambiguous." *See, e.g.*, Long Decl. Ex. A at 17 (joint annotated ISA, containing annotations from each party as to which sections should be construed by the court and which should be interpreted by the jury but reflecting a position by defendants only as to interpreting ISA § 18); May 11 Trial Tr. at 56:7-15; May 16 Trial Tr. at 244:25-48:4; ECF No. 388 at 99-100 (Copart's objections to defendants' proposed instruction on ISA § 18). Copart even concedes it "has consistently asserted that [ISA § 18] is unambiguous in that it does not, on its face, apply to the jury's professional negligence award." ECF No. 520 at 3. At summary judgment, a party can

waive an argument that contract language is ambiguous by failing to brief an issue. *See Paragon Tank Leasing, LLC v. Riccelli Enterprises, Inc.*, No. 09-CV-513, 2010 WL 2181315, at *2 (E.D. Wisc. May 25, 2010). Similarly here, Copart's declining the court's offer to instruct the jury on ISA § 18 could have waived an argument that the jury should have interpreted ISA § 18 as an ambiguous clause. *See United States v. Guthrie*, 931 F.2d 564, 567 (9th Cir. 1991) (trial court offered to give omitted instruction, but defendant rejected offer); *United States v. Baldwin*, 987 F.2d 1432, 1437 (9th Cir. 1993) (government offered omitted instruction, but defendant rejected it). *But see United States v. Budziak*, 697 F.3d 1105, 1110 (9th Cir. 2012) (finding no "invited" error because the record did "not reflect that [defendant] intentionally abandoned or rejected the element of [an] instruction he now asserts the court should have included").

Regardless, the court's duty under California contract law is to provisionally receive extrinsic evidence to interpret the contract. The court will provisionally receive Copart's offered exhibits when it construes ISA § 18 below. Before engaging in that construction, the court considers other possible waivers by defendants and by Copart.

### 2. Waiver by Defendants

Copart asserts defendants "waived [their] argument that" ISA § 18(A) permitted "only 'market-based' damages—*i.e.*, the difference in value between the system as promised and as delivered." ECF No. 516 at 5 (emphasis in original). Copart relies on defendants' proposed jury instructions to support its argument. *Id*

Copart is correct that defendants' proposed limitation of liability instruction only proposed a complete bar to "lost profits" damages. *See* ECF No. 374 at 76. Defendants also proposed an instruction listing "Copart's internal labor" and "Copart's internal expenses" as available items of damages for professional negligence and fraud claims. ECF No. 374 at 72. These proposed instructions reflect a position that the "indirect, incidental, special, or consequential damages" prohibited under ISA § 18(A) only prohibit lost profits, at least in this case. The court's review of the complete proposed instruction discloses defendants accounted for ISA § 18(B)(X)-(Y) by including a direction to the jury that it "in no event shall" it award damages "of any type that exceed the greater of (a) $5,000,000 or (b) amounts actually paid or

payable by Copart to Sparta pursuant to the ISA." ECF No. 374 at 76. Although the parties agreed to resolve the application of ISA § 18 after the jury verdict, this agreement occurred well after defendants had submitted proposed final jury instructions. *Compare* ECF No. 374 (filed April 9), *with* May 11 Trial Tr. at 56:7-15, *and* May 16 Trial Tr. at 244:25-248:4. Without any notice to Copart that defendants held a different view than that advanced in their proposed final instructions, Copart had no means to ensure it presented evidence of market-based damages if necessary. *See Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1129 (9th Cir. 2010) ("Plaintiff cannot now claim the district court erred by not providing an instruction they never offered."); *Taddeo v. Koval Flamingo, LLC*, No. 212CV01110APGNJK, 2016 WL 6272367, at *3 (D. Nev. Oct. 25, 2016) ("If [defendant] believed that the jury needed to make findings about the value of the [plaintiffs'] home to prove fraud damages—which is the issue it raised in both its post-verdict motion and its motion for reconsideration—then the proper time to raise this issue was before the jury deliberated."). Defendants have waived the argument that ISA § 18(A) precludes damages other than lost profits.

Copart also asserts defendants have waived argument challenging the sufficiency of damages under a "market-based" measure. ECF No. 516 at 4-5 (citing ECF No. 503 at 12). According to Copart, "Sparta did not move pre-verdict for" judgment as a matter of law "on the sufficiency of evidence on this point." *Id.* at 5. In essence, Copart argues for waiver under Federal Rule of Civil Procedure 50(a). *See* ECF No. 516 at 5 (citing Fed. R. Civ. P. 50(a)-(b)).

Rule 50(a) applies "[i]f a party has been fully heard on an issue during a jury trial." Fed. R. Civ. P. 50(a)(1); *see Ritchie v. United States*, 451 F.3d 1019, 1022-23 (9th Cir. 2006) (explaining difference between Rule 50(a), which applies to jury trials, and Rule 52(c), which applies to bench trials). Rule 50(a) waiver applies to a Rule 50(b) motion for judgment as a matter of law because that motion is a renewed 50(a) motion. *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "[A] party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'" *Id.* (quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)); *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028-29 (9th Cir. 2003) ("The failure

11

to raise this issue prior to the return of the verdict results in a complete waiver" for judgment as a matter of law under Rule 50). This court's order and the parties' arguments here do not invoke a Rule 50 motion for judgment as a matter of law. The court declines to determine waiver on this issue.

### 3. Waiver by Copart

Defendants assert Copart waived claims related to gross negligence, willful misconduct or "active" negligence because Copart never included those terms "in its pretrial statement, trial brief, or any proposed jury instructions." ECF No. 518 at 4-5; *see Cargill Inc. v. Progressive Dairy Sols., Inc.*, No. CV-F-07-0349-LJO-SMS, 2008 WL 4532436, at *4 (E.D. Cal. Oct. 8, 2008) (party's objection to submitting an issue to jury waived where issue was not included in pretrial statement, motions *in limine*, or during discussions about jury instructions and verdict form). Defendants also assert Copart admitted "the jury, not the [c]ourt had to make the factual determination of Sparta's negligence." ECF No. 518 at 5 (citing ECF No. 505 at 30).

Although defendants are correct that Copart did not raise these issues, the burden to show the limitation of liability clause applies is on defendants, as explained below and as argued by defendants themselves. ECF No. 518 at 4; *Eriksson v. Nunninck*, 233 Cal. App. 4th 708, 733-34 (2015). Defendants bore the burden to show the limitation of liability existed and would apply to Copart's claims. Only then would Copart need to respond to show an exception to the limitation of liability clause applied. And Copart had objected to defendants' proposed instruction on the limitation of liability clause, distinguishing the facts here from those in *Cargill*. *Compare* ECF No. 388 at 99-100, *with* 2008 WL 4532436, at *4 (finding objection to giving a jury instruction waived in part because objecting party "failed to raise this issue . . . at any time during the process of preparing jury instructions and the verdict form"). Given the need for both parties to manage the presentation of their cases, it is not surprising that Copart would not make a case for gross negligence, active or passive negligence and what constitutes willful misconduct. Until Copart's objection was resolved, all Copart could do was submit its strongest evidence to prove its professional negligence and fraud claims, then seek to rely on a gross negligence

1    instruction if the court included defendants' proposed limitation of liability instruction that

2    specifically references "grossly negligent." *See* ECF No. 374 at 76.

3                           4.    ISA § 18

4                Copart contends ISA § 18 does not affect the jury's professional negligence award

5    in any respect. ECF No. 505 at 32-39. Defendants contend ISA § 18 covers all negligence except

6    for gross negligence. ECF No. 518 at 2. Defendants' interpretation is correct, as explained

7    below.

8                ISA § 18 reads:

9                **18.  LIMITATIONS OF LIABILITY.**  EXCEPT FOR A BREACH OF A
             PARTY'S OBLIGATIONS UNDER <u>SECTION 11</u> OR <u>SECTION 12</u>,
10            INDEMNIFICATION OBLIGATIONS UNDER <u>SECTION 17</u>, OR LIABILITY
             ARISING FROM A PARTY'S GROSS NEGLIGENCE OR WILLFUL
11            MISCONDUCT (INCLUDING WILLFUL BREACH OF THIS
             AGREEMENT), (A) NEITHER COPART NOR SERVICE PROVIDER
12            SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, OR
             CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO ITS
13            PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT
             EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND (B) IN
14            NO EVENT SHALL EITHER PARTY'S CUMULATIVE LIABILITY ARISING
             OUT OF THIS AGREEMENT EXCEED AN AMOUNT EQUAL TO THE
15            GREATER OF (X) $5,000,000 OR (Y) AMOUNTS ACTUALLY PAID OR
             PAYABLE BY COPART TO SERVICE PROVIDER PURSUANT TO THIS
16            AGREEMENT.

17    JX-1 at 17.

18                "Under California law, '[t]he fundamental goal of contract interpretation is to give

19    effect to the mutual intent of the parties as it existed at the time of contracting.'" *Skilstaf, Inc. v.*

20    *CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012) (quoting *Miller v. Glenn Miller*

21    *Prods., Inc.*, 454 F.3d 975, 989 (9th Cir. 2006) (per curiam)). "Because California law recognizes

22    that the words of a written instrument often lack a clear meaning apart from the context in which

23    the words are written, courts may preliminarily consider any extrinsic evidence offered by the

24    parties." *Id.* at 989–90; *see also Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391

25    (2006) ("'[E]ven if a contract appears unambiguous on its face, a latent ambiguity may be

26    exposed by extrinsic evidence which reveals more than one possible meaning to which the

27    language of the contract is yet reasonably susceptible,'" quoting *Morey v. Vannucci*, 64 Cal. App.

28    4th 904, 912 (1998)). "If the court decides, after consideration of this evidence, that the language

                                              13

of a contract, in the light of all the circumstances, is fairly susceptible of either one of the two interpretations contended for, extrinsic evidence relevant to prove either of such meanings is admissible." *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 40 (1968). "If, however, the court decides that the contract is not reasonably susceptible to more than one interpretation, the court can reject the assertion of ambiguity." *Skilstaf*, 669 F.3d at 1015.

Additionally, "when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing." *Riverisland Cold Storage, Inc. v. Fresno–Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1174 (2013) (citing Cal. Code Civ. Proc. § 1856 and Cal. Civ. Code § 1625). This rule, commonly called the parol evidence rule, is a rule of substantive law, not of procedure. *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343 (2004). "It is founded on the principle that when the parties put all the terms of their agreement in writing, the writing itself becomes the agreement." *Riverisland*, 55 Cal. 4th at 1174. Because a contract's "written terms supersede statements made during the negotiations," evidence other than those written terms is "irrelevant, and cannot be relied upon." *Id.* (emphasis omitted).

The parol evidence rule applies only to "an integrated written agreement." *Id.* A written agreement is "integrated" or is an "integration" if it is "a complete and final embodiment of the terms of an agreement," *Masterson v. Sine*, 68 Cal. 2d 222, 225 (1968); *Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1434 (1992), or in other words, if it is "intended by the parties as a final expression of their agreement," Cal. Code Civ. Proc. § 1856(a). Here, both "the presence of an integration clause" at ISA § 19.10 and the contract's language in that clause shows the ISA is an integrated agreement. *See Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 963 (E.D. Cal. 2016) (finding policy was "an integrated writing" because it was "comprehensive, refer[red] expressly to other policies when necessary," and included integration clause).

Extrinsic evidence may "explain[] or supplement[]" an integrated written agreement, but that evidence may not "contradict[]" the written agreement.  Cal. Civ. Proc. Code § 1856(a)-(b).

And finally, "[l]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract."  *Foster–Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal. 4th 857, 868 (1998) (internal citation and quotations omitted); *see also* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other").

As relevant here, "gross negligence" or "willful misconduct" are not limited by ISA §§ 18(A), 18(B)(X) or 18(B)(Y).  But for all other conduct "arising out of or relating to [Copart or Sparta's] performance or failure to perform under" the ISA, no indirect, incidental, special or consequential damages are available as relief.  ISA § 18(A).  In proposing jury instructions, defendants proposed only lost profits as an item of damages that the jury could outright exclude from conduct arising out of or relating to the ISA.  ECF No. 374 at 76 ("You shall not award any damages for lost profits against Sparta unless . . . .").  For other conduct that is not gross negligence or willful misconduct and "aris[es] out of the" ISA, no party's cumulative liability will exceed the greater of $5,000,000 or "amounts actually paid or payable by Copart" to Sparta under the ISA.  ISA § 18(B)(X)-(Y).

A sister court in *WeBoost Media S.R.L. v. LookSmart Ltd.*, No. C 13-5304 SC, 2014 WL 824297, at *6 (N.D. Cal. Feb. 28, 2014), interpreted a similar limitation of liability clause incorporating language excluding "indirect, incidental, consequential, special or exemplary damages."  There, the agreement's clause did "not read as prohibiting either party from recovery any type of damages, just most types of damages, and only up to a limit."  *Id.*  "Direct damages up to the amount paid under the contract are still allowed."  *Id.*  The court ruled, "regardless of whether [p]laintiff is ultimately able to recover on a tort or contract claim, [the limitation of liability provision] would cap [p]laintiff's damages to the amount it paid under the contract."  *Id.*  So too here.

Copart disputes defendants' position that the jury's professional negligence award "arises out of or relates to performance or failure to perform under the agreement." ECF No. 520 at 3 (citation omitted). Although Copart cites cases explaining that viable professional negligence claims are distinct from breach of contract claims, Copart's own evidence cited in its post-verdict briefing, and its evidence presented at trial, involve defendants' failures to perform under the contract between Copart and Sparta.

That the parties intended to exclude gross negligence from the limitation of liability clause makes sense given that California courts have held that limitations of liability for gross negligence violate public policy and are unenforceable. *See, e.g.*, *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 777 (2007).

The court addresses the parties' disputes about ISA § 18 below.

a)    <u>Active and Passive Negligence</u>

Copart asserts ISA § 18 covers "passive" negligence but does not cover "active" negligence. ECF Nos. 505 at 32-33, 516 at 5, 520 at 2 (arguing "[t]he plain meaning of [ISA § 18] necessarily excludes 'active negligence'"). Defendants contend instead that ISA § 18 excludes only "gross negligence," leaving all other forms of negligence within its coverage. ECF No. 518 at 1.

Although Copart cites case law distinguishing between active and passive negligence, those cases, analyze "general" indemnity clauses that do "not state what effect [plaintiff's] negligence will have on [defendant's] obligation to indemnify." *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal. 3d 622, 629 (1975); *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.*, 172 Cal. App. 3d 914, 931, 933 (1985) (clause exempting party from liability "for any damage or injury caused or occasioned by" rising seas or flooding did not cover active negligence); *Aeros Aeronautical Sys. Corp. v. United States*, No. CV 15-1712, 2016 WL 10516020, at *2, 4 (C.D. Cal. June 20, 2016) (clause reading "[t]he Licensor will not be responsible for any lost, stolen, or damaged property of Licensee" did not cover active negligence). But if a limitation of liability clause mentioning negligence involves language that is "broad enough, an actor may disclaim liability for negligence of any type." *Delta Air Lines, Inc.*

*v. Douglas Aircraft Co.*, 238 Cal. App. 2d 95, 101 (1965). Here, ISA § 18 explicitly carves out "gross negligence" from the limitation of liability provision, distinguishing it from the authority Copart cites.

Copart also relies on *Hoot Winc, L.L.C. v. RSM McGladrey Fin. Process Outsourcing, LLC*, No. 08CV1559 BTM(WMC), 2009 WL 3805212, at *1 (S.D. Cal. Nov. 12, 2009). ECF No. 505 at 40. In *Hoot Winc*, the court held the limitation of liability clause could not apply to the extent plaintiffs alleged willful and wanton professional negligence, where the parties' limitation of liability clause limited liability "for damages whether based on breach of warranty or other contract, negligence, strict liability, other tort, breach of statute or governmental role, or any other legal or equitable theory . . . ." *Id*. But that court applied Minnesota law, and the court did rule as a matter of law that the limitation of liability clause was "enforceable with respect to [p]laintiff's . . . professional negligence claim to the extent it is premised on ordinary negligence." *Id.* at *2. This persuasive case supports defendants' contention that the limitation of liability clause here excludes only gross negligence or willful misconduct.

Copart cites to California Civil Code section 1668 to support its asserted distinction between active and passive negligence. But courts have construed section 1668 as a statute that ordinarily "invalidates contracts that purport to exempt an individual or entity from liability for future intentional wrongs . . . and gross negligence." *Frittelli, Inc. v. 350 N. Canon Drive, LP*, 202 Cal. App. 4th 35, 43 (2011) (citing *Farnham v. Superior Court*, 60 Cal. App. 4th 69, 74 (1997); *Santa Barbara*, 41 Cal. 4th at 777). Section 1668 therefore buttresses the plain language reading of ISA § 18, which carves out only gross negligence and willful misconduct.

Copart relies on P-54 and P-63 to argue that defendants had intended to include "negligence (active or passive)" in the limitation of liability clause, but Copart rejected that language. Although P-54 involves an email from a Sparta employee with a subject line stating "final documents" and a draft ISA attached that has that language, it is not clear at all from the exhibit who proposed that language. And the language stricken out in P-63 in favor of language referring to "gross negligence," the language that appears in the executed ISA, does not indicate who proposed the striking out. The exhibits, even if the court were to admit them, do not shed

light on the meaning of the terms in dispute here. Moreover, injecting active negligence or passive negligence into an integrated agreement that mentions only gross negligence would contradict or add to the agreement instead of supplementing it, contrary to the requirements of California Code of Civil Procedure section 1856(a)-(b).

The court therefore finds gross negligence is the only form of negligence excepted from the limitation of liability clause, consistent with the integrated ISA's plain language.

b)        Exception for Gross Negligence

Defendants contend a burden-shifting framework applies to limitation of liability clauses such as ISA § 18. ECF No. 518 at 4. In other words, they say, once defendants show the clause applies, the burden shifts to Copart to show an exception to the clause prevents its application. *See id.*

California courts do apply a burden shifting framework. First, a defendant must establish the clause applies, that the clause is "binding and enforceable" except to the extent "it would protect [defendant] from future liability arising from [its] gross negligence." *Eriksson*, 233 Cal. App. 4th at 733-34. The burden then shifts to a plaintiff to show by a preponderance of the evidence that a defendant "was grossly negligent." *Id.* at 732; *see also Jimenez v. 24 Hour Fitness USA Inc.*, 237 Cal. App. 4th 546, 561 (2015); *Esprit de Corp. v. Victory Exp., Inc.*, 1999 WL 9939, at *5 (N.D. Cal. Jan. 5, 1999) (defendant "has the burden of proving that its liability to [plaintiff] is limited under the terms of the . . . contract"); *see also* ECF No. 374 at 75-77 (Sparta's proposed instruction predicating lost profit damages on jury's finding of gross negligence or willful misconduct).

The implicit factual determinations made by the jury here in reaching its verdict appear to preclude a finding of gross negligence in this case. The jury found Sparta did not have unclean hands. *Id.* at 8. Nor did Sparta engage "in conduct with malice, oppression, or fraud." *Id.* at 2, 4. *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) (trial court must "follow the jury's implicit or explicit factual determinations" for "both liability and relief on the equitable claims") (citations omitted). The jury found Copart 20 percent liable for its own professional negligence claim against Sparta. Verdict Form at 4. The jury also found in favor of Sparta on all

of Copart's fraud claims except for fraudulent concealment. *Id.* at 2. Given the highly factual nature of a gross negligence determination, the court may not make such a finding without risking disregard of the "jury's finding of fact." *Acosta*, 718 F.3d at 828; *see Jimenez*, 237 Cal. App. 4th at 555 ("As our high court has noted, whether conduct constitutes gross negligence is generally a question of fact, depending on the nature of the act and the surrounding circumstances shown by the evidence."); *Acosta v. Glenfed Dev. Corp.*, 128 Cal. App. 4th 1278, 1295 (2005) ("[W]hether an action constitutes willful misconduct is a question of fact.") (citation and internal quotation marks omitted). *See also* May 16 Trial Tr. at 246:13-19 (Copart responding "I know" after court states it does not think it can make a factual determination as to gross negligence).

Copart also has argued this court "should reject [d]efendants' attempt to assert a contract defense that they failed to present to the jury as a basis to overturn the jury's verdict." ECF No. 520 at 5. But this was not what happened at trial. As explained above, the parties agreed to have the court determine the application of ISA § 18.

### c) Indirect, Special, or Consequential Damages

Defendants claim the limitation of liability clause precludes Copart from recovering anything but general damages or market damages. ECF No. 503 at 9-11; *see* Instruction No. 45. According to defendants, the only damages available to Copart for professional negligence under the limitation of liability clause would be "the difference between the result that would have occurred without negligence and the actual result." ECF No. 503 at 15. Because "Copart failed to seek the market-based difference between the SAP system as expected and the value of the SAP system as delivered," Copart has no available damages for professional negligence under ISA § 18. *Id.* at 15. Although defendants appear to have waived this issue, as explained above, the court analyze the merits of defendants' argument here. *See Miller v. Blacketter*, 525 F.3d 890, 895 n.6 (9th Cir. 2008) (reviewing district court's decision on merits when district court "expressly stated it would treat the claim as preserved and proceeded to assess the merits" despite observing defendant "may have waived" his right to counsel of choice).

Copart disputes defendants' characterization that "fees paid to the negligent defendant [are] not recoverable because" they are "indirect" or "consequential." ECF No. 520 at

1    2.  Both parties cite *Orrick Herrington & Sutcliffe LLP v. Superior Court*, 107 Cal. App. 4th 1052

2    (2003), to support their positions.

3           In *Orrick*, the California Court of Appeal held the fees a client paid to his attorney

4    could "constitute actual damages" to the extent the client was "claiming he paid more than the

5    value of the legal services he received." *Id.* at 1060.  "If he [can] prove he did not receive value

6    for his payment, he may recover damages 'to the extent' the fees exceed[ed] the value of the

7    services received." *Id.* (citation omitted).  The court ruled the client's recovery was "limited to

8    the amount of fees paid." *Id.*  The court also stated it believed "it is evident that an overpayment

9    for services is contract damages," reasoning that "were the law to be otherwise, tort damages

10   would exist in every instance an attorney collected a fee." *Id.*

11          The parties also discuss *Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified Sch.*

12   *Dist.*, 34 Cal. 4th 960, 968 (2004).  In that case, the California Supreme Court distinguished

13   between general damages and special damages as the "two types" of "contractual damages." *Id.*

14   at 968-69.  But as Copart observed, defendants cite no case in which fees a plaintiff paid to the

15   negligent defendant were not recoverable because they were held to be "indirect" or

16   "consequential."  Neither *Orrick* nor *Lewis* discusses limitation of liability clauses.  They address

17   general or special damages only as limited to contract damages.  Thus, the authority defendants

18   cite merely shows ISA § 18's preclusion of "any indirect, incidental, special, or consequential

19   damages arising out of or relating to [a party's] performance or failure to perform . . . even if

20   advised of the possibility of such damages" applies only to contract damages.  Here, the court

21   finds no damages more direct than the fees Copart paid for a product that never launched.

22          To the extent Copart put forth evidence at trial that the product created by

23   defendants had no value, Copart was showing a difference between the value of the product

24   purchased and how much Copart paid, as outlined in *Orrick*.  *See, e.g.*, April 26 Trial Tr. at

25   57:11-58:9, 59:13-60:2, 60:8-15, ECF No. 416 (testimony that Sparta never delivered "lot master

26   lockdown" functionality); *id.* at 38:4-39:1, 39:2-41:3, 43:8-11, 41:4-43:7, 44:15-45:1 (testimony

27   that Sparta did not deliver multiple functions to track customer credits and payments); *id.* at

28   46:19-20, 49:1-14, 51:9-17, 53:1-18, 57:1-8 (no delivery of "call for release" or "gate pass"

functions). Testimony at trial indicated Copart abandoned Sparta's system because it was "laden with bugs," "unstable" and poorly documented, making it ultimately unusable for Copart's business. May 1 Trial Tr. at 19:8-20, ECF No. 424; *id*. at 163:16-164:6; May 3 Trial Tr. at 157:9-11, ECF No. 425. Again, this testimony shows a discrepancy between the value of the system Copart received and the value Copart paid Sparta for the system.

Thus, either because the "indirect, incidental, special, or consequential damages" limitations do not apply to tort claims, or because Copart has shown general damages by showing a difference between the value of the system delivered and the value Copart paid to Sparta, the only portion of the limitation of liability clause applicable to Copart's professional negligence award is therefore ISA § 18(B).

### d) Paid or Payable

Copart asserts the phase "actually paid or payable" means the limitation of liability clause accounts for Copart's fees paid to Sparta, $11,364,461, and the jury award to Sparta for $4,880,000 based on Sparta's claim against Copart for breach of the implied covenant of good faith and fair dealing. ECF No. 505 at 38-39. But this interpretation ignores the ISA's use of "payable" throughout the agreement. For instance, Milestone fees "shall be payable" to Sparta only after "Acceptance" and "in accordance" with "the payment schedule in the applicable Statement of Work." ISA § 9.1. The jury's award to Sparta does not conform to that use of "payable." *See* Instruction No. 40 (requiring a finding that "Copart unfairly interfered with Sparta's rights to receive the benefits of the contract," in order to find for Sparta on its claim against Copart for breach of the implied covenant of good faith and fair dealing). This interpretation respects the requirement that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641.

Copart's argument also ignores the use of "or" instead of "and." Were Copart limited to "amounts actually paid" and "payable," Copart's position would have more merit.

Copart's damages for its professional negligence claim are therefore limited to the fees it "actually paid" to Sparta for Milestones 1 through 7.

## 5.    Section 18's Application

Copart asserts trial evidence "showed that Copart 'actually paid' at least $11,364,461 in fees to Sparta."  ECF No. 520 at 2 n.3 (citing ECF No. 38-39; P-1076).  "Another $13 million was 'payable' on the remaining Milestones of the Build Phase of the contract, . . . resulting in a 'cap' of $24 million under [ISA § 18(B)]."  *Id.* (citing JX-3 at 33, JX-4 at 5).  Alternatively, it argues, if this court rules ISA § 18(B)(Y)'s language of "AMOUNTS . . . PAYABLE" was limited "to the jury's award of $4.88 million, the 'cap' under [ISA § 18(B)] is at least $16,244,461."  *Id.*  Copart also argues its "fees paid to Sparta, fees paid to other vendors, and internal Copart spending—amounted to over $23 million."  ECF No. 505 at 35.  Thus, "as a matter of mathematics, [ISA § 18] would not reduce the jury award even if it were applicable (which it is not)."  ECF No. 516 at 5.

Defendants assert Copart is limited to general or market damages, which Copart did not show.  In response, Copart asserts "the jury received evidence of direct damages— including fees Copart paid to Sparta and third parties that were expressly contemplated by the contract—that exceed $23 million and fall outside the restriction of [ISA § 18(A)]."  ECF No. 520 at 2 (citing ECF Nos. 505 at 33-36, 516 at 5-6).  The court has already rejected defendants' argument above as waived or alternatively, if not waived, has rejected it on the merits.

Sparta's liability to Copart for the professional negligence claim would be $11,364,461, or $16,244,461 if the damages owed to Sparta for its contract-related claim were a fee "payable by Copart to [Sparta]" and the "amounts actually paid or payable" is not properly read as a disjunctive "or" phrase.  ISA § 18(B)(X)-(Y) (limiting damages to "$5,000,000 or" . . . amounts actually paid or payable . . . .").  Because Copart's successful fraud—concealment claim involves "willful misconduct" and is not limited by § 18, the professional negligence claim award is limited to the fees Copart paid, or Copart's fees payable, to Sparta.  As discussed above, the jury award of $4,880,000 is not properly calculated as part of the liability limit because it does not qualify as "payable" and ISA § 18 permits Copart to recover for the amount "actually paid" or "payable."

Defendants contend the 20 percent comparative fault of Copart, as found by the jury, applies after determining the cap on Copart's professional negligence damages. ECF No. 503 at 20 (citing *Luttrell v. Island Pac. Supermarkets, Inc.*, 215 Cal. App. 4th 196, 208 (2013) (applying failure to mitigate reduction after applying doctrine limiting damages to "amount actually paid" for medical expenses because otherwise plaintiff's "failure to mitigate would have had no consequence whatsoever" and because "tortfeasor should be held to pay the full cost of its negligence or wrongdoing—no more and no less"). In response, Copart cites *Cohen v. Kite Hill Community Ass'n*, 142 Cal. App. 3d 642, 654 (1983) for the general proposition that courts construe limited liability clauses narrowly. But the court has already construed ISA § 18 above. And as noted the court cannot "disregard a jury's finding of fact." *Acosta*, 718 F.3d at 828. Here, that finding is that Copart bears 20 percent of the responsibility for the damages found on its professional negligence claim against Sparta.

Copart also refers to the court's refusal "to admit certain evidence of additional payments by Copart to Sparta, which Copart sought to admit under Rule 801(d)(2) of the Federal Rules of Evidence." ECF No. 505 at 29 n.15. The court however will not now consider evidence the court "refused to admit . . . under Rule 801(d)(2)," including as an example D-1011. *See* ECF No. 505 at 38 n.5. Because the jury considered "[p]ayments to Sparta for Milestones 1 through 7," Instruction No. 45, the amount of money Sparta received from Copart for allegedly deficient work was before the jury. The court will not "disregard a jury's finding of fact" as to what Sparta owes Copart based on what Copart paid to Sparta. *Acosta*, 718 F.3d at 828; P-1076 (admitted exhibit showing Copart paid Sparta $11,364,460.88 in fees).

Deducting Copart's 20 percentage of responsibility from the fees Copart paid to Sparta results in Copart's professional negligence award being capped by ISA § 18 at $9,091,568.70.[2]

---

[2] Copart paid $11,364,460.88 in fees to Sparta. *See* P-1076. Eighty percent of that sum is $9,091,568.70.

C.      Restitution: Unjust Enrichment and Unfair Competition Law (UCL)

Copart asserts Sparta owes restitution to Copart of $11,364,461 in the amount of fees it paid to Sparta during the project, based on Copart's unjust enrichment or unfair competition law (UCL) claims. ECF No. 505 at 10, 24-29. Defendants contend Copart is not entitled to restitution under unjust enrichment or the UCL. ECF No. 503 at 29-40. Additionally, defendants argue an award of restitution under the UCL would effect an impermissible double recovery. *Id.* at 38-39. As explained below, the court determines Copart is not entitled to an unjust enrichment award, but Copart is entitled to $6,332,350.77 as an alternative remedy to Copart's damages award, which does not alter the jury verdict at this time.

1.      Unjust Enrichment

Copart argues Sparta is liable "for common law unjust enrichment." ECF No. 505 at 10, asserting "[a] plaintiff can seek restitution in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." *Id.* at 29. Defendants assert unjust enrichment is unavailable "because, as Copart concedes, there is a valid, enforceable contract governing the relationship between Copart and Sparta." ECF No. 503 at 21.

"When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014)). But a plaintiff may not "pursue or recover on a quasi-contract claim if the parties have an enforceable agreement [on] a particular subject matter." *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1388 (2012); *see Cont'l Cas. Co. v. Enodis Corp.*, 417 F. App'x 668, 670 (9th Cir. 2011) ("Under California law, unjust enrichment is an action in quasi-contract and is not cognizable when there is a valid and enforceable contract between the parties."). As this court has recognized previously in dismissing a claim for unjust enrichment, "to state a quasi-contract claim for restitution or unjust enrichment, [counterdefendant] must plausibly allege the absence of any applicable and enforceable contract provisions, even if in the alternative." *Lennar*

*Mare Island, LLC v. Steadfast Ins. Co.*, No. 2:12-CV-02182-KJM-KJN, 2016 WL 829210, at *4 (E.D. Cal. Mar. 3, 2016).

This court's rulings and the party's representations to the court have all been based on assertions of an enforceable contract. For example, the court dismissed Sparta's unjust enrichment claim at summary judgment, finding "Sparta cannot show Sparta's claims are outside the [c]ontract's scope." ECF No. 264 at 17. Sparta's equitable claims sought "compensation for the reasonable value of, or benefit conferred by, Sparta's work under the [c]ontract." *Id.* Copart has represented multiple times in this litigation that the agreements in this case "are valid, enforceable contracts." Third Am. Compl. (TAC) ¶¶ 146, 152, ECF No. 126. During argument on defendants' motion to bifurcate trial, defendants acknowledged "one element of prejudice is undercut" because "Copart flat[-]out says it intends not to seek [rescission] but, rather, to hold defendants to the terms of the contract and seek damages, and the [c]ourt would consider Copart bound at this point by that statement . . . ." February 9, 2018 Hr'g Tr. at 6:6-14. When the court asked Copart if it could "hold [Copart] to that," Copart responded, "Yes, your Honor." *Id.* at 6:15-16. The court then stated "Copart is held to that regardless of whatever else I may say." *Id.* at 6:17-18; *see* ECF No. 390 at 5-6 (court order denying defendants' motion for bifurcation); ECF No. 341 at 10 (Copart opposition to defendant's motion to bifurcate).

The jury verdict affirms the contract between Copart and Sparta, precluding unjust enrichment under a quasi-contract claim. The jury found Copart had breached the implied covenant of good faith and fair dealing. *See* Verdict Form at 8. To reach that finding, the jury first had to find, in relevant part, that "Sparta and Copart entered into a contract;" "Sparta did all, or substantially all of the significant things that the contract required it to do or that it was excused from having to do those things;" and "All conditions required for Copart's performance had occurred or were excused . . . ." Instruction No. 40. The jury had to reject Copart's affirmative defenses of unclean hands and waiver, at least to some extent, to award any damages to Sparta. *See id.*; Verdict Form at 8.

Because the jury found an enforceable contract, Copart may not recover under unjust enrichment. To rule otherwise would violate the Seventh Amendment. *See Acosta*, 718

F.3d at 828; *see also Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 814-15 (N.D. Cal. 2011) (granting defendant's motion to dismiss plaintiffs' unjust enrichment claim with prejudice while denying defendant's motion to dismiss plaintiffs' UCL claim under any prong because "unjust enrichment is not an independent cause of action under California law").

### 2.   New Evidence: UCL Claims

With respect to the unfair and fraudulent prongs of the UCL, "[t]o the extent the Court believes the evidence presented to the jury was insufficient, Copart requests an opportunity to present additional trial exhibits and testimony to the Court." ECF No. 505 at 25 n.3. Defendants insist Copart cannot establish UCL liability. ECF No. 521 at 5-6. And "if the court held "an evidentiary bench trial . . . over [d]efendants' objection, [d]efendants would contest Copart's causation and other evidence." *Id.* at 5 n.9 (citing ECF No. 522).

The court does not need to admit any new evidence on these claims. The jury's findings and Copart's UCL claims "involve common issues" such that the court must "follow the jury's implicit or explicit factual determinations." *Granite State*, 76 F.3d at 1027; *L.A. Police Protective League*, 995 F.2d at 1473.

### 3.   UCL Standing

Defendants assert Copart lacks standing to assert a UCL claim. ECF No. 503 at 27-29. Copart disagrees. *See* ECF No. 505 at 24-25 & n.2. The court finds Copart has standing.

To have standing under the UCL, a plaintiff must have "suffered injury in fact" and "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. As the California Supreme Court has held, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis removed). At least one court has found that standing for a fraudulent prong UCL claim requires the plaintiff to prove actual reliance. *Goonewardene v. ADP, LLC*, 5 Cal. App. 5th 154, 184-87 (2016), *as modified on denial of reh'g* (Nov. 29, 2016) (rejecting plaintiff's argument that UCL's "as a result of" language only requires showing a causal

connection or reliance on alleged misrepresentation and reasoning that argument "reflects a misapprehension of" *Kwikset*, 51 Cal. 4th at 326-27 & n.10), *review granted*, 388 P.3d 818 (Cal. 2017) (presenting issue on appeal of whether aggrieved employee in lawsuit based on unpaid overtime has viable claims against outside vendor that performed payroll services under contract with employer). Because the California Supreme Court has granted a petition for review in *Goonewardene*, the court instead addresses actual reliance below as part of the merits analysis regarding a UCL fraudulent prong claim. *See* Cal. R. Ct. 8.1115(e)(1) ("a published opinion of a Court of Appeal in the matter has no binding or precedential effect, and may be cited for potentially persuasive value only").

At trial, Copart argued "Sparta's conduct included withholding of critical project information from Copart in order to induce Copart to pay for incomplete and ultimately worthless software, and providing an SAP team that Sparta knew was insufficiently skilled and that Sparta knew was providing flawed and incomplete work." ECF No. 505 at 28; May 17 Trial Tr. at 8:13-15, 8:21-9:14, 34:9-22, (Copart's closing argument referring to Sparta's "fraud, fatal defects in [the software] and the full extent of Sparta's vast incompetence," including concealing "a fatal defect with respect" to various modules and concealing "its struggling, incompetent team"). Copart specifically argued it "paid Sparta more than $10 million for [a software] system that couldn't generate reports. You can't make that up. And Copart had no idea. Classic fraud by concealment." May 17 Trial Tr. at 21:6-9; *see also* P-1076 (showing Copart paid Sparta $11,364,460.88); JX-2 at 25 (showing $3,250,000 in fees for Milestones 1 through 3 and a $150,000 bonus); JX-3 at 33 (showing $5,640,000 for Milestones 5-7).

As noted, the jury found for Copart on its claims for fraud—concealment and professional negligence, awarding Copart $4.69 million and $20.37 million, respectively, having considered for both claims the "[p]ayments to Sparta for Milestones 1 through 7." Verdict Form at 2, 4; Instruction No. 45. These jury findings satisfy one of the four types of injury the *Kwikset* court identified as an economic injury one can suffer under the UCL: "surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have." 51 Cal. 4th at 323. This economic injury also qualifies as an "injury in fact" under Article III of the Constitution,

qualifying as "“an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959–60 (9th Cir. 2009) (citing *Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 814 (2007)).

Defendants rely on *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 135 (2007), and *Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal. App. 4th 1073, 1078 (2002), to assert that Copart, as a "sophisticated publicly-traded corporation," lacks standing. ECF No. 503 at 28. But those cases addressed a plaintiff's "purport[ing] to represent other customers" as part of its UCL claim. *Linear Tech.*, 152 Cal. App. 4th at 135; *Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal. App. 4th 1073, 1079 (2002), *as modified* (Sept. 11, 2002) ("By purporting to act as their self-appointed representative and asserting claims on their behalf in a UCL action, Serrano could in fact deprive Rosenbluth's alleged victims of the individual opportunity to seek remedies far more extensive than those available under the UCL, which limits the plaintiffs to injunctive relief and restitution.").

The jury's findings support Copart's having standing under the UCL.

### 4. UCL Merits

Defendants contend the jury verdict and evidence admitted at trial prevent finding a UCL violation on the merits. ECF No. 503 at 19-26. Specifically, defendants rely on the jury finding for Sparta on two of Copart's three fraud claims, finding Copart had breached the implied covenant of good faith and fair dealing, rejecting Copart's unclean hands defense and finding Copart was twenty percent at fault for Sparta's professional negligence. *Id.* at 119-21. Defendants also assert that no facts supporting Copart's fraud—concealment claim would also support a restitution award under the UCL. *Id.* at 21-26.

Copart asserts "[t]he evidence already presented to the jury established that Sparta violated the fraudulent and unfair prongs of the UCL, and that Copart is entitled to restitution of any and all fees paid or payable to Sparta." ECF No. 505 at 16. Copart does not argue for an unlawful prong UCL violation. *See* ECF Nos. 505 at 24-29, 516 at 3-4.

California Business & Professions Code section 17200, also known as the UCL, prohibits in relevant part "any unlawful, unfair or fraudulent business act or practice . . . ." Each prong of the UCL, "unlawful," "unfair" and "fraudulent," provides a separate and distinct theory of liability. Thus, the "unfair" practices prong offers an independent basis for relief. *South Bay Chevrolet v. Gen. Motors Acceptance Corp.,* 72 Cal. App. 4th 861 (1999) (citation and quotation omitted); *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) ("Each prong of the UCL is a separate and distinct theory of liability" and "an independent basis for relief.") (citation omitted).

To prove a claim under the unfair or fraudulent prongs, a plaintiff "must show that members of the public are likely to be deceived by the practice." *Prata v. Superior Court*, 91 Cal. App. 4th 1128, 1144 (2001) (citations mitted). Courts assess likelihood of deception under a "reasonable consumer standard." *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). Further, to establish a fraudulent prong claim under the UCL, a plaintiff must demonstrate actual reliance. *In re Tobacco II Cases*, 46 Cal. 4th 298, 325 (2009).

The court applies these standards to the jury's findings, addressing the parties' specific arguments for each prong.

a) <u>Fraudulent Prong</u>

Copart contends Sparta is liable under the UCL's fraudulent prong. ECF No. 505 at 26-27. Defendants assert there is no evidence that members of the public were likely to be deceived in part because Copart put forth no evidence showing any "statements disseminated to the public." ECF No. 503 at 32-34. In response, Copart asserts the "likely to deceive" standard for a fraudulent prong UCL claim does not require a public statement. ECF No. 516 at 2.

Distinct from common law fraud, a fraudulent prong UCL claim requires only a showing that "members of the public are likely to be deceived." *Berryman v. Merit Prop. Mgmt., Inc.,* 152 Cal. App. 4th 1544, 1556 (2007). There can be a violation without "actual deception, reasonable reliance and damage." *Daugherty v. American Honda Motor Co., Inc.,* 144 Cal. App. 4th 824, 838 (2006). In alleging a failure to disclose material facts, plaintiff must show that the defendant had a duty to disclose those facts. *Berryman,* 152 Cal. App. 4th at 1557 ("Absent a

29

duty to disclose, the failure to do so does not support a claim under the fraudulent prong of the UCL."); *see also Buller v. Sutter Health,* 160 Cal. App. 4th 981, 986 (2008).  Additionally, the UCL "imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong." *In re Tobacco II Cases,* 46 Cal. 4th at 326. In other words, the plaintiff "must allege he or she was motivated to act or refrain from action based on the truth or falsity of a defendant's statement, not merely on the fact it was made." *Kwikset Corp.,* 51 Cal. 4th at 327 n.10; *Ehrlich v. BMW of N.A., Inc.*, 801 F. Supp. 2d 908, 919 (C.D. Cal. 2010) ("In an omissions case, omitted information is material if a plaintiff can allege that, had the omitted information been disclosed, one would have been aware of it and behaved differently. . . . Materiality is viewed from the [perspective] of the reasonable consumer.") (citing *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993) (internal citations removed)).  Although a fraudulent prong UCL claim does not require reasonable reliance by the alleged victim, "[t]he determination as to whether a business practice is deceptive is based on the likely effect such [a] practice would have on a reasonable consumer." *Morgan v. AT&T Wireless Services, Inc.*, 177 Cal. App. 4th 1235, 1256-57 (2009) (citing *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1471 (2006)).

The jury's findings for Copart on its fraud—concealment claim also prove up Copart's fraudulent prong UCL claim.  The jury had to find "Sparta had a duty to disclose" certain facts to Copart.  Instruction No. 17.  The jury also had to find Sparta "intentionally failed to disclose one or more of" these facts "that were known only to Sparta and that Copart could not have discovered." *Id.* "Had the omitted information been disclosed, Copart reasonably would have behaved differently." *Id.* These findings reflect actual reliance by Copart on Sparta's intentional failure to disclose certain facts, resulting in Copart's being "harmed." *Id.* The jury's finding that "Copart reasonably would have behaved differently" reflects the perspective of a reasonable consumer. *See Ehrlich*, 801 F. Supp. 2d at 919; *Morgan*, 177 Cal. App. 4th at 1256-57.  And the jury's finding that "Copart could not have discovered" this intentionally concealed information precludes a finding of manifest unreasonableness if Copart prevails here. Instruction No. 17; *see Broberg v. Guardian Life Ins. Co. of Am.,* 171 Cal. App. 4th 912, 921-22

30

(2009) (plaintiff denied recovery "only if his conduct is manifestly unreasonable in light of his own intelligence or information. It must appear that he put faith in representations that were 'preposterous' or 'shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth.'") (citation omitted). "Moreover, under California law, whether reliance was reasonable is a question of fact for the jury, and may be decided as a matter of law only if the facts permit reasonable minds to come to just one conclusion." *Id.* at 929 (citation omitted); *see also Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1163 (9th Cir. 2012).

(1)     Public Statements

Defendants assert "Copart has not presented a shred of evidence establishing either that (a) Sparta made any representations at all to the public; or (b) that members of the public were likely to be deceived by anything Sparta did or did not do." ECF No. 503 at 32. Defendants cite multiple cases to support their assertion that Copart has not proven a fraud claim because Copart has not established any statement made to the public. *Id.* at 33-34. But defendants' cited cases include incomplete statements of standards from cases that involves competitors, not consumers.

For example, defendants cite *Express, LLC v. Fetish Grp., Inc.*, 464 F. Supp. 2d 965, 980 (C.D. Cal. 2006), a case involving a competitor suing for UCL violations. There, the court ruled competitor plaintiff "failed to point to *any* evidence suggesting it suffered *any* harm." *Id.* (emphases in original). The court also found plaintiff did "not point to any evidence suggesting that the representations concerning the copyright were disseminated to the public, let alone likely to deceive the public" in relation to plaintiff's UCL claim for fraudulent conduct. *Id.* The court's ruling reflects the core inquiry that applies to fraudulent prong claims: likely public deception. The court's ruling also reflects a rule specific to competitors suing for UCL violations as stated in *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001). In *Watson*, the court identified no cases brought under the UCL's fraudulent prong "allowing one competitor to proceed against another on the basis that the defendant deceived him." *Id.* The court announced "[t]here is no case authority that 'fraudulent' business acts were

31

separately actionable by business competitors absent a showing that the public, rather than merely the plaintiff, is likely to be deceived." *Id.* The *Watson* court likened its fraudulent prong analysis to the unfair prong analysis conducted in another competitor UCL case, *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 184-85 (1999) (establishing a more rigorous unfair prong test for UCL claims between competitors). *See Watson*, 178 F. Supp. 2d at 1121. The *Watson* court repeated the importance that "it be necessary under the 'fraudulent' prong to show deception to some members of the public, or harm to the public interest, and not merely the direct competitor or other non-consumer party to a contract." *Id.*

Here, Copart was not a competitor of Sparta, much less a direct competitor. Instead, Copart was Sparta's consumer, and the jury found Copart was deceived by Sparta. *See* Verdict Form at 2; Instruction No. 17; *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 469, 512 (2003) ("[T]he question whether it is misleading to the public will be viewed from the vantage point of members of the targeted group, not others to whom it is not primarily directed."). Neither *Express* nor *Watson* applies here. *Watson* itself does not require a public statement: a plaintiff may satisfy the UCL's fraudulent prong by showing "deception to some members of the public, or harm to the public interest," or that members of the public are "likely to be deceived" by defendants' conduct. *Watson*, 178 F. Supp. 2d at 1121. A complete reading of *Watson* also helps explain why plaintiffs can assert fraudulent prong UCL claims in suits involving home mortgages, which consist of representations only to the plaintiff homeowner, not to the public. *See, e.g.*, *Majd v. Bank of Am., N.A.*, 243 Cal. App. 4th 1293, 1296, 1303 (2015), *as modified* (Jan. 14, 2016) (plaintiff alleging "defendants wrongfully foreclosed on his home"); *Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1089 (N.D. Cal. 2012); *Saldate v. Wilshire Credit Corp.*, 686 F. Supp. 2d 1051, 1067 (E.D. Cal. 2010) (citing *Watson*, 178 F. Supp. 2d at 1121, for showing deception to members of public or harm to public interest, and *Medical Instrument Development Laboratories v. Alcon Laboratories*, No. C 05-1138 MJJ, 2005 WL 1926673, at *5 (N.D. Cal. 2005), as an alternative "to alleg[ing] that 'members of the public are likely to be deceived'"). If fraudulent prong UCL claims required public statements, then

homeowners could not allege fraudulent prong UCL claims in relation to their home mortgages where no actionable statements were public.

Because the UCL does not require a public statement for consumer UCL claims, the court need not consider Copart's new evidence, Takenouchi Supplemental Declaration Exhibit A, ECF No. 517-1, to which defendants object "as outside the jury trial record." ECF No. 521 at 5 n.7.

(2) Evidence at Trial

Defendants also contend Copart has not proved "members of the public were likely to be deceived by anything Sparta did or did not do." ECF No. 503 at 32. But the evidence before the jury, which resulted in the jury's finding fraud—concealment, supports likely deception of members of the public. At trial, the jury heard from Vincent Phillips, Copart's Chief Technology Officer, who signed off on Milestone installments based on defendants' representations of their progress. *See* May 3 Trial Tr. at 65:9-191:10; May 8 Trial Tr. at 6:15-65:2, ECF No. 451. During Phillips' testimony, Copart introduced multiple internal emails from Sparta employees to Phillips and asked if Phillips had seen those emails or learned the substance communicated in those emails before signing off on various Milestones. The court summarizes the relevant exhibits and witness testimony below:

- P-90, dated January 20, 2012, is an internal Sparta email exhibit in which a Sparta employee discussed "our dynamic and constantly changing approach" resulting in "certain side effects." Difficulties included the "[w]hole offshore team find[ing] it difficult to have clear understanding of things /changes happening in [Sparta's] present model . . . ." Another employee observed "poor quality" in "functional specification documents," including "[i]naccurate wrong references and with wrong data mapping sheets." No party asked Phillips about this document, which is dated more than a month after Phillips signed off on Milestone 1. *See* D-1053 (December 7-8, 2011).

- P-118, dated February 22, 2012, is an internal Sparta email exhibit in which a Sparta employee observed "many placeholders" when Sparta's "design phase

33

is [technically] complete and should not have ANY placeholder." Phillips never saw this email, and the substance of this communication was not shared with him at any time. May 3 Trial Tr. at 109:16-111:4, 111:19-112:5. Phillips had already signed off on Milestones 1-2 at the time it was sent. *Id.* at 111:7-12; *see* D-605 (Milestone 2 sign-off dated February 2, 2012); D-1053 (Milestone 1 sign-off, dated December 7-8, 2011).

■ P-474, dated December 11, 2012, is an internal Sparta email exhibit in which a Sparta employee stated, "I think, there is a lack of documentation but that was the case back in Feb[ruary 2012] when we signed up document in 8 weeks!" Another Sparta employee stated "we found lack of detailed documentation . . . ." Phillips never saw this email at any point from October 2011 to September 2013. May 3 Trial Tr. at 146:10-15. Phillips never learned from anyone at Sparta about a lack of documentation. *Id.* at 146:16-19, 149:23-150:1.

■ P-133, dated February 29, 2012, is an internal Sparta email exhibit in which a Sparta employee comments on improvements to a power point presentation. That employee states he has "reservations calling High level plan/Testing and training strategy as key deliverables as they all are not solid. High level plan was done in order to meet end dates given, training strategy - we will not be responsible for training and Testing strategy is questionable." Phillips did not see this email "on or about the date" it was sent. May 3 Trial Tr. at 114:4-7. The same day of this email, Phillips had signed off on Milestone 3, which included a "high-level test plan." *Id.* at 114:8-25; *see* JX-2 at 24 ("High-Level Test Plan" as part of Milestone 3 in the Design Statement of Work). Phillips did not see the email in P-133 any time from October 2011 to September 2013. May 3 Trial Tr. at 115:13-16. And Sparta never shared during the project the information about the high level plan and testing strategy. *Id.* at 115:17-20

("No, they did not. Quite the opposite."). Nobody from Sparta told Phillips the test plan and training plan were not solid. *Id.* at 115:21-116:2.

■ P-134, dated March 3, 2012, is a Sparta email exhibit that includes a Sparta employee stating the project plan was "very poor quality" and appears to reflect a view looking back. This email is dated just after Phillips signed off on Milestone 3 on February 29, 2012, and before Phillips signed off on Milestone 4 on March 28, 2012. D-870-1; D-1055. Phillips did not see this email at any time from October 2011 to September 2013, and no Sparta employee told Phillips about the information contained in this email. May 3 Trial Tr. at 121:8-15 ("No. They shared the opposite.").

■ P-213, dated from May 10 to May 25, 2012, is an internal Sparta email exhibit containing in part the following message: "Thanks for this note. Here are some of my observations that leads to initiate this discussion. Most of 'to be' design documents are weak and are significantly incomplete. Client has approved those only in good faith, and Simon is very vocal about it." [3] Phillips never saw this email between October 11 and September 2013, and no Sparta employee told Phillips the information contained in this email. May 3 Trial Tr. at 117:23-118:11. Phillips had signed off on Milestones 1, 2, 3, 4 and 5 at the time it was sent. *Id.* at 118:12-15; D-1056 (Phillips signed off on Milestone 5 on May 4, 2012).

Phillips had testified that "two to five days" before code delivery for Milestones 5-7, Sparta employees told him "that this represented quality code that they had tested and was ready to be moved into user acceptance testing." May 3 Trial Tr. at 131:17-20. Phillips then approved the code. *Id.* at 131:21-22. Phillips also testified he did not know about the "severe problems" with the "BI/BW component that generates reports" even at the time he decided to

---

[3] Simon Rote, a Copart employee. *See* ECF No. 367-1 at 4.

terminate Sparta. *Id.* at 154:9-13, 160:9-12. Sparta employees had assured him that Sparta was

using proper methodology. *Id.* at 151:4-152:13.

If Phillips had known the information from internal Sparta emails reviewed with

him during his testimony, Phillips would not have terminated Sparta for convenience under the

ISA—he "absolutely" would have terminated Sparta for cause. *Id.* at 164:7-16. Sparta received

its last payment, for Milestone 7, "sometime in the July-August time frame of 2012." May 16

Trial Tr. at 164:7-9 (Nadgauda[4] testimony), ECF No. 482; *see also* D-1058 (Milestone 7 sign-off

dated June 29, 2012).

The evidence presented at trial supports the jury's finding for Copart on its fraud—

concealment claim. Assuming the jury found Phillips credible, as it must have, then the evidence

above shows "Sparta did not disclose a single . . . module was not functioning and might cause

'severe' problems" and "Sparta did not disclose ongoing failures regarding its project team."

Instruction No. 17. Phillips' signing of approvals for Sparta's work while unaware of ongoing

project issues, as outlined above, constitutes sufficient "anecdotal evidence" of a likelihood of

deceiving members of the public if properly credited by the jury, as here. *Clemens v.*

*DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008). The evidence reviewed above

reflects more than "'a few isolated' examples of actual deception." *Id.* (citing *Brockey v. Moore*,

107 Cal. App. 4th 86, 99 (2003)); *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d

1280, 1292 (9th Cir. 1992) ("Evidence of actual confusion is relevant to the issue of likelihood of

confusion . . . .").

The evidence before the jury here differs from the plaintiff's allegations of actual

confusion or deception in *Rahman v. Mott's LLP*, No. CV 13-3482 SI, 2014 WL 5282106, at *2

(N.D. Cal. Oct. 15, 2014), in which the plaintiff alleged that a misleading "No Sugar Added"

label on a particular apple juice brand misled him into purchasing that product over others.

There, the court found "because the allegedly deceptive nature of the statement is not self-evident

(presumably both parties would agree that "No Sugar Added" is literally true, in that it accurately

---

[4] Vaibhav Nadgauda, a former Executive Vice President of Sparta Consulting. ECF
No. 282-4; May 16 Trial Tr. at 77:13-21.

reflects the ingredients used to make Mott's 100% Apple Juice)." *Id.* at *9. Thus, the court reasoned, the plaintiff "must introduce some additional evidence . . . to raise a triable issue of fact as to whether a reasonable consumer would be misled by the labeling on Mott's 100% Apple Juice. The testimony of a single consumer in a putative class of potentially millions is not enough to meet this burden." *Id.*

Unlike the plaintiff in *Rahman*, Copart's evidence of actual deception involved deception as to multiple issues throughout an ongoing project. Copart did not seek to represent a putative class. And Copart's fraudulent prong UCL claim involves fraud—concealment or omissions, not an affirmative misrepresentation. Copart's claim is therefore governed by other requirements, including as outlined above, including the fraudulent prong test for an omissions case. *Ehrlich*, 801 F. Supp. 2d at 919; *see Berryman,* 152 Cal. App. 4th at 1557; *Buller v. Sutter Health,* 160 Cal. App. 4th at 986; *Daugherty*, 144 Cal. App. 4th at 838.

b)    Unfairness Prong

Copart contends "a showing of 'immoral, unethical, oppressive, unscrupulous or substantially injurious' conduct also satisfies the 'unfair' prong" of the UCL. ECF No. 516 at 2 (citing *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001); ECF No. 55 at 14-15). Defendants contend the California Supreme Court has rejected that definition as "too amorphous," providing "too little guidance to courts and business." ECF No. 521 at 4 (citing *Cel-Tech*, 20 Cal. 4th at 184-85).

Contrary to defendants' argument, *Cel-Tech* does not clearly apply here to bar the definition from *Smith v. State Farm* of what unfairness means for a consumer UCL claim. In *Cel-Tech*, the California Supreme Court adopted a test for competitors. *See* 20 Cal. 4th at 187 n.12 ("This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers . . . ."). As has already been reviewed, Copart was Sparta's consumer or client, not a competitor. *See generally* JX-1.

In cases not involving direct competitors, some California courts have still read "*Cel-Tech* to require that [a] public policy which is a predicate to the action must be 'tethered' to

37

specific constitutional, statutory or regulatory provisions." *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003). Thus, there are now two opposing lines of California appellate court opinions defining what constitutes an "unfair" business practices for the UCL. *See, e.g.*, *Morgan v. Harmonix Music Sys., Inc.*, No. C08-5211 BZ, 2009 WL 2031765, at *4 (N. D. Cal. July 7, 2009) (noting the split in authority); *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1264-75 (2006) (same). "One line defines 'unfair' as prohibiting conduct that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Bardin*, 136 Cal. App. 4th at 1259 (citing *Smith v. State Farm*, 93 Cal. App. 4th at 718-19). "The other line of cases holds that the public policy which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions." *Bardin*, 136 Cal. App. 4th at 1260-61 (citing *Scripps Clinic*, 108 Cal. App. 4th at 940).

The Ninth Circuit, addressing these opposing lines of opinions, has held that "adopting one standard does not necessitate rejection of the other," in upholding a federal district court's application of the test from *Smith v. State Farm*, 93 Cal. App. 4th at 718-19. *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007). In *Lozano*, the Ninth Circuit referred to the *Smith v. State Farm* test as "the balancing test" and noted the California Supreme Court's rejection of that test "in suits involving unfairness to the defendant's competitors." *Id.* at 735. Although the California Court of Appeal applied "the three-pronged test contained in the Federal Trade Commission [(FTC)] Act," the *Lozano* court did "not agree that the FTC test is appropriate in this circumstance," declining "to apply the FTC standard in the absence of a clear holding from the California Supreme Court." *Id.* at 736. Instead, the Ninth Circuit observed the two remaining options, the *Smith v. State Farm* balancing test and the *Cel-Tech* tethering test, "are not mutually exclusive." *Id.* "In the absence of further clarification by the California Supreme Court, [the Ninth Circuit] endorse[d] the district court's approach to the law as if it still contained a balancing test." *Id.* In a later case, the Ninth Circuit has applied both the balancing

test and the *Cel-Tech* tethering test to plaintiff's UCL claim. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1170 (9th Cir. 2012).

At hearing, Copart clarified it is not asserting "any tethering to a constitutional, statutory, or regulatory provision." Hr'g Tr. at 13:21-14:7, ECF No. 515. The court therefore applies only the balancing test, consistent with the Ninth Circuit's opinions in *Lozano*, 504 F.3d at 736, and *Davis*, 691 F.3d at 1170.

(1) Fraud—Concealment

Here, the jury findings for Copart on its fraud—concealment and professional negligence claims also prove up Copart's unfair prong UCL claim. The same jury conclusions and evidence reviewed above in connection with Copart's fraud—concealment claim also support a finding that Sparta's behavior was "immoral," "unethical" and "unscrupulous." *See Smith v. State Farm*, 93 Cal. App. 4th at 718-19. And Sparta's conduct was "substantially injurious" to Copart, resulting in Copart's approving Milestones and paying millions of dollars without information that credibly would have caused Phillips to terminate Sparta for cause or Copart to "behave[] differently." Instruction No. 17; P-1076 (showing $11,364,460.88 in payments to Sparta related to Milestones 1 through 7). This case thus is unlike *Hodsdon v. Mars, Inc.*, 162 F. Supp. 3d 1016, 1027 (N.D. Cal. 2016), *aff'd*, 891 F.3d 857 (9th Cir. 2018), in which the court ruled "the absence of" information on packaging about the source of Mars's cocoa beans was "not 'substantially injurious to consumers' or necessarily immoral" because plaintiff, "like any other consumer, has access" to this information elsewhere. *Id.* Here, Phillips never had access to the information Sparta employees did not share with him. *See also Rubenstein v. The Gap, Inc.*, 14 Cal. App. 5th 870, 880 (2017), *review denied* (Nov. 29, 2017) (finding injury "not substantial because consumers" were getting "brand name items for low prices" and consumers "who cared" could ask if the brand name items were identical to other merchandise with the same brand name, inspect the merchandise before purchase and return the merchandise if it was unsatisfactory).

The court also must balance "the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Smith v. State Farm*, 93 Cal. App. 4th at 718-19 (citation omitted). As noted above, the gravity of the harm was quite large, even for a large

39

company: millions of dollars paid to Sparta. And the jury awarded a significant amount, $4.69 million, for Copart's fraud—concealment claim. Verdict Form at 2.

Defendants do not argue for the utility of any of their conduct. *See* ECF Nos. 503, 518, 521. Nor does the court find utility in "intentionally fail[ing] to disclose" or "conceal[ing]" information a party "had a duty to disclose" with an "inten[t] to deceive" the other party "by concealing the fact(s)" when the other party "reasonably would have behaved differently" if "the omitted information had been disclosed." *See* Instruction No. 17; *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1099 (N.D. Cal. 2014) ("Under the balancing test, [defendant's] failure to disclose the alleged safety problems . . . was without utility, and therefore does not outweigh the harm [p]laintiffs suffered as a result of the defective" products); *Long v. Graco Children's Prod. Inc.*, No. 13-CV-01257-WHO, 2013 WL 4655763, at *9 (N.D. Cal. Aug. 26, 2013) ("[T]here would be no utility in the defendants' provision of a defective product or failure to notify consumers about the defect . . . .").

Weighing Copart's harm against defendants' conduct based on the jury's implicit factual determinations, the court finds Copart prevails on an unfairness prong UCL claim.

(2)     Professional Negligence

The court also finds Copart's successful professional negligence claim supports an unfairness prong UCL claim. Defendants are correct that "Copart cites to" no authority "to support its position that a finding of fraud or professional negligence is sufficient to meet the 'unfair' prong." ECF No. 521 at 5. But Copart has cited authority that negligence can support a fraudulent or unlawful prong UCL claim. *See* ECF No. 505 at 28. For instance, while analyzing fraudulent and unlawful prong UCL claims, one court determined "plaintiffs' UCL claim may proceed to the extent it is based upon [defendant's] established negligence." *Hensley-Maclean v. Safeway, Inc.*, No. CV 11-01230 RS, 2014 WL 1364906, at *8 (N.D. Cal. Apr. 7, 2014). Another court ruled "[p]laintiff's [Real Estate Settlement Procedures Act] and negligence allegations survive[d] [d]efendants' dismissal motion," concluding that "[t]hese allegations of unlawful conduct . . . provide predicate violations to support [p]laintiff's UCL claim." *Gardner v. Am. Home Mortg. Servicing, Inc.*, 691 F. Supp. 2d 1192, 1201 (E.D. Cal. 2010).

The court notes at least one other court has sustained a "UCL unfair prong claim" and a "negligence claim" while dismissing all other claims. *See Rovai v. Select Portfolio Servicing, Inc.*, No. 14-CV-1738-BAS-WVG, 2018 WL 3140543, at *2, 25 (S.D. Cal. June 27, 2018). There, the court dismissed without prejudice a "claim for a preliminary and permanent injunction" but dismissed all other claims with prejudice, including "a UCL claim under the unlawful and fraudulent prongs." *Id.*; *see also Pemberton v. Nationstar Mortg. LLC*, No. 14-CV-1024-BAS-WVG, 2018 WL 3126102, at *29 (S.D. Cal. June 26, 2018) (same except sustaining "negligence claims" in addition to "UCL unfair prong").

This court therefore applies the UCL unfair prong balancing test to the jury's professional negligence finding here. To find Sparta liable for professional negligence, the jury had to find Sparta failed "to use the skill and care that a reasonably careful SAP [Systems Applications and Products] systems integrator would have used in similar circumstances." Instruction No. 27. The jury's finding of that level of skill and care could have been "based only on testimony of witnesses LaBaron Hartfield [Copart's expert] and James Mottern [defendants' expert] . . . ." *Id.*

It is true that "[s]imply asserting that a party breached a contract is not enough to make the breach 'unfair' under the UCL. The breach must *independently* constitute unfair conduct . . . ." *Soriano v. Countrywide Home Loans, Inc.*, No. 09-CV-02415-LHK, 2011 WL 2600759, at *12 (N.D. Cal. June 30, 2011) (emphasis in original). But the jury's finding that Sparta breached the standard of care required for a finding of professional negligence is a finding of conduct independent of a mere breach of contract. *See Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 998 (2004) (recognizing "conduct amounting to a breach of [contract] becomes tortious when it also violates a duty independent of the contract arising from principles of tort law") (citation omitted).

Copart's "SAP implementation expert" witness LaBaron Hartfield testified to the existence of "ASAP methodology," a "set of practices that SAP has researched, conformed and refined over years of implementations of different SAP projects working in concert with their partners, i.e., their customers, to ensure that SAP projects are deployed successfully, that goals

are met." May 8 Trial Tr. at 109:9-15, 113:20-25. Hartfield also testified that "most and the majority [in SAP project management] look at the PMBOK, which is the Project Management Body of Knowledge, which structures how projects should be managed as well." *Id.* at 114:1-4. The PMBOK "is actually a published set of recommendations and standards for managing projects," including "execution . . . staffing, . . . financial aspects . . . how to close out projects, how to really safeguard a project, everything from assessing risk to ensure that not only is there something delivered, but you deliver what was expected." *Id.* at 114:13-20.

Hartfield testified in his opinion Sparta "did not" meet these professional standards. *Id.* at 117:8-13. According to Hartfield, "Sparta's performance" on "its risk identification and risk mitigation responsibilities" was "poor" and even "ridiculous." *Id.* at 126:4-11. Sparta's use and syncing of ECC and CRM[5] components for Copart involved a "deficient" design, "one of the designs that SAP highly does not recommend . . . ." *Id.* at 127:19-25. Hartfield also opined that Sparta's staffing on the project "did not" meet applicable professional standards. *Id.* at 130:14-19. Sparta's project management practices were "severely" deficient. *Id.* at 131:1-5. Independently, a Sparta employee in an email dated January 30, 2013 conceded, at least in part, that "[p]roper implementation of ASAP methodology didn't happen." P-554.

Hartfield's testimony and exhibits such as P-554 were before the jury, and Hartfield was cross-examined vigorously by defendants' counsel. *See* May 8 Tr. at 152:18-182:10; May 9 Tr. at 7:16-11:5, ECF No. 458. The jury's finding in in favor of Copart on its professional negligence claim required a finding that "Sparta had a duty as an SAP systems integrator," that "Sparta breached that duty" and that "Copart suffered actual loss or damage resulting from the professional negligence." Verdict Form at 4; Instruction Nos. 26-27. The jury could not have found for Copart if Sparta's "efforts [were] unsuccessful" or if Sparta made "an error that was reasonable under the circumstances." Instruction No. 28. The jury awarded $20.37 million in damages to Copart. Verdict Form at 4. These findings of professional negligence

---

[5] ECC "stands for ERP central component," and CRM is the "customer relationship management component of SAP." *See* April 30 Trial Tr. at 39:14-40:3, ECF No. 423.

support a finding that Sparta's conduct was "substantially injurious," if not "unethical." *Smith v. State Farm*, 93 Cal. App. 4th at 719.

As with defendants' fraud—concealment, defendants here do not argue they offered any utility to defendants through their conduct. *See* ECF Nos. 503, 518, 521. Similar to defendants' fraud—concealment claim discussed above, the court finds no utility in Sparta's breaching its duty to maintain the applicable professional standard of care, as the jury found. The gravity of the harm here is larger than it was for fraud—concealment, reflected in the jury's award of $20.37 million compared with $4.69 million. *See* Verdict Form at 2, 4.

The court finds defendants' conduct, based on the jury's implicit factual determinations for Copart's professional negligence claim, satisfies Copart's unfair prong UCL claim.

### 5. Causation

Copart contends the jury's finding of causation in connection with Sparta's liability to Copart on fraud and professional negligence binds the court under the Seventh Amendment. ECF No. 516 at 4. Copart also argues Sparta waived any argument on causation "with respect to anything other than lost profits." ECF No. 516 at 4 (citing ECF No. 457 at 25).

Defendants assert they have not waived arguments on causation "by only challenging causation as to lost profits in its Rule 50 motion," because Rule 50(a) requires a jury trial. ECF No. 521 at 6. Additionally, defendants argue Copart cannot show causation because Copart has not causally linked any omissions "to a specific payment to Sparta." ECF No. 503 at 32-33. Defendants contend "nearly all of the emails and issues Copart alleges Sparta failed to disclose cannot support restitution because they occurred *after* all of the payments Copart seeks to claw back as restitution." *Id.* (emphasis in original).

Copart asserts Sparta failed to present evidence at trial "about when Copart paid Sparta for Milestones 1 through 7, so there is no date other than the date of termination (September 7, 2013) from which to judge Copart's reliance." ECF No. 516 at 4. Regardless, Copart contends, "there is ample evidence in the record of Sparta's fraud and professional

negligence leading up to and surrounding Copart's Milestone 7 sign-off." *Id.* (citing TSD Exs. E-J).

As stated above, Rule 50(a) applies "[i]f a party has been fully heard on an issue during a jury trial." Fed. R. Civ. P. 50(a)(1); *see Ritchie*, 451 F.3d at 1022-23 (explaining difference between Rule 50(a), which applies to jury trials, and Rule 52(c), which applies to bench trials). Rule 50(a) waiver applies to a Rule 50(b) motion for judgment as a matter of law because that motion is a renewed 50(a) motion. *Go Daddy Software*, 581 F.3d at 961. "[A] party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'" *Id.* (quoting *Freund*, 347 F.3d at 761; *Zhang*, 339 F.3d at 1028-29 ("The failure to raise this issue prior to the return of the verdict results in a complete waiver" for judgment as a matter of law under Rule 50). This court's order and the parties' arguments here do not involve a Rule 50 motion for judgment as a matter of law.

It should be no surprise to Copart that defendants argue against Copart's UCL claim more fully here than in their Rule 50(a) motion. At trial, while expressing different views on the jury's factfinding role with respect to the UCL claims, the parties agreed the court, not the jury, would resolve the UCL claims, which justified the court's not adopting Copart's proposed final instructions on its UCL claim. *See id.* at 18:21-19:23; ECF No. 384 at 13-15 (defendants objecting to Copart's proposed jury instructions on UCL claims because these claims "must be decided by the [c]ourt, not jury"). The court therefore addresses causation under the UCL.

Here, the jury's factfinding on Copart's fraud—concealment claim binds the court on UCL causation as to Milestones 2 through 7. The jury heard evidence on various of Sparta's omissions occurring throughout February 2012. *See* P-118 (Feb. 22, 2012), P-474 (dated Dec. 11, 2012 but referring back to "February [2012]"), P-133 (Feb. 29, 2012). The jury also heard testimony from Phillips, who signed off on Milestones 1 through 7 for Copart, about Sparta's never informing him about the contents of Sparta communications about project issues. May 3 Trial Tr. at 109:16-111:4, 111:19-112:5, 115:13-116:2, 146:10-19, 149:23-150:1. This evidence existed well before Phillips's signing off on Milestones 3 through 7. *See* D-870-1, D-1055, D-

44

1056, D-1057, D-1058.  Other evidence supported the jury's causation finding on Copart's

fraud—concealment claim.  One e-mail, P-134, dated March 3, 2012, which Phillips had not seen

or learned of, May 3 Trial Tr. at 121:8-15, was sent shortly after Phillips signed off on Milestone

3 but well before Phillips signed off on Milestone 4.  *Compare* P-134, *with* D-870-1 (Phillips

signed Feb. 29, 2012), *and* D-1055 (Phillips signed Mar. 28, 2012).  Communications in P-213,

an internal Sparta email, occurred shortly after Phillips signed off on Milestone 5 but well before

Phillips signed off on Milestones 6 through 7.  *Compare* P-213 (May 10 to May 25, 2012), *with*

D-1056 (Phillips signed May 4, 2012), D-1057 (Phillips signed June 7, 2012), *and* D-1058

(Phillips signed June 29, 2012).  Phillips also testified that "two to five days" before code

delivery for Milestones 5-7, Sparta employees told him "that this represented quality code that

they had tested and was ready to be moved into user acceptance testing."  May 3 Trial Tr. at

131:17-20.  Phillips then approved the code.  *Id.* at 131:21-22.

　　　　If Phillips had known of the information contained in internal Sparta emails,

Phillips would not have terminated Sparta for convenience under the ISA—he testified

"absolutely" would have terminated Sparta for cause.  *Id.* at 164:7-16.  The jury found causation

sufficient to sustain a finding that if "the omitted information [had] been disclosed, Copart

reasonably would have behaved differently."  Instruction No. 17.  The jury also found "a causal

connection between the negligent conduct and any resulting injury to Copart" for professional

negligence, where the jury awarded $20.37 million based in part on "[p]ayments to Sparta for

Milestones 1 through 7."  Instruction No. 45; *see* Verdict Form at 4.

　　　　Although the exhibits referring to the February 2012 timeframe are dated February

22 or later, those exhibits and Phillips's testimony still support causation with respect to

Milestone 2.  First, a Sparta employee communicating in a December 11, 2012 email contained in

exhibit P-474 refers to "back in Feb" without specifying when in February the "lack of

documentation" occurred.  Second, in P-118, dated February 22, 2012, a Sparta employee in an

internal email observed "many placeholders" when Sparta's "design phase is [technically]

complete and should not have ANY placeholder."  These observations are close enough in time to

support causation in relation to Copart's fraud—concealment claim and Phillips signing off on

1   Milestone 2. Phillips testified that at no time did Sparta tell him about the placeholder issue.

2   May 3 Trial Tr. at 109:16-111:4, 111:19-112:5.

3          The only Milestone for which causation is lacking is Milestone 1. There, Copart

4   relies on P-90, an email exhibit dated over a month after Phillips signed off on the first Milestone.

5   *Compare* P-90, *with* D-1053. And Phillips never testified about this exhibit. The jury therefore

6   had no evidence on which to find "actual reliance" or causation linking any omissions reflected in

7   P-90 and Phillips's signing off on Milestone 1. *See Tobacco II,* 46 Cal. 4th at 32 (holding, in

8   context of fraudulent prong UCL, phrase "as a result of" in California Business & Professions

9   Code section 17204 requires a plaintiff show "actual reliance" on a defendant's misrepresentation

10  or omission). Additionally, Hartfield never testified about P-90 in expressing his opinions on

11  Sparta's adherence to the appropriate standard of care. May 8 Trial Tr. at 105:5-182:10; May 9

12  Trial Tr. at 7:19-11:5. Although a Sparta employee stated certain "functional specification

13  documents" were "poor quality" in an email contained in P-90, the same employee expressed a

14  prospective view that "every functional specification document that we are delivering should be

15  accurate . . . ." The court finds no basis to link these email communications to a Milestone sign-

16  off occurring over a month earlier. Additionally, other evidence, such as the Sparta employee's

17  referring to a documentation problem as being "the case back in Feb[ruary 2012]," P-474, does

18  not support a finding of causation for a Milestone sign-off occurring on December 8, 2011. *See*

19  D-1053.

20         In sum, the jury's factual findings support causation under fraudulent prong and

21  unfair prong UCL claims for Milestones 2 through 7. The court next addresses the appropriate

22  amount of restitution for these claims.

23              6.      Restitution Amount

24         Copart asserts its UCL claim warrants "restitution of all fees that Copart paid to

25  Sparta," which "would furnish an independent basis for $11,364,461" in restitution. ECF No. 505

26  at 49. Defendants do not dispute this amount but contend an award would constitute an

27  impermissible double recovery and would be inequitable given the jury award to Sparta on its

28  breach of the implied covenant of good faith and fair dealing claim. ECF No. 503 at 38-40.

Copart also requests the court "order restitution by Sparta of any future amounts that Copart pays Sparta under the contract . . . ." ECF No. 505 at 10, 49-50. Defendants contend this is "an absurd proposition, which would directly undermine the jury's verdict." ECF No. 503 at 39.

"Remedies for private individuals bringing suit under the UCL are limited to restitution and injunctive relief." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *20 (N.D. Cal. Aug. 30, 2017) (citing *Pom Wonderful LLC v. Welch Foods, Inc.*, No. CV 09-567 AHM AGRX, 2009 WL 5184422, at *2 (C.D. Cal. Dec. 21, 2009)). A court awarding restitution under the UCL has "very broad discretion to determine an appropriate remedy as long as it is supported by the evidence and is consistent with the purpose of restoring to the plaintiff the amount that the defendant wrongfully acquired." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 506 (S.D. Cal. 2013). Restitution under the UCL is consistently awarded with the goal of "restoring" to plaintiffs money wrongfully taken as a result of defendant's unlawful, unfair or fraudulent practices. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1147-48 (2003). California law "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938–39 (9th Cir.1999). "[T]he fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." *Id.* at 939.

The Ninth Circuit has held that, in the context of "fraudulent omission, UCL . . . restitution is based on what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015). "[T]he focus is on the value of the service at the time of purchase" and "on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." *Id.* (citing *Kwikset*, 51 Cal. 4th at 329).

According to Phillips, he "absolutely" would have terminated Sparta for cause under the ISA if he had known the information from internal Sparta emails reviewed with him during his trial testimony. May 3 Trial Tr. at 164:7-16. Under ISA §§ 15.4 and 15.5, Copart

47

would "not be obligated to pay any costs, fees, or charges or other amounts in connection with any termination of" the ISA for cause. Thus, excluding Milestone 1 fees for which Copart could not establish causation, the value of Copart's UCL restitution award would be $10,064,460.88. *See* P-1076.

However, the Ninth Circuit requires a focus on "what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." *Pulaski*, 802 F.3d at 989. The jury's finding on the fraud—concealment claim resulted in an award of $4.69 million, which included consideration of "[p]ayments to Sparta for Milestones 1 through 7." Instruction No. 45; Verdict Form at 2. The jury also considered payments for Milestones 1 through 7 as part of the jury's award of $20.37 million for Copart's professional negligence claim. Verdict Form at 4. But the jury awarded $4.88 million to Sparta on its breach of the implied covenant of good faith and fair dealing claim, necessarily finding "Sparta did all, or substantially all of the significant things that the contract required it to do or that it was excused from having to do those things." Instruction No. 40; Verdict Form at 8.

The $4.88 million award to Sparta did not include "New Services" payments the jury found Sparta had waived. Verdict Form at 8; *see* Instruction Nos. 41. Those "New Services," defined in Instruction No. 41 as "New Services, as used in ISA § 2.2," would have required a "written proposal" and Copart's agreeing "upon the terms for such new services." *See* ISA § 2.2. The court therefore looks only to the fees due to Sparta for successful completion of the rest of the project, Milestones 8 through 15. The fees due to Sparta for completion of Milestones 8 through 15 totaled $13,160,000. *See* JX-4 at 5 (ISA Amendment). Sparta asked for $12.7 million based on "84 percent of the fee." May 17 Trial Tr. at 86:15-16. Although the jury did not award Sparta its requested amount, the jury's awarding $4.88 million contains an implicit factual determination that the work Sparta did had some value; it was not worthless. The court therefore relies on the jury award of $4.88 million out of a possible fee value of $13.16 million for Sparta's work to conclude the appropriate amount of restitution is $6,332,350.77 to Copart, out of a possible restitution award of $10,064,460.88 for the milestones on which Copart is eligible for a restitution award.

48

As defendants correctly note, and given the court's analysis above, Copart's request of "restitution by Sparta of any future amounts that Copart pays Sparta under the contract," ECF No. 505 at 10, 49-50, "would be a violation of the Seventh Amendment right to jury trial" because it calls on the court "to disregard a jury's finding of fact." *Acosta*, 718 F.3d at 828. Other jury findings support the existence of a conflict between Copart's request for restitution of future amounts paid and the jury award of $4.88 million to Sparta. For example, although the jury could have rejected Copart's affirmative defense of unclean hands for a failure to satisfy any of three elements, the jury did not "find that Sparta had unclean hands." Verdict Form at 8; *see* Instruction No. 42 (listing three elements Copart must prove to establish an unclean hands affirmative defense against Sparta). And the jury also found Copart 20 percent responsible for Sparta's professional negligence. *See* Verdict Form at 8. These jury findings do not support the equitable remedy of restitution for all of Copart's fees paid to Sparta.

The court next addresses defendants' concerns about an impermissible double recovery and Copart's election of remedies.

### 7. Judgment

Recognizing the jury has already awarded damages based on "[p]ayments to Sparta for Milestones 1 through 7," Instruction No. 45, Copart contends the court "may find Sparta liable under the UCL and determine the amount of restitution while withholding judgment on Copart's restitution demand until the post-trial motions are resolved." ECF No. 516 at 4. According to Copart, "[b]ecause this award in equity would furnish an independent basis for" a portion "of the professional negligence damages award imposed by the jury verdict, the [c]ourt need not add that amount to Sparta's overall liability in the judgment so long as the [restitution award] is deemed to be included in Copart's professional negligence award." ECF No. 503 at 10.

Defendants assert "Copart has already elected to affirm the contract" and that Copart "provides no rationale or justification for why the [c]ourt should entertain" Copart's request "until after all post-trial motions have been briefed, heard, and adjudicated." ECF No. 521 at 5 n.8.

The jury awarded damages on both Copart's fraud—concealment claim and professional negligence claim. *See* Instruction No. 45. Damages for both claims constitute all of the recovery the jury awarded to Copart. *See* Verdict Form at 1-7. Copart's UCL restitution of $6,332, 350.77 does not add to any recovery because jury instructions for Copart's fraud—concealment claim and Copart's professional negligence claim already required the jury to consider "[p]ayments to Sparta for Milestones 1 through 7." Instruction No. 45.

Although Copart's acknowledgement of a valid, enforceable contact precludes its unjust enrichment claim, defendants' assertion that "Copart has already elected to affirm the contract," ECF No. 521 at 5 n.8, does not affect restitution under the UCL. A breach of contract may "form the predicate for Section 17200 claims, provided it also constitutes conduct that is 'unlawful, or unfair, or fraudulent.'" *Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638, 645 (2008) (emphasis removed, citation omitted). The court has explained above how the jury's findings prove up a fraudulent prong and unfair prong UCL claim. That conduct constitutes "additional unlawful, unfair, or fraudulent conduct" beyond a breach of contract. *See Conder v. Home Sav. of Am.*, 680 F. Supp. 2d 1168, 1176 (C.D. Cal. 2010).

Moreover, Copart is "entitled to elect [its] remedy at any time" before judgment. *Viasphere Int'l, Inc v. Vardanyan*, No. 12-CV-01536-HRL, 2015 WL 493833, at *2 (N.D. Cal. Feb. 4, 2015) (citing *May v. Watt*, 822 F.2d 896, 901 (9th Cir. 1987)). In *May*, the Ninth Circuit held "the jury should have had the opportunity to reconsider [plaintiff's]" alternative theory that would "warrant rescission" of a contract. 822 F.2d at 900. There, plaintiff "was not required to make an election between the relevant contract theories he advocated (breach of contract and rescission) prior to a jury verdict." *Id.* at 901; *see also Dopp v. HTP Corp.*, 947 F.2d 506, 515 (1st Cir. 1991) ("'Generally, an election between inconsistent remedies is made after a verdict but prior to the entry of judgment.'") (quoting *Wynfield Inns v. Edward LeRoux Group, Inc.*, 896 F.2d 483, 488 (11th Cir. 1990), and citing *May*, 822 F.2d at 900); *Weft, Inc. v. G.C. Inv. Assocs.*, 630 F. Supp. 1138, 1144 (E.D. N.C. 1986), *aff'd sub nom. Weft, Inc. v. Georgaide*, 822 F.2d 56 (4th Cir. 1987) (citation omitted). Here, the court has not yet entered judgment; Copart may elect between its damages awards or UCL restitution prior to entry of judgment, but may not receive

both. *See Tu Thien The, Inc.*, 2014 WL 12580249, at *9 ("These [UCL] remedies are redundant with those awarded under the trademark claims, which include injunctive relief and [d]efendants' profits. Therefore, Plaintiff is not entitled to any greater remedies under the UCL.").

### D.    Prejudgment Interest

#### 1.    Availability

Copart contends prejudgment interest is not available for defendants' successful breach of the implied covenant of good faith and fair dealing claim because the jury's award of $4.88 million on that claim "fairly and adequately compensated Sparta for the breach, placing it in as good a position as it would have been had Copart performed." ECF Nos. 505 at 44-46, 516 at 2-3. At hearing, Copart argued Sparta's demand was exorbitantly high. Hr'g Tr. at 31:19-20. Defendants contend they are entitled to prejudgment interest based on Copart's actions, which included responding to an initial settlement offer based on Copart's termination for convenience by suing in Texas instead of California, seeking to amend and amending the complaint to add a trade secrets misappropriation claim, and failing to litigate a bona fide dispute as to Sparta's contract claims. Sparta also points to its hardship associated with the delay in being compensated for at least some of its work. ECF No. 503 at 40-45.

California Civil Code section 3287(b) grants a court discretion to award prejudgment interest for certain contract claims "from a day prior to the entry of judgment . . . but in no event earlier than the date the action was filed."[6] If the contract "does not stipulate a legal rate of interest," then the interest rate is "10 percent per annum after a breach." Cal. Civ. Code § 3289(b).

---

[6] California Civil Code § 3287(b) provides in full:

> Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed.

No party disputes Sparta's claims here were unliquidated.

"Courts may consider a variety of factors in determining an award of prejudgment interest under Section 3287(b), including (1) whether the party seeking interest was at fault for any delay in resolution of the case; (2) whether interest penalizes the defendant for litigating a bona fide dispute; and (3) whether the defendant refused a definite demand for settlement at the outset." *Fresno Rock Taco, LLC v. National Sur. Ins. Corp.*, No. 1:11–cv–845–SKO, 2015 WL 135720, at *28 (E.D. Cal. Jan. 9, 2015) (citing *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 47, 495-96 (1982)). "An award of prejudgment interest is intended to make the plaintiff whole 'for the accrual of wealth which could have been produced during the period of loss.'" *Wisper Corp. v. California Commerce Bank*, 49 Cal. App. 4th 948, 958 (1996) (citation omitted). California Civil Code section 3287 "should be broadly interpreted to provide just compensation to the injured party for loss of use of money during the prejudgment period." *Gourley v. State Farm Mut. Auto. Ins. Co.*, 53 Cal. 3d 121, 132 (1991). Sparta's breach of the implied covenant of good faith and fair dealing claim qualifies as a contract claim. *See Mundy v. Household Finance Corp.*, 885 F.2d 542, 544 n.1 (9th Cir. 1989) ("[T]he California Supreme Court has spoken decisively [in saying] . . . an allegation of breach of the implied covenant is a purely contractual claim.").

Here, Copart refused a definite demand for settlement before litigation occurred. Although Copart asserts defendants "never presented the jury with admissible evidence of a settlement demand, much less a reasonable one," ECF No. 516 at 2 & n.2, Sparta's CEO, Vaibhav Nadgauda, testified at trial about the steps Sparta took in response to Copart's termination for convenience under ISA § 15.2. May 16 Trial Tr. at 172:20-174:7. Nadgauda testified about exhibit D-301-1, admitted at trial, which was a letter dated September 17, 2013; in the letter, Copart's general counsel informed Nadgauda that Copart had terminated the ISA. *See* May 16 Trial Tr. at 171:17-24. Copart's letter asserted Copart "has no obligation to pay any costs, fees, charges, or other amounts associated with this termination unless expressly provided for in Section 15.2." D-301-1. Copart's general counsel stated, "I invite you or your representative to contact [Copart] to discuss the services that Sparta believes have been performed, completed, and documented as of today for Copart's review and, as appropriate, Copart's agreement." *Id.*

Nadgauda testified that Sparta sent a response on October 18, 2013, about a month later, based on Sparta's "work[ing] to kind of gather the information that was requested by Copart and then . . . asking for what we were owed." May 16 Trial Tr. at 173:2-4, 14-17. Defendants requested a response to their letter by November 1. *Id.* at 173:18-19. Copart responded with "a lawsuit" in Texas "alleging fraud and contract—breach of contract and a few other things." *Id.* at 174:3-4. Prior to November 1, Copart had not accused Sparta of fraud or breach of contract. *Id.* at 174:5-7.

Copart had terminated the ISA under ISA § 15.2, a "Termination for Convenience." It did not terminate under the provision for "Termination for Specified Events," including as one event Copart's not accepting a milestone by the completion date, nor did it rely on "Termination for Cause," where the other party "fails to perform any of its obligations under" the ISA. ISA §§ 15.3-15.4. ISA § 15.5 clarifies that only § 15.2 permits "any costs, fees, charges or other amounts in connection with any termination of this [ISA] pursuant to Section 15." Although Copart contends Sparta's demand was exorbitantly high, Hr'g Tr. at 31: 19-2, Copart has not satisfactorily explained why its response at the time, instead of a counter-offer or rejection, was to immediately file suit in Texas.

Nadgauda's testimony is sufficient to demonstrate Copart refused a definite settlement demand at the outset. Moreover, Sparta's settlement demand was based on Copart's choice to terminate Sparta for convenience instead of for cause. ISA § 15.2 contemplated Sparta's receiving payment for the work it had completed. Copart has argued the court should not review unadmitted exhibits to assess prejudgment interest, including D-1226. *See* Llewellyn Decl. Ex. D, ECF No. 504-4 (D-1226). But the parties agreed prejudgment interest for contract claims was "an issue for the [c]ourt to decide," even "the fact of" prejudgment interest, "[e]ntirely." May 11 Trial Tr. at 57:9-10; May 16 Trial Tr. at 225:7-12, 226:3-15. And, as noted above, the court omitted a prejudgment interest instruction to the jury based on the parties' agreement. *See* May 16 Trial Tr. at 248:15-16. The court overrules Copart's objection based on its previous agreement and considers Sparta's evidence.

In D-1226, Copart acknowledged Sparta had not requested the entire outstanding contract price. Yet Copart asserted "Sparta's unreasonable position" regarding the amount Copart owed under ISA § 15.2, based on Copart's termination for convenience, "caused Copart to file suit against Sparta." *Id.* Copart asserted because it did "not agree, nothing is due under section 15.2." *Id.*; *see* ISA § 15.2 (stating in part "Copart shall pay [S]parta only for the portion of the Services that have been performed and completed as of the termination date, as such portion agreed by Copart"). Copart referred to Sparta's "demand" as "groundless and inflated," but did not suggest an alternative. Instead, Copart sued Sparta "for breach of contract, fraud, fraud in the inducement, promissory fraud, as well as for unfair business practices" approximately two weeks after Sparta provided its estimate of the amount owed for the work it had performed. *See* D-1226. Copart sued in Texas state court on the same day Sparta had requested a response to its estimate: November 1, 2013. *See Copart, Inc., v. Sparta Consulting Inc.*, No. 3:13-CV-0013, ECF No. 1 at 1; May 16 Trial Tr. at 173:18-174:4.

To the extent Copart maintains it should not be penalized for litigating a bona fide dispute, the court finds prejudgment interest based on the jury's award of $4.88 million instead of Sparta's requested award of more than $12 million would not result in penalizing Copart to the extent it did litigate a bona fide dispute.

No party asserts Sparta was at fault for delaying resolution of this case, although Copart says "Sparta refused to even consider any payment to Copart" in settlement discussions without providing any additional detail or support for this assertion. ECF No. 516 at 2 n.3. Again, Copart sued before considering settlement or engaging in the negotiation contemplated under ISA § 15.2 based on Copart's choice to terminate for convenience. Copart does refer to "late-produced documents from Sparta" to justify "its motion for leave to amend the complaint in March 2016." ECF No. 505 at 19. The court addresses this justification below when assessing the start date for prejudgment interest accrual. The court does not find that Sparta delayed the litigation. Nor does the court find an award of prejudgment interest set to start at the appropriate time would penalize Copart for litigating any bona fide dispute in this case. Copart's refusal to settle or meaningfully negotiate, especially when that was the course contemplated by the

contract and chosen as one among many options Copart had under that contract, and Copart's

other litigation conduct caused Sparta "loss of use of money during the prejudgment period."

*Gourley*, 53 Cal. 3d at 132.

Copart cites to *Lewis C. Nelson & Sons, Inc. v. Clovis Unified Sch. Dist.*, 90 Cal.

App. 4th 64, 69 (2001), *as modified* (June 27, 2001), which observes "it is unreasonable to expect

a defendant to pay a debt before he or she becomes aware of it or is able to compute its amount."

But the court in *Nelson* merely stated this rationale as supporting "[t]he usual prohibition" against

prejudgment interest in the context of the adoption of California Civil Code § 3287(b), which

created an exception to that usual prohibition. *Id.* This exception "balance[s] the concern for

fairness to the debtor against the concern for full compensation to the wronged party." *Id.*

(citations omitted). Nor does *Faigin v. Signature Group Holdings, Inc.*, 211 Cal. App. 4th 726,

751 (2012), support Copart's position. There, the court held the trial court did not abuse its

discretion in part because the amount of damages sought changed from certain to uncertain when

the plaintiff's written employment contract was excluded from trial on defendant's motion in

limine and because the trial court had concluded "an award of prejudgment interest in these

circumstances would result in a windfall to [plaintiff]." *Id.* at 752. In contrast, Sparta's demand

has remained consistent from the date of its October 18, 2013 demand letter through trial.

Copart's argument that the jury adequately compensated Sparta is unavailing,

based on its citation to *Esgro Central, Inc. v. General Insurance Co.,* 20 Cal. App. 3d 1054

(1971). In *Esgro*, the appellate court observed it was possible the trial judge "was of the opinion

that the jury had already considered [prejudgment interest] in awarding damages." *Id*. at 1065.

Here, in contrast, the court declined to instruct on prejudgment interest based on the parties'

mutual agreement. The jury instructions and verdict form do not contemplate an interest award or

even some form of delay in Sparta's receiving compensation for the "work Sparta performed" or

its "unreimbursed expenses." Instruction No. 52; Verdict Form at 8; *cf. Fresno Rock Taco*, 2015

WL 135720, at *24-25 ("Plaintiffs are not entitled to prejudgment interest on the jury verdict"

because whether "the aggregated jury award include[d] interest was solely in the hands of the

jury").

Finally, Copart's citation to *Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.*, 231 Cal. App. 4th 134, 205-06 (2014), does not support denying prejudgment interest to Sparta. There, the court noted California Civil Code section 3287(b) is "discretionary with the court," which means the court "must consider the circumstances, realizing a party cannot pay the amount due until it is determined what the amount was—which in this case was the reason for the litigation in the first place." *Id.* at 203. Granting prejudgment interest in those circumstances would be unjust in part because the defendant "acted precisely as the parties agreed while waiting for the litigation to play out . . . ." *Id.* at 206. That is not the scenario here. Although the damages were not certain until the jury award, Sparta had provided its estimate of a portion of the remaining contract value based on Sparta's belief in the amount of work it had completed. That demand of approximately $12 million remained consistent from initial settlement demand to closing argument. *Compare* D-1226 (Copart letter responding to Sparta's settlement letter, asserting Sparta demanded "$12,200,835.72"), *with* May 17 Trial Tr. at 86:15-16 (defendants' closing argument); *see* Instruction No. 52 (requiring jury to find "both parties knew or could reasonably have foreseen that the harm was likely to occur" to find liability for breach of implied covenant of good faith and fair dealing). Moreover, the parties here had agreed under the ISA to determining between themselves what Copart would owe Sparta if Copart terminated for convenience instead of for cause or for specified events. *See* ISA §§ 15.2-15.4.

The court therefore determines the appropriate interest and the starting date of prejudgment interest accrual, below.

### 2. Starting Date of Accrual and Interest Rate

Copart contends if awarded at all, prejudgment interest "should not begin to accrue until the jury actually determined the amount due," which was May 22, 2018. ECF No. 516 at 3; *see* Verdict Form at 1, 8. Alternatively, Copart states the earliest date prejudgment interest "should begin to accrue" is "on September 26, 2017—when the [c]ourt rejected Copart's challenge to Sparta's contract claim . . . ." ECF No. 516 at 3 (citing summary judgment order, ECF No. 264 at 16). Copart asserts the latter date ensures "Copart is not punished for the natural

progression of this litigation through trial." *Id.* Additionally, any interest awarded should be "simple interest," which is 1 percent under ISA § 10.2. ECF No. 516 at 3 (citing JX-1-10).

Defendants maintain prejudgment interest should run from January 8, 2014, the date Copart first sued in Texas state court. ECF No. 521 at 4-5. And "because the ISA is silent on the 'rate of interest chargeable after breach of contract,' the applicable rate of prejudgment interest is 10% per annum." *Id.* at 5 (citing Cal. Civ. Code § 3289(b)).

First, the court concludes the appropriate interest rate here is 10 percent per annum because the ISA "does not stipulate a legal rate of interest." *See* Cal. Civ. Code § 3289(b). Copart's reference to ISA § 10.2 does not point to a stipulated interest rate related to breach, fee disputes or termination for convenience. Rather, the stipulated rate there applies to "the amount of overcharge" if Sparta "has overcharged Copart." ISA § 10.2; *cf. Resolution Tr. Corp. v. First Am. Bank*, 155 F.3d 1126, 1129 (9th Cir. 1998) (holding district court erred by using 10% rate where agreement established "a formula" to determine rate for "[a]ny net settlement payment" under agreement); *Fitz Fresh, Inc. v. Mondragon*, No. C-08-02407 RMW, 2008 WL 4811457, at *2 (N.D. Cal. Nov. 5, 2008) (reasoning 10% per annum award is "simple interest absent an explicit agreement . . . to use compound interest" and can be awarded "for a fraction of a year"). The prejudgment interest here involves Copart's failure to pay Sparta for services performed, as found by the jury, not Sparta's overcharging Copart. *See* Verdict Form at 8; Instruction Nos. 40, 52.

Second, the court in its discretion fixes the date at which prejudgment interest accrues as December 26, 2016, ten months before the court issued its order on summary judgment. *See* ECF 264. The court fixes this date to "balance the concern for fairness to the debtor against the concern for full compensation to the wronged party." *Lewis C. Nelson & Sons*, 90 Cal. App. 4th at 69. In resolving summary judgment on September 26, 2017, the court rejected Copart's arguments regarding Sparta's contract claim, specifically rejecting Copart's argument that it had "unfettered discretion whether to 'agree' to Sparta's evaluation of work completed" under ISA § 15.2, a claim Copart had asserted in its letter to Sparta notifying Sparta of Copart's lawsuit. ECF No. 264 at 15; D-1226 ("[S]ince Copart does not agree, nothing is due

under section 15.2").  Copart's continued pursuit of this claim, including through trial, cuts against an assertion that Copart pursued bona fide litigation by refusing to acknowledge Copart owed Sparta anything.  *See, e.g.*, May 17 Trial Tr. at 106:18-19 ("Their request for a dollar is offensive, much less 13 million. . . .  Copart didn't agree that Sparta completed this work.").

The court also finds Copart's decision to respond with litigation is a clear rejection of a settlement demand, when the litigation commenced a mere two weeks after Sparta provided its settlement calculation, following the process envisioned by the ISA upon a termination for convenience.  Copart suggested no alternative number and did not negotiate before filing suit.  Copart sued, then told Sparta it believed Sparta breached the contract and committed fraud, and asserted Sparta was owed nothing.  *See* D-1226; May 16 Trial Tr. at 174:5-7 (Nadgauda stating "[n]o" when asked if Copart ever accused Sparta of fraud or breach of contract before the letter notifying Sparta of the lawsuit).  Copart's suing in Texas state court led to a delay of approximately 10 months involving removal to federal court and eventually transfer to this court over Copart's opposition.  *See Copart, Inc. v. Sparta Consulting, Inc.*, No. 3:14-cv-013-L-BK, ECF No. 26 at 6-7 (granting motion to transfer venue to Eastern District of California in part because Sparta "points to more than a dozen current and former employees of [Copart's] that have relevant knowledge of this case and reside within the subpoena power of the district court of the Eastern District of California"); *see also* ECF Nos. 12, 22 (Copart moving to transfer case filed in Eastern District of California to Northern District of Texas, then withdrawing motion after Northern District of Texas transferred case here).  It is the 10-month delay that supports setting the start date here in December 2016, ten months before the court's summary judgment decision issued.

After careful consideration, the court concludes setting the starting date earlier than December 26, 2016 risks penalizing Copart unnecessarily for the bonafide litigation it did undertake, including by seeking to amend the complaint to add a trade secret misappropriation claim based on its review of document production, the natural progression of complex litigation or any "delays in this matter [that] were due to the [c]ourt's case load."  *Patriot Rail Corp. v. Sierra R. Co.*, No. 2:09-CV-0009-TLN-AC, 2014 WL 5426446, at *1 (E.D. Cal. Oct. 23, 2014).

For all the reasons reviewed above, the court awards 10 percent-per-annum interest starting from December 26, 2016.

E.  <u>Trade Secrets Claim</u>

Defendants contend the court should dismiss Copart's trade secret claim with prejudice. ECF No. 503 at 45. Copart agrees. ECF No. 505 at 11, 23-24 47, 51. But Copart also argues awarding attorneys' fees and costs to defendants in connection with litigating trade secret questions would be inappropriate as a general proposition and specifically under California Civil Code section 3426.4. *Id.* Defendants respond that "this issue has not been briefed and is not properly before the [c]ourt." ECF No. 503 at 45-46. Copart does not address this point in any supplemental or reply briefing. *See* ECF Nos. 516, 520.

California Civil Code section 3426.4 permits attorney's fees and costs "[i]f a claim of misappropriation is made in bad faith." But as defendants state, they "have not yet even made a demand for such fees, and there is no evidence before the [c]ourt on what, if any, costs or fees are sought." ECF No. 503 at 46. The court therefore declines to rule prematurely on a request or motion that has not been brought. *See* Fed. R. Civ. P. 54(d)(2)(A) ("A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."); *id.* (d)(2)(B)(i) ("Unless a statute or a court order provides otherwise, the motion must . . . be filed no later than 14 days after the entry of judgment . . . ."); Cal. Civ. Code § 3426.4 (no timing provided for motion for attorney's fees). As the court observed in *Indigo Grp. USA, Inc. v. Polo Ralph Lauren Corp.*, No. CV-11-5883-MWF (CWX), 2014 WL 12573380, at *3 (C.D. Cal. Mar. 17, 2014), "an award of fees under § 3426.4 is not an element of damages that must be proven at trial, but rather is a sanction that may be used in the discretion of trial courts to deter parties who have brought bad faith misappropriation claims. Hence, the claim must be brought by motion pursuant to Rule 54(d)(2)." *See FLIR Sys., Inc v. Parrish*, 174 Cal. App. 4th 1270, 1275 (2009) (citing *Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1262 (2002)).

The court also declines to rule at this time on defendants' objections to Copart's relying on P-357 (admitted at trial in a redacted format) and P-540 (not admitted at trial), to

explain Copart's "decision to add a trade secret misappropriation claim" based on Sparta's document production "in late 2015 . . . of internal documents that discussed copying materials . . . ." *See* ECF Nos. 483-1 at 2, 3 (admitted exhibits), 505 at 19-20 (Copart's brief) & 48, 509 at 2 (defendants' objections). Although Copart asserts this evidence is "objective proof of at least potential misconduct," ECF No. 505 at 48, it is premature to reach the question in any respect.

IV.    CONCLUSION

The court hereby ORDERS the following:

-   Copart's professional negligence award is capped by ISA § 18 at $9,091,568.70.

-   Copart is not entitled to restitution under unjust enrichment.

-   Although Copart is entitled to restitution under either its fraudulent prong or unfair prong UCL claim of $6,332,350.77, Copart must elect to rely on the jury award or accept UCL restitution before entry of judgment.

-   Sparta is entitled to prejudgment interest at a rate of 10 percent per annum beginning December 26, 2016.

-   Copart's trade secrets misappropriation claim is DISMISSED with prejudice.

-   The parties are ORDERED to meet and confer and submit, within fourteen (14) days of this order's date: (1) a proposed briefing and hearing schedule for post-trial motion practice; and (2) notice of whether the parties have stipulated to a stay of entry of judgment or a stay of enforcement of judgment.

IT IS SO ORDERED.

DATED:  September 10, 2018.

_____
UNITED STATES DISTRICT JUDGE

60